UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No.: 1:23-cv-22083-RUIZ/Sanchez

MICHAEL OSTERER,

          *Plaintiff*,

v.

BAM TRADING SERVICES, INC. *et al.*,

          *Defendants*.

_____/

## DECLARATION OF SHERLIN HSIE-LIEN TUNG IN SUPPORT OF DEFENDANTS' MOTION TO COMPEL ARBITRATION OR, IN THE ALTERNATIVE, TO DISMISS PLAINTIFF'S COMPLAINT <u>AND STRIKE CLASS ACTION ALLEGATIONS</u>

I, Sherlin Tung, pursuant to 28 U.S.C. § 1746(1), declare as follows:

1.      I make this declaration in support of Defendants' Motion to Compel Arbitration or, in the Alternative, to Dismiss Plaintiff's Complaint and Strike Class Action Allegations.

2.      I am a partner in the international arbitration and litigation team at Withers LLP, and I am based in the Hong Kong office.  I have been a registered foreign lawyer in Hong Kong since 2018.  Attached hereto as **Exhibit 1** is a true and correct copy of a document showing an overview of my practice, my experience, my publications, and my credentials, which is otherwise available at https://www.withersworldwide.com/en-gb/people/sherlin-tung.  I specialize in the field of international arbitration, having worked in this field since 2010.

3.      I have reviewed the Class Action Complaint, dated June 5, 2023 (ECF No. 1) as well as Binance's Terms of Use (the "Terms"). A true and correct copy of the Terms is attached hereto as **Exhibit 2**.

4.      The Terms select Hong Kong as the seat of arbitration and Hong Kong law as the governing law. (*See* Exh. 2 at X(2).)

5.      As a general matter, Hong Kong law provides that the arbitral tribunal, and not the courts, shall have the power to determine jurisdiction and arbitrability.

6.      The HKIAC Rules also delegate all questions of arbitrability to the arbitrator. Specifically, Article 19 of the HKIAC Rules state: "*19.1 The arbitral tribunal may rule on its own jurisdiction under these Rules, including any objections with respect to the existence, validity or scope of the arbitration agreement....19.4 Subject to Article 19.5, if a question arises as to ... the existence, validity or scope of the arbitration agreement ... before the constitution of the arbitral tribunal, the arbitration shall proceed and any such question shall be decided by the arbitral tribunal once constituted. 19.5 ... Any question as to the jurisdiction of the arbitral tribunal shall be decided by the arbitral tribunal once constituted, pursuant to Article 19.1.*" A true and correct copy of Article 19 of the HKIAC Rules is attached hereto as **Exhibit 3**.

7.      Moreover, the Terms state that "*any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms*[,]" is arbitrable, "*that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim*[,]" and that the "*arbitration shall be subject to the HKIAC Administered Arbitration Rules*" ("**HKAIC Rules**") (emphasis added). (*See* Exh. 2 at X(2).)

## Overview of Hong Kong Arbitration Law

8.    Arbitration in Hong Kong is governed by the Arbitration Ordinance (Cap. 609 of the Laws of Hong Kong) ("**AO**"), and the AO is based on the UNCITRAL Model Law 2006. Pursuant to section 19(1) of the AO, an arbitration agreement is defined as "*an agreement by the parties to submit to arbitration all or certain disputes which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not.*" A true and correct copy of section 19(1) of the AO is attached hereto as **Exhibit 4**.

9.    An arbitration agreement may take the form of an arbitration clause in a contract, or in the form of a separate agreement. As such, the ordinary rules of contract interpretation apply to arbitration agreements. *See B+B Construction Ltd v Sun Alliance & London Insurance Plc* [2000] 2 HKC 295 at 301B-F ("***B+B Construction***"). A true and correct copy of *B+B Construction* is attached hereto as **Exhibit 5.**

## Hong Kong Courts' Interpretation of Arbitration Agreements

10.    The Hong Kong courts are very pro-arbitration.  In this respect, and similar to courts in the United States, the courts of Hong Kong interpret arbitration clauses broadly and determine that disputes or claims "*arising out of*" or "*related to*" contracts containing arbitration agreements fall under the scope of arbitration.

11.    For example, in *Overseas Union Insurance. v. AA Mutual* [1988] 2 Lloyd's Law Reports 63 (U.K.Q.B.) ("***Overseas Union***"), the court interpreted an arbitration clause containing the terms, "*arising out of*" or "*in connection with*" as covering a wider scope of issues to fall under arbitration. *See Overseas Union*, at 67 ("[I]f the parties agree to refer disputes arising 'in relation to' or 'in connection with' their contract, a fortiori if the clause covers disputes arising 'during the execution of this contract'…or in relation to 'the work to be carried out hereunder'…, then both as

a matter of language and of authority some wider category may be intended.'").  A true and correct copy of *Overseas Union* is attached hereto as **Exhibit 6.**

12.     Further, in Mustill & Boyd: Commercial Arbitration (2nd ed.), the author writes that: "[w]*here the words 'in connection with' are used, while every contract must of course be construed in accordance with its ordinary and natural meaning (and arbitration agreements are no exception), it seems to me that they are wide in nature. They would in general cover all disputes other than one entirely unrelated to the transaction covered by the contract in question*." A true and correct copy of a portion of this text is attached hereto as **Exhibit 7**.

13.     In Hong Kong, even tort claims are subject to arbitration if they related to the arbitration agreement.  In *Xu Yi Hong (許毅紅) v Chen Ming Han (陳明翰) & Ors* [2006] HKC 633 (CFI) ("***Xu Yi Hong***"), the court stated: "[w]*hether a dispute is in connection with or arises because of a contract is a question of fact which has to be answered by examining all the circumstances of the case and is not to be determined solely on the basis whether it is a claim in contract or otherwise. Indeed, in Halsbury's Laws of Hong Kong, Vol 1(2) para 25.022, the learned authors referred to a claim in tort which has a sufficiently close connection with the contractual claim as an example of the type of dispute that may be covered by an arbitration agreement in which the parties agreed to submit all disputes in connection with the contract to arbitration*." A true and correct copy of *Xu Yi Hong* is attached hereto as **Exhibit 8**.

### Binding Non-Signatories to Arbitration Agreements Under Hong Kong Law

14.     Under Hong Kong common law, in the appropriate circumstances, non-signatories may be bound to written arbitration agreements under the theory of estoppel.  In particular, if a party attempts to rely on conditions in a contract containing an arbitration provision to make its claim, it is likely that a Hong Kong court would find that the non-signatory is bound to the arbitration provision in that contract.

15.     For example, in *Dickson Valora Group (Holdings) Co., Ltd. v. Fan Ji Qian* [2019] HKCFI 482 ("*Dickson Valora*"), the Hong Kong Court of First Instance enjoined mainland Chinese court proceedings commenced by the defendant on the ground that the dispute should be referred to arbitration. Although the defendant was not a signatory to the contract containing the arbitration clause, he nonetheless sought to enforce a contractual right under that agreement, so the court concluded he was also bound by agreement's arbitration clause. The Hong Kong Court held that since the defendant was asserting a right under the agreement with an arbitration clause, principles of equity prevented him from acting in a manner inconsistent with the arbitration clause despite not being a party to the agreement. A true and correct copy of *Dickson Valora* is attached hereto as **Exhibit 9**.

16.     Based on the reasoning of *Dickson Valora*, as well as subsequent decisions by the courts of Hong Kong, a non-signatory that attempts to assert a right under a contract is also subject to the conditions set out by that contract, which includes an agreement to arbitrate. *See AIG Insurance Hong Kong Ltd. V Lynn McCullough and Another* [2020] HKCFI 1793 ("*AIG Insurance*") (where the Court of First Instance applied reasoning from *Dickson Valora* and held similarly that a non-signatory to an arbitration clause which formed part of insurance policy was bound by that clause). A true and correct copy of *AIG Insurance* is attached hereto as **Exhibit 10**.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on July 21, 2023, in Hong Kong S.A.R.

_____
Sherlin Tung

# EXHIBIT 1

## withersworldwide

# Sherlin Tung

PARTNER | HONG KONG

 SHERLIN.TUNG@WITHERSWORLDWIDE.COM

 +852 3711 1671

SECRETARY WYNNIE POON

 WYNNIE.POON@WITHERSWORLDWIDE.COM

 +852 3711 1678



## Sherlin is a partner in the international arbitration and litigation team.

She is a specialist in cross-border disputes, international commercial arbitration, and multi-jurisdiction litigations. With over a decade of experience, Sherlin has advised clients in Asia, the Americas, and Europe on all phases and aspects of cross-border disputes (both litigation and arbitration). Sherlin also advises clients on the enforcement of international arbitral awards and/or court judgments. Sherlin has a rare set of skills given her unique background. Her career has given her the ability to be involved in all roles of a dispute. Given this experience, she is able to understand the overlaying objectives of not only of her clients but also the strategies implemented by counterparties, how arbitral tribunal members/judges think, and how arbitral institutions/courts operate.

Prior to joining Withers, Sherlin worked with a leading international law firm in Hong Kong where she was a member of the international disputes practice group. Sherlin started her international disputes career by working with a leading independent arbitrator where she acted as tribunal secretary for over 35 complex, international arbitration matters. Thereafter, Sherlin worked for the leading arbitral institution, the Secretariat of the ICC International Court of Arbitration, in both Hong Kong and New York, the latter of which she was a founding member of the case management office. During her time at the ICC, she managed over 300 international arbitration proceedings. Sherlin also worked in-house with a publicly listed international conglomerate where she handled the group's international litigation and arbitration disputes. She is currently appointed as a permanent member of the ICC International Court of Arbitration's National Committee Nominations Commission for Hong Kong. The committee is responsible for selecting candidates for proposal to act as arbitrators for ICC arbitrations. She is also appointed to be a commissioner to the ICC Belt & Road Commission for its next term.

With her distinctive background and legal experience, Sherlin has an understanding of the various players in an international transaction and dispute. This allows her to prepare not only a winning strategy for her clients, but one that is most suited to their needs.

Sherlin regularly speaks in conferences worldwide and gives lectures and trainings on international arbitration and cross-border disputes. She is prominent in the international arbitration community and sits on various international committees and boards. Sherlin is a member of the ICC Dispute Resolution Bulletin Editorial Board and the BVI International Arbitration Centre Rules Committee. She is currently on the South China International Arbitration Center (Hong Kong)'s Panel of Arbitrators. Sherlin is also the Deputy Director of the Vis East Moot Foundation, a non-profit organization that promotes international arbitration and trade law and operates the Vis East Moot Court Competition, the sister competition to the Willem C. Vis International Commercial Arbitration Moot, which is the world's largest and most renowned law student competition in the fields of international commercial arbitration and trade law.

---

# Track record

### Artificial intelligence based web marketing and technology services

Represented an artificial intelligence based web marketing and technology services company in a dispute with an Australian headquarterd artifical intelligence conglomerate over the company's investments in a Cayman Islands' based fund. The dispute was resolved before commencing any litigation or arbitration proceedings.

### Belgian funder

Represented a Belgian funder in a dispute with Chinese counterparties over a financial investment in a Cayman Islands' incorporated company that was meant to go public. All disputes to be resolved by arbitration in Hong Kong is to be administered by the Hong Kong International Arbitration Centre.

### Mainland Chinese industrial conglomerate

Represented a mainland Chinese industrial conglomerate, Zhongshan Fucheng Industrial Investment Co. Ltd., on a billion-dollar treaty claim against the Federal Republic of Nigeria under the China-Nigeria bilateral investment treaty.

### Hong Kong based family office

Representing and advising a Hong Kong based family office in commercial disputes with business partners over investments in the U.S. and Hong Kong.

### HKIAC arbitration

Representing and advising a privately held, Belgian incorporated private funds company and its subsidiaries in the U.K. and the BVI in a HKIAC arbitration involving a dispute with a P.R. Chinese privately held investment company and its Cayman Islands and BVI subsidiaries.

## New York litigation and ICC arbitration

Representing and advising a publicly held Chinese international aviation conglomerate in parallel proceedings: a New York litigation and ICC arbitration seated in New York against a publicly held U.S. technology company.

## Court litigation

Providing an expert report for an international conglomerate headquartered in Brussels in a court litigation against a customer over the breach of a sale and distribution agreement for the sale of medical products.

## HKIAC arbitration

Representing and advising a publicly listed Japanese technology company and its Hong Kong subsidiary in a HKIAC arbitration in a dispute with a publicly listed Australian investment company and its Hong Kong, Cayman Islands, and BVI subsidiaries.

## German distribution company

Advising a German distribution company in a P.R. Chinese litigation over a commercial dispute with a P.R. Chinese factory over the manufacture and distribution of FFP face masks.

## German and P.R. Chinese subsidiaries

Representing and advising German and P.R. Chinese subsidiaries of an international power module and systems conglomerate in a commercial dispute against its P.R. Chinese supplier in an ICC arbitration seated in Hong Kong with parallel proceedings in P.R. China.

## German technology company

Representing and advising a German technology company in a commercial dispute with an international conglomerate of factories based in Germany, Indonesia, Hong Kong, and P.R. China.

## Dispute with Korean investment company

Advising a UK subsidiary in a UK litigation in the hospitality sector of an international conglomerate in a dispute with a Korean investment company in a commercial dispute over the sale and purchase of retail and hospitality entities.

## Advertising & marketing firm

Representing and advising a Canadian incorporated advertising & marketing firm in a commercial dispute with a U.S. privately held company over a breach of a media contract.

### ICC arbitration

Representing and advising a P.R. Chinese international conglomerate in an ICC arbitration seated in New York, New York (U.S.A.) against a U.K. subsidiary of an American Aerospace and Defense Company.

### ICDR arbitration

Representing and advising a P.R. Chinese international conglomerate in an ICDR arbitration seated in Seattle, Washington (U.S.A.) against a U.S. subsidiary of a French international high technology group operating in the aviation, defense, and space markets.

### Taiwanese pharmaceutical company

Representing and advising a publicly listed Taiwanese pharmaceutical company in parallel ICC arbitrations against its Austrian business partner, seated in Frankfurt, Germany.

### Parallel ICC arbitration proceedings

Representing and advising a publicly listed international rubber medical and industrial conglomerate in three parallel ICC arbitration proceedings seated in Zurich, Switzerland, with its Thai joint venture partner involving a joint venture and shareholder dispute over claims of conspiracy, fraud, and unfair business practices with the joint venture company.

### Commodities litigation

Advising a publicly listed international conglomerate in various cross-border disputes involving the commodities trade resulting in litigations in Singapore, Thailand, and the U.S.A.

### Singaporean medical device company

Representing and advising a Singaporean medical device company in a commercial dispute against its Korean distributor in an SIAC arbitration seated in Singapore.

### Acting as Tribunal Secretary

Acting as Tribunal Secretary in over 35 international arbitration proceedings covering the Americas, APAC, and European regions. Sectors include commodities, complex corporate matters (joint ventures and shareholders), general commercial disputes, international contracts (including the CISG), construction, energy, medical devices, pharmaceuticals, and supply chain management.

# Talks

- *Guest Lecture for Humboldt University's International Dispute Resolution LL.M. Programme: Specific Features of Arbitration and the*

- *International Dispute Resolution Market in Hong Kong* (November 2021)

- *2021 YSIAC Annual Conference: Speed Networking* (November 2021)

- *Exclusive Interview with YSIAC Committee Member Sherlin Tung* (November 2021)

- *SIAC Academy, Inaugural training on Tribunal Secretaries in International Arbitration: Overview of Key Arbitration Documents from the Perspective of Tribunal Secretaries* (November 2021)

- *Generations in Arbitration Conference - Hong Kong Legal Week 2021 Edition: Second Bite at the Apple: Is Public Policy Really Only a Last Line of Defence?* (November 2021)

- *2021 British Virgin Islands Arbitration Week: BVI IAC Rules Change* (November 2021)

- *2021 Sao Paulo Arbitration Week: CIArb Brazil Presents Arbitrator Ethics, Challenges and Vacatur: International Experience* (October 2021)

- *2021 Hong Kong Arbitration Week: The Future of International Arbitration Following COVID* (October 2021)

- *2021 Taipei International Conference on Arbitration and Mediation: Ethics in International Arbitration* (October 2021)

- *2021 GAR Live Hong Kong: The Courts and International Arbitration - the Year in Review* (October 2021)

- *Young ArbitralWomen Practitioners Presents: Path to Partnership* (July 2021)

- *Arbitrating the Vis Case in Practice* (May 2021)

- *Guest Lecture for Hong Kong University's LL.M. in Arbitration & Dispute Resolution: Jurisdictional Challenges* (April 2021)

- *The BVI IAC presents Arbitration Life with Janette and Hana - Interview with Sherlin Tung* (April 2021)

- *Guest Lecture for Hong Kong University's LL.M. in Arbitration & Dispute Resolution: Discovery and Inspection of Documents* (March 2021)

- *The Korean Commercial Arbitration Board ("KCAB") Webinar: Aren't we Forgetting What Arbitration is For: Disputes Resolution, Not Creation?* (March 2021)

- *16th Annual ICDR Y&I Coffee House Debate: The House only has one door! The Joinder of Non-Signatories Should Only be Decided Under the Law of the Place of Arbitration* (March 2021)

- *15[^th^] Annual Generations in Arbitration Conference: Behind the Scenes - Arbitrating Pharmaceutical Disputes* (March 2021)

- *Contract Negotiations in Asia - Latin America Transactions: How and Why Negotiate Applicable Law and Dispute Resolution?* (March 2021)

- *Perks and Pitfalls of Virtual Hearings* (February 2021)

- *The Law of the Arbitration Agreement: Does Where You Stand Depend on Where You Sit?* (February 2021)

- *The 13th Swiss Chinese Law Association Global Forum: Diversity in International Legal Negotiations - Genders, Cultures, and Strategies* (January 2021)

- *Maximizing Your Options in International Cross-Border Disputes* (December 2020)

- *Joinder of Parties and Virtual Hearings: When, Why and How?* (November 2020)

- *Generations in Arbitration Conference - Hong Kong Legal Week 2020 Edition: Chasing the Asymmetries in Arbitration Clauses - to be or not to be valid?* (November 2020)

- *Swiss Chinese Law Association 12th Global Online Forum: The 'Selection' Panel - Which Institution to Choose - Regional or International?* (October 2020)

- *CISG as a Tool for Global Trade - Theory and Practice Hong Kong, Celebrating the 40th Anniversary of the CISG* (October 2020)

- *ArbitralWomen Presents: Developing Your Career During the Current Crisis: Strategies for Success* (October 2020)

- *Does Party Autonomy Trump Statutory Winding-Up Proceedings* (October 2020)

- *2020 GAR Interactive Hong Kong: GAR Live Decision Time* (October 2020)

- *The Future of Investment Arbitration in Asia: Opportunities and Challenges* (January 2020)

- *2017 Taipei International Conference on Arbitration and Mediation: More Transparency in International Arbitration: To Have or Not to Have?* (August 2017)

- *2017 GAR Live: Frankfurt - Document Production in International Arbitration* (June 2017)

- *2017 Vienna Arbitration Days: Transparency in International Commercial Arbitration* (February 2017)

- *ICC Austria: Effects of the New ICC Rules on Small Claim Procedures - Launch of the new ICC Arbitration Rules* (February 2017)

- *2016 Taipei International Conference on Arbitration and Mediation: Language in International Arbitration* (August 2016)

- *Made in China 2025 vs. Industry 4.0: The European Way of Solving Disputes Arising from International Transactions* (June 2016)

- *2016 International Bar Association Spring Meeting: Document Production in International Arbitration and Litigation* (April 2016)

- *HKIAC-VIAC Jointly Presents: One Size Fits All - A Cultural Lens on the Ideal Arbitrator* (March 2016)

- *HK45 Seminar: A Young Practitioner's Perspective on a Career in International Arbitration* (March 2016)

- *YIMC Seminar: When and How to Encourage Meditation in an Arbitration?* (March 2016)

- *Guest Lecture for the University of San Diego School of Law: The Rise of Emergency Arbitrators in International Arbitration* (February 2015)

- *Fall 2014 American Bar Association's Section on International Law Conference: The Rise of International Arbitrations between Latin America and Eastern Asia* (October 2014)

## External publications

*'Investment treaties and their role in protecting Chinese businesses abroad: A look at the Zhongshan v Nigeria award'*, Mar 2022, co-author

*'Review of Gustav Flecke-Giammarco et al. (EDS.), The DIS Arbitration Rules: An Article-By-Article Commentary'* - Contemporary Asia Arbitration Journal (Vol. 14, No. 2), Nov 2021, co-author

*'A radical reform of the PRC Arbitration Law: A summary of the key revisions'* - Withers, 23 August 2021, co-author

*"Enka v. Chubb Russia: The Law of the Arbitration Agreement - An end to the continuous battle between the law of the seat and the law of the underlying contract?"*, Contemporary Asia Arbitration Journal - May 2021, co-author

*'A new year, a new set of arbitral rules: a summary of the key changes introduced in the 2021 ICC arbitration rules'* - March 2021, co-author

*'Opening Pandora's Box: Unpacking the principles relating to the law governing the arbitration agreement across various jurisdictions'* - March 2021, co-author

*'Would Party Autonomy Trump Winding-Up Petitions? An Analysis of Hong Kong's Position'*, Contemporary Asia Arbitration Journal - Dec 2020, co-author

*'Why Hong Kong is the Ideal Place to Resolve Your Commercial Disputes'* - 16 July 2020, co-author

*'Finances in International Arbitration: Liber Amicorum Patricia Shaughnessy'* - 26 November 2019, co-editor with Fabricio Fortese and Crina Baltag

*'More Transparency in International Commercial Arbitration: To Have or Not To Have?'*, 2018 Austrian Arbitration Yearbook / Contemporary Asian Arbitration Journal Volume 10.2 - November 2017, co-authored with Brian Lin

*'The Powers and Duties of an Arbitrator: Liber Amicorum'* - June 2017, co-editor with Patricia Shaughnessy

*'Languages and Their Impact on Parties' Due Process Rights in International Arbitration Proceedings'*, Contemporary Asian Arbitration Journal Volume 10.1 - June 2017, author

## Admissions

Hong Kong (Registered Foreign Lawyer), 2018

New York, 2014

California, 2009

---

## Education

Stockholm University, LL.M. in International Commercial Arbitration, 2010

University of San Diego School of Law, J.D., 2009

University of California Los Angeles, B.A., 2005

---

## Languages

English
German
Mandarin
Spanish

---

## Memberships

ICC International Court of Arbitration's National Committee Nominations Commission for Hong Kong - Member

ICC Belt & Road Commission - Commissioner

Vis East Moot Court Foundation - Deputy Director & Board Member

Verein zur Veranstaltung und Förderung des Willem C. Vis International Commercial Arbitration Moot - Member

Moot Alumni Association - President

ICC Dispute Resolution Bulletin - Member of the Editorial Board

Singapore International Arbitration Centre ("SIAC") Users Council - Member

South China International Arbitration Center (Hong Kong) ("SCIAHK") - Panel of Arbitrators

British Virgin Islands International Arbitration Centre Rules - Committee Member

Young Singapore International Arbitration Centre ("YSIAC") - Committee Member

Young Hong Kong International Arbitration Centre ("HK45") - Regional Ambassador

ArbitralWomen - Member

---

## Key dates

Year joined: 2020
Year became partner: 2020

---

View full profile online

# EXHIBIT 2

2021/06/03, 13:21                                                 Binance Terms of Use | Binance
The Wayback Machine - https://web.archive.org/web/20210530034249/https://www.binance.com/en/terms

**Can You Chip In?**

They're trying to change history—don't let them. The Wayback Machine is a crucial resource in the fight against disinformation, and now more than ever we need your help. Right now we're preserving history as it unfolds, keeping track of who's saying what and when—all without charging for access, selling user data, or running ads. Instead, the Internet Archive (which runs this project) relies on the generosity of individuals to help us keep the record straight.

We don't ask often, but right now, we have a 2-to-1 Matching Gift Campaign, tripling the impact of every donation. If each of our users gave just $10, we could end this fundraiser today—so if you find all these bits



# Binance Terms of Use

**Last revised: 30 March, 2021**

These Binance Terms of Use is entered into between you (hereinafter referred to as "you" or "your") and Binance operators (as defined below). By accessing, downloading, using or clicking on "I agree" to accept any Binance Services (as defined below) provided by Binance (as defined below), you agree that you have read, understood and accepted all of the terms and conditions stipulated in these Terms of Use (hereinafter referred to as "these Terms") as well as our Privacy Policy at https://www.binance.com/en/privacy. In addition, when using some features of the Services, you may be subject to specific additional terms and conditions applicable to those features.

Please read the terms carefully as they govern your use of Binance Services.**THESE TERMS CONTAIN IMPORTANT PROVISIONS INCLUDING AN ARBITRATION PROVISION THAT REQUIRES ALL CLAIMS TO BE RESOLVED BY WAY OF LEGALLY BINDING ARBITRATION.** The terms of the arbitration provision are set forth in Article 10, "Resolving Disputes: Forum, Arbitration, Class Action Waiver", hereunder. As with any asset, the values of Digital Currencies (as defined below) may fluctuate significantly and there is a substantial risk of economic losses when purchasing, selling, holding or investing in Digital Currencies and their derivatives.**BY MAKING USE OF BINANCE SERVICES, YOU ACKNOWLEDGE AND AGREE THAT: (1) YOU ARE AWARE OF THE RISKS ASSOCIATED WITH TRANSACTIONS OF DIGITAL CURRENCIES AND THEIR DERIVATIVES; (2) YOU SHALL ASSUME ALL RISKS RELATED TO THE USE OF BINANCE SERVICES AND TRANSACTIONS OF DIGITAL CURRENCIES AND THEIR DERIVATIVES; AND (3) BINANCE SHALL NOT BE LIABLE FOR ANY SUCH RISKS OR ADVERSE OUTCOMES.**

By accessing, using or attempting to use Binance Services in any capacity, you acknowledge that you accept and agree to be bound by these Terms. If you do not agree, do not access Binance or utilize Binance services.

## I. Definitions

**1. Binance** refers to an ecosystem comprising Binance websites (whose domain names include but are not limited to  https://web.archive.org/web/20210530034249/https://www.binance.com), mobile applications, clients, applets and other applications that are developed to offer Binance Services, and includes independently-operated platforms, websites and clients within the ecosystem (e.g. Binance's Open Platform, Binance Launchpad, Binance Labs, Binance Charity, Binance DEX, Binance X, JEX, Trust Wallet, and fiat gateways). In case of any inconsistency between relevant terms of use of the above platforms and the contents of these Terms, the respective applicable terms of such platforms shall prevail.

**2. Binance Operators** refer to all parties that run Binance, including but not limited to legal persons, unincorporated organizations and teams that provide Binance Services and are responsible for such services. For convenience, unless otherwise stated, references to "Binance" and "we" in these Terms specifically mean Binance Operators.UNDER THESE TERMS, BINANCE OPERATORS MAY CHANGE AS BINANCE'S BUSINESS ADJUSTS, IN WHICH CASE, THE CHANGED OPERATORS SHALL PERFORM THEIR OBLIGATIONS UNDER THESE TERMS WITH YOU AND PROVIDE SERVICES TO YOU, AND SUCH CHANGE DOES NOT AFFECT YOUR RIGHTS AND INTERESTS UNDER THESE TERMS. ADDITIONALLY, THE SCOPE OF BINANCE OPERATORS MAY BE EXPANDED DUE TO THE PROVISION OF NEW BINANCE SERVICES, IN WHICH CASE, IF YOU CONTINUE TO USE BINANCE SERVICES, IT IS DEEMED THAT YOU HAVE AGREED TO JOINTLY EXECUTE THESE TERMS WITH THE NEWLY ADDED BINANCE OPERATORS. IN CASE OF A DISPUTE, YOU SHALL DETERMINE THE ENTITIES BY WHICH THESE TERMS ARE PERFORMED WITH YOU AND THE COUNTERPARTIES OF THE DISPUTE, DEPENDING ON THE SPECIFIC SERVICES YOU USE AND THE PARTICULAR ACTIONS THAT AFFECT YOUR RIGHTS OR INTERESTS.

**3. Binance Services** refer to various services provided to you by Binance that are based on Internet and/or blockchain technologies and offered via Binance websites, mobile applications, clients and other forms (including new ones enabled by future technological development). Binance Services include but are not limited to such Binance ecosystem components as Digital Asset Trading Platforms, the financing sector, Binance Labs, Binance Academy, Binance Charity, Binance Info, Binance Launchpad, Binance Research, Binance Chain, Binance X, Binance Fiat Gateway, existing services offered by Trust Wallet and novel services to be provided by Binance.

**4. Binance Platform Rules** refer to all rules, interpretations, announcements, statements, letters of consent and other contents that have been and will be subsequently released by Binance, as well as all regulations, implementation rules, product process descriptions, and announcements published in the Help Center or within products or service processes.

**5. Users** refer to all individuals, institutions or organizations that access, download or use Binance or Binance Services and who meet the criteria and conditions stipulated by Binance. If there exist other agreements for such entities as developers, distributors, market makers, and Digital Currencies exchanges, such agreements shall be followed.

**6. Digital Currencies** refer to encrypted or digital tokens or cryptocurrencies with a certain value that are based on blockchain and cryptography technologies and are issued and managed in a decentralized form.

**7. Digital Assets** refer to Digital Currencies, their derivatives or other types of digitalized assets with a certain value.

**8. Binance Accounts** refer to the foundational virtual accounts, including main accounts and subaccounts, which are opened by Binance for Users to record on Binance their usage of Binance Services, transactions, asset changes and basic information. Binance Accounts serve as the basis for Users to enjoy and exercise their rights on Binance.

**9. Crypto-to-crypto Trading** refers to spot transactions in which one digital currency is exchanged for another digital currency.

**10. Fiat Trading** refers to spot transactions in which Digital Currencies are exchanged for fiat currencies or vice versa.

**11. Collateral Accounts** refer to special accounts opened by Users on Binance to deposit and withdraw collateral (such as margins) in accordance with these Terms (including the Binance Contract Services Agreement and Binance Platform Rules), as required for contract transactions, leveraged trading and/or currency borrowing services.

**12. Loan/Lending** refers to Binance's lending of Digital Currencies to Users at an interest collected in certain ways (in the form of Digital Currencies), including but not limited to the leveraged trading and currency lending services currently offered, and other forms of loan/lending services to be launched by Binance.

## II. General Provisions

### 1. About These Terms

#### a. Contractual Relationship

These Terms constitute a legal agreement and create a binding contract between you and Binance Operators.

#### b. Supplementary Terms

Due to the rapid development of Digital Currencies and Binance, these Terms between you and Binance Operators do not enumerate or cover all rights and obligations of each party, and do not

guarantee full alignment with needs arising from future development. Therefore, **THE PRIVACY POLICY** ([https://web.archive.org/web/20210530034249/https://www.binance.com/en/privacy](https://web.archive.org/web/20210530034249/https://www.binance.com/en/privacy)), **BINANCE PLATFORM RULES, AND ALL OTHER AGREEMENTS ENTERED INTO SEPARATELY BETWEEN YOU AND BINANCE ARE DEEMED SUPPLEMENTARY TERMS THAT ARE AN INTEGRAL PART OF THESE TERMS AND SHALL HAVE THE SAME LEGAL EFFECT. YOUR USE OF BINANCE SERVICES IS DEEMED YOUR ACCEPTANCE OF THE ABOVE SUPPLEMENTARY TERMS.**

### c. Changes to These Terms

Binance reserves the right to change or modify these Terms in its discretion at any time. Binance will notify such changes by updating the terms on its website ([https://web.archive.org/web/20210530034249/https://www.binance.com/en/terms](https://web.archive.org/web/20210530034249/https://www.binance.com/en/terms)) and modifying the [Last revised] date displayed on this page. **ANY AND ALL MODIFICATIONS OR CHANGES TO THESE TERMS WILL BECOME EFFECTIVE UPON PUBLICATION ON THE WEBSITE OR RELEASE TO USERS. THEREFORE, YOUR CONTINUED USE OF BINANCE SERVICES IS DEEMED YOUR ACCEPTANCE OF THE MODIFIED AGREEMENT AND RULES. IF YOU DO NOT AGREE TO ANY CHANGES TO THESE TERMS, YOU MUST STOP USING BINANCE SERVICES IMMEDIATELY. YOU ARE RECOMMENDED TO FREQUENTLY REVIEW THESE TERMS TO ENSURE YOUR UNDERSTANDING OF THE TERMS AND CONDITIONS THAT APPLY TO YOUR ACCESS TO AND USE OF BINANCE SERVICES.**

### d. Prohibition of Use

**BY ACCESSING AND USING BINANCE SERVICES, YOU REPRESENT AND WARRANT THAT YOU HAVE NOT BEEN INCLUDED IN ANY TRADE EMBARGOES OR ECONOMIC SANCTIONS LIST (SUCH AS THE UNITED NATIONS SECURITY COUNCIL SANCTIONS LIST), THE LIST OF SPECIALLY DESIGNATED NATIONALS MAINTAINED BY OFAC (THE OFFICE OF FOREIGN ASSETS CONTROL OF THE U.S. DEPARTMENT OF THE TREASURY), OR THE DENIED PERSONS OR ENTITY LIST OF THE U.S. DEPARTMENT OF COMMERCE. BINANCE RESERVES THE RIGHT TO CHOOSE MARKETS AND JURISDICTIONS TO CONDUCT BUSINESS, AND MAY RESTRICT OR REFUSE, IN ITS DISCRETION, THE PROVISION OF BINANCE SERVICES IN CERTAIN COUNTRIES OR REGIONS.**

## 2. About Binance

As an important part of the Binance Ecosystem, Binance mainly serves as a global online platform for Digital Assets trading, and provides Users with a trading platform, financing services, technical services and other Digital Assets-related services. As further detailed in Article 3 below, Users must register and open an account with Binance, and deposit Digital Assets into their account prior to trading. Users may, subject to the restrictions set forth in these Terms, apply for the withdrawal of Digital Assets.

Although Binance has been committed to maintaining the accuracy of the information provided through Binance Services, Binance cannot and does not guarantee its accuracy, applicability, reliability, integrity, performance or appropriateness, nor shall Binance be liable for any loss or damage that may be caused directly or indirectly by your use of these contents. The information about

Binance Services may change without notice, and the main purpose of providing such information is to help Users make independent decisions. Binance does not provide investment or consulting advice of any kind, and is not responsible for the use or interpretation of information on Binance or any other communication medium. All Users of Binance Services must understand the risks involved in Digital Assets trading, and are recommended to exercise prudence and trade responsibly within their own capabilities.

## 3. Binance Account Registration and Requirements

### a. Registration

All Users must apply for a Binance Account at ([https://accounts.binance.com/en/register](https://accounts.binance.com/en/register)) before using Binance Services. When you register a Binance Account, you must provide your real name, email address and password, and accept these Terms, the Privacy Policy, and other Binance Platform Rules. Binance may refuse, in its discretion, to open a Binance Account for you. You agree to provide complete and accurate information when opening a Binance Account, and agree to timely update any information you provide to Binance to maintain the integrity and accuracy of the information. Only one User can be registered at a time, but each individual User (including any User that is a business or legal entity) may maintain only one main account at any given time. Institutional Users (including Users that are businesses and other legal entities) can open one or more subaccounts under the main account with the consent of Binance. For certain Binance Services, you may be required to set up a special account independent from your Binance Account, based on the provisions of these Terms or the Supplementary Terms. The registration, use, protection and management of such trading accounts are equally governed by the provisions of this article and article 6, unless otherwise stated in these Terms or the Supplementary Terms.

### b. Eligibility

By registering to use a Binance Account, you represent and warrant that (i) as an individual, you are at least 18 or are of legal age to form a binding contract under applicable laws; (ii) as an individual, legal person, or other organization, you have full legal capacity and sufficient authorizations to enter into these Terms; (iii) you have not been previously suspended or removed from using Binance Services; (iv) you do not currently have a Binance Account; (v) you are a non-U.S User, unless you only log on to websites for U.S. Users and use Binance Services for U.S. Users. If you act as an employee or agent of a legal entity, and enter into these Terms on their behalf, you represent and warrant that you have all the necessary rights and authorizations to bind such legal entity; (vi) your use of Binance Services will not violate any and all laws and regulations applicable to you, including but not limited to regulations on anti-money laundering, anti-corruption, and counter-terrorist financing.

### c. User Identity Verification

Your registration of an account with Binance will be deemed your agreement to provide required personal information for identity verification. Such information will be used to verify Users' identity,

identify traces of money laundering, terrorist financing, fraud and other financial crimes through Binance, or for other lawful purposes stated by Binance. We will collect, use and share such

information in accordance with our Privacy Policy. In addition to providing such information, you agree to allow us to keep a record of that information during the period for which your account is active and within five (5) years after your account is closed, in compliance with global industry standards on data storage. You also authorize us to conduct necessary investigations directly or through a third party to verify your identity or protect you and/or us from financial crimes, such as fraud. The information we require to verify your identity may include, but is not limited to, your name, email address, contact information, phone number, username, government-issued ID, date of birth, and other information collected during account registration. When providing the required information, you confirm it is true and accurate.AFTER REGISTRATION, YOU MUST ENSURE THAT THE INFORMATION IS TRUE, COMPLETE, AND TIMELY UPDATED WHEN CHANGED. IF THERE ARE ANY GROUNDS FOR BELIEVING THAT ANY OF THE INFORMATION YOU PROVIDED IS INCORRECT, FALSE, OUTDATED OR INCOMPLETE, BINANCE RESERVES THE RIGHT TO SEND YOU A NOTICE TO DEMAND CORRECTION, DIRECTLY DELETE THE RELEVANT INFORMATION, AND, AS THE CASE MAY BE, TERMINATE ALL OR PART OF BINANCE SERVICES WE PROVIDE FOR YOU. IF WE ARE UNABLE TO REACH YOU WITH THE CONTACT INFORMATION YOU PROVIDED, YOU SHALL BE FULLY LIABLE FOR ANY LOSS OR EXPENSE CAUSED TO BINANCE DURING YOUR USE OF BINANCE SERVICES. YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE THE OBLIGATION TO UPDATE ALL THE INFORMATION IF THERE IS ANY CHANGE.

BY REGISTERING AN ACCOUNT, YOU HEREBY AUTHORIZE BINANCE TO CONDUCT INVESTIGATIONS THAT BINANCE CONSIDERS NECESSARY, EITHER DIRECTLY OR THROUGH A THIRD PARTY, TO VERIFY YOUR IDENTITY OR PROTECT YOU, OTHER USERS AND/OR BINANCE FROM FRAUD OR OTHER FINANCIAL CRIMES, AND TO TAKE NECESSARY ACTIONS BASED ON THE RESULTS OF SUCH INVESTIGATIONS. YOU ALSO ACKNOWLEDGE AND AGREE THAT YOUR PERSONAL INFORMATION MAY BE DISCLOSED TO CREDIT BUREAUS AND AGENCIES FOR FRAUD PREVENTION OR FINANCIAL CRIME PREVENTION, WHICH MAY RESPOND TO OUR INVESTIGATIONS IN FULL.


### d. Account Usage Requirements

The Binance Account can only be used by the account registrant. Binance reserves the right to suspend, freeze or cancel the use of Binance Accounts by persons other than account registrant. If you suspect or become aware of any unauthorized use of your username and password, you should notify Binance immediately. Binance assumes no liability for any loss or damage arising from the use of Binance Account by you or any third party with or without your authorization.


### e. Account Security

Binance has been committed to maintaining the security of User entrusted funds, and has implemented industry standard protection for Binance Services. However, the actions of individual Users may pose risks. You shall agree to treat your access credentials (such as username and password) as confidential information, and not to disclose such information to any third party. You also agree to be solely responsible for taking the necessary security measures to protect your Binance

Account and personal information.

You should be solely responsible for keeping safe of your Binance Account and password, and be

responsible for all the transactions under your Binance Account. Binance assumes no liability for any loss or consequences caused by authorized or unauthorized use of your account credentials, including but not limited to information disclosure, information release, consent or submission of various rules and agreements by clicking on the website, online agreement renewal, etc.

By creating a Binance Account, you hereby agree that:

    i. you will notify Binance immediately if you are aware of any unauthorized use of your Binance Account and password or any other violation of security rules;

    ii. you will strictly abide by all mechanisms or procedures of Binance regarding security, authentication, trading, charging, and withdrawal; and

    iii. you will take appropriate steps to logout from Binance at the end of each visit.

## f. Personal Data

Your personal data will be properly protected and kept confidential, but Binance has the right to collect, process, use or disclose your personal data in accordance with the Terms (including the Privacy Policy) or applicable laws. Depending on the products or services concerned, your personal data may be disclosed to the following third parties:

    i. your transaction counterparty;

    ii. Binance Operators, and the shareholders, partners, investors, directors, supervisors, senior managers and employees of such entities;

    iii. our joint ventures, alliance partners and business partners;

    iv. our agents, contractors, suppliers, third-party service providers and professional advisers, including the parties who have been contracted to provide us with administrative, financial, research, operations, IT and other services, in such areas as telecommunications, information technology, payroll, information processing, training, market research, storage and archival;

    v. third-party business partners who provide goods and services or sponsor contests or other promotional activities, whether or not in cooperation with us;

    vi. insurance companies or insurance investigators and credit providers;

    vii. credit bureaus, or any debt collection agencies or dispute resolution centers in the event of violation or dispute;

    viii. business partners, investors, trustees or assignees (actual or expected) that promote business asset transactions (which can be broadened to include any merger, acquisition or asset sale) of Binance Operators;

    ix. professional consultants such as auditors and lawyers;

    x. relevant government regulatory agencies or law enforcement agencies to comply with laws or regulations formulated by government authorities;

regulations formulated by government authorities;

    xi. assignees of our rights and obligations;

    xii. banks, credit card companies and their respective service providers;

   xiii. persons with your consent as determined by you or the applicable contract.

## III. Binance Services

Upon completion of the registration and identity verification for your Binance Account, you may use various Binance Services, including but not limited to, Crypto-to-crypto Trading, Fiat Trading, contract trading, leveraged trading, Binance Savings services, staking, acquiring market-related data, research and other information released by Binance, participating in User activities held by Binance, etc., in accordance with the provisions of these Terms (including Binance Platform Rules and other individual agreements). Binance has the right to:

- Provide, modify or terminate, in its discretion, any Binance Services based on its development plan; and

- Allow or prohibit some Users' use of any Binance Services in accordance with relevant Binance Platform Rules.

## 1. Service Usage Guidelines

### a. License

Provided that you constantly comply with the express terms and conditions stated in these Terms, Binance grants you a revocable, limited, royalty-free, non-exclusive, non-transferable, and non-sublicensable license to access and use Binance Services through your computer or Internet compatible devices for your personal/internal purposes. You are prohibited to use Binance Services for resale or commercial purposes, including transactions on behalf of other persons or entities. All the above actions are expressly prohibited and constitute a material violation of these Terms. The content layout, format, function and access rights regarding Binance Services should be stipulated in the discretion of Binance. Binance reserves all rights not expressly granted in these Terms. Therefore, you are hereby prohibited from using Binance Services in any way not expressly authorized by these Terms.

These Terms only grant a limited license to access and use Binance Services. Therefore, you hereby agree that when you use Binance Services, Binance does not transfer Binance Services or the ownership or intellectual property rights of any Binance intellectual property to you or anyone else. All the text, graphics, user interfaces, visual interface, photos, sounds, process flow diagrams, computer code (including html code), programs, software, products, information and documents, as well as the design, structure, selection, coordination, expression, look and feel, and layout of any content included in the services or provided through Binance Services, are exclusively owned, controlled and/or licensed by Binance Operators or its members, parent companies, licensors or affiliates. Binance owns any feedback, suggestions, ideas, or other information or materials (hereinafter collectively referred to as "Feedback") about Binance or Binance Services that you provide through

email, Binance Services, or other ways. You hereby transfer all rights, ownership and interests of the Feedback and all related intellectual property rights to Binance. You have no right and hereby waive

any request for acknowledgment or compensation based on any Feedback, or any modifications based on any Feedback.

## b. Restrictions

When you use Binance Services, you agree and undertake to comply with the following provisions:

   i. During the use of Binance Services, all activities you carry out should comply with the requirements of applicable laws and regulations, these Terms, and various guidelines of Binance;

   ii. Your use of Binance Services should not violate public interests, public morals, or the legitimate interests of others, including any actions that would interfere with, disrupt, negatively affect, or prohibit other Users from using Binance Services;

   iii. You agree not to use the services for market manipulation (such as pump and dump schemes, wash trading, self-trading, front running, quote stuffing, and spoofing or layering, regardless of whether prohibited by law);

   iv. Without written consent from Binance, the following commercial uses of Binance data are prohibited:
   1) Trading services that make use of Binance quotes or market bulletin board information.
   2) Data feeding or streaming services that make use of any market data of Binance.
   3) Any other websites/apps/services that charge for or otherwise profit from (including through advertising or referral fees) market data obtained from Binance.

   v. Without prior written consent from Binance, you may not modify, replicate, duplicate, copy, download, store, further transmit, disseminate, transfer, disassemble, broadcast, publish, remove or alter any copyright statement or label, or license, sub-license, sell, mirror, design, rent, lease, private label, grant security interests in the properties or any part of the properties, or create their derivative works or otherwise take advantage of any part of the properties.

   vi. You may not (i) use any deep linking, web crawlers, bots, spiders or other automatic devices, programs, scripts, algorithms or methods, or any similar or equivalent manual processes to access, obtain, copy or monitor any part of the properties, or replicate or bypass the navigational structure or presentation of Binance Services in any way, in order to obtain or attempt to obtain any materials, documents or information in any manner not purposely provided through Binance Services; (ii) attempt to access any part or function of the properties without authorization, or connect to Binance Services or any Binance servers or any other systems or networks of any Binance Services provided through the services by hacking, password mining or any other unlawful or prohibited means; (iii) probe, scan or test the vulnerabilities of Binance Services or any network connected to the properties, or violate any security or authentication measures on Binance Services or any network connected to Binance Services; (iv) reverse look-up, track or seek to track any information of any other Users or visitors of Binance Services; (v) take any actions that imposes an unreasonable or

visitors of Binance Services, (v) take any actions that imposes an unreasonable or disproportionately large load on the infrastructure of systems or networks of Binance Services or Binance, or the infrastructure of any systems or networks connected to Binance services; (vi) use any devices, software or routine programs to interfere with the normal operation of Binance Services or any transactions on Binance Services, or any other person's use of Binance Services; (vii) forge headers, impersonate, or otherwise manipulate identification, to disguise your identity or the origin of any messages or transmissions you send to Binance, or (viii) use Binance Services in an illegal way.

By accessing Binance Services, you agree that Binance has the right to investigate any violation of these Terms, unilaterally determine whether you have violated these Terms, and take actions under relevant regulations without your consent or prior notice. Examples of such actions include, but are not limited to:

- Blocking and closing order requests;

- Freezing your account;

- Reporting the incident to the authorities;

- Publishing the alleged violations and actions that have been taken;

- Deleting any information you published that are found to be violations.

## 2. Crypto-to-crypto Trading

Upon completion of the registration and identity verification for your Binance Account, you may conduct Crypto-to-crypto Trading on Binance in accordance with the provisions of these Terms and Binance Platform Rules.

### a. Orders

Upon sending an instruction of using Binance Services for Crypto-to-crypto Trading (an "Order"), your account will be immediately updated to reflect the open Orders, and your Orders will be included in Binance's order book to match other users' Orders. If one of your Orders fully or partially matches another user's Order, Binance will execute an exchange (a "Transaction"). Once the Transaction is executed, your account will be updated to reflect that the Order has been fully executed and closed, or the Order has been partially executed. The Order will remain uncompleted until it is fully executed or cancelled under paragraph (b) below. To conclude a Transaction, you authorize Binance to temporarily control the Digital Currencies involved in your Transaction.

### b. Cancellation

For Orders initiated through Binance Services, you may only cancel them before they have been matched with other Users' Orders. Once your Order has been matched with another user's Order, you may not change, revoke or cancel Binance's authorization to complete the Order. For any partially matched Order, you may cancel the unmatched part of the Order unless such portion has been matched. Binance reserves the right to reject any cancellation request related to the Order you have

2021/5/30, 1:59  Binance terms of Use | Binance
Case 1:23-cv-22083-RAR   Document 34-2   Entered on FLSD Docket 07/21/2023   Page 26 of
186

matched. Binance reserves the right to reject any cancellation request related to the Order you have submitted. If your account does not have sufficient amount of Digital Currencies to execute an Order, Binance may cancel the entire Order, or execute part of the Order with the amount of Digital Currencies you have in your account (in each case, any Transaction related fees payable to Binance are deducted as stated in paragraph (c) below).

### c. Fees

You agree to pay Binance the fees specified in
https://web.archive.org/web/20210530034249/https://www.binance.com/en/fee/schedule. Binance may, in its discretion, update the fees at any time. Any updated fees will apply to any sales or other Transactions that occur following the effective date of the updated fees. You authorize Binance to deduct from your account any applicable fees that you owe under these Terms.

### d. Other Types of Crypto-to-crypto Trading

In addition to the Crypto-to-crypto Trading that allows users to directly place orders as mentioned in paragraph (a) above, Binance may, in its discretion, provide technical and platform services for other types of Crypto-to-crypto Trading under its separately formulated Binance Platform Rules, such as One Cancels the Other (OCO) and block trade.

## 3. Fiat Trading

Prior to conducting Fiat Trading, in accordance with type of fiat trading, you shall separately read and sign User Agreements with various Binance partnered OTC platforms, and comply with the Legal Statement, Privacy Policy，P2P User Transaction Policy（/en/support/faq/360041066751） and other specific Binance Platform Rules related to Fiat Trading as well as the business rules of such partners, and open an account on such Binance OTC platforms, following the completion of the registration and identity verification for your Binance Account, if applicable.
a. Fiat Payments
In order to provide adequate operational support for you in respect of refunds and cancelations (where applicable), the following Binance Operators shall be responsible for transactions as below:
- in respect of transactions available (Bank Card, GBP deposit/withdraw), BINANCE UAB (registration number: 305595206) and having its registered office at Didžioji g. 18, Vilnius, Lithuania
- BINANCE DIGITAL LIMITED (registration number: 12340481) having its registered office at Hub 26 Hunsworth Lane, Cleckheaton, England, BD19 4LN will only be responsible for receiving/transferring GBP on behalf of Binance UAB and will not be responsible for providing any Digital Assets exchange or custody services to you.

## 4. Futures Trading

Unless otherwise specified by Binance, to conduct Futures Trading, you must conclude with Binance a separate Binance Futures Service Agreement ( /en/support/faq/360033180732) and open a special Collateral Account, following the completion of registration and identity verification for your Binance

Account. You acknowledge and agree that:

a. You fully understand the high risks of Futures Trading, including but not limited to the risk of major fluctuations of Digital Assets in Futures Trading, and the risk of exacerbated adverse outcome when leverage is used;

b. You have sufficient investment knowledge and experience and the capacity to take risks arising from Futures Trading, and agree to independently assume all the risks arising from the investment of Futures Trading;

c. Before performing Futures Trading, you have read and understood all the contents of the Binance Futures Service Agreement and the relevant Binance Platform Rules, and have consulted relevant professionals to make informed decisions on whether and how to complete Futures Trading according to their recommendations and your own reasonable judgment;

d. You agree and authorize Binance to take various reasonable measures in its discretion (including but not limited to forced liquidation and forced position reduction under specific circumstances) in accordance with the Binance Futures Service Agreement and the relevant Binance Platform Rules to protect the legitimate interests of you, Binance and other Users.

## 5. Margins Trading

Unless otherwise specified by Binance, prior to conducting Margins Trading, you must open a special Collateral Account and/or complete other related procedures, following the completion of registration and identity verification for your Binance Account.

### a. Risks of Margins Trading

Margins Trading is highly risky. As a leveraged trader, you acknowledge and agree that you access and use Margins Trading and borrowing services at your own risk, which include but are not limited to:

   i. The liquidity, market depth and dynamics of the trading market fluctuate violently and change rapidly. The use of leverage may work to your advantage or disadvantage, which may result in major gains or losses as the case may be.

   ii. You are not eligible to receive forked currencies split from any blockchain assets in your Collateral Account, even if you have not engaged in any Margins Trading or borrowing at all.

   iii. Loans carry risk, and the value of your blockchain assets may decline. If the value of your assets drops to a certain level, you are responsible for dealing with these market circumstances.

   iv. In some market situations, you may find it difficult or impossible to liquidate a position. This may occur, for example, as a result of insufficient market liquidity or technical issues on Binance.

   v. Placing contingent Orders does not necessarily limit your losses to the expected amount, as market conditions may prevent you from executing such orders.

market conditions may prevent you from executing such orders.

vi. Margins Trading does not have guaranteed measures against losses. As a borrower, you may suffer losses that exceed the amount you deposited into your Collateral Account.

**b. To start Margins Trading:**

  i. You represent and warrant that you are neither from the U.S. nor on any list of trade embargoes or economic sanctions, such as the Specially Designated National by OFAC (The Office of Foreign Assets Control of the U.S. Department of the Treasury).

  ii. You should fully understand the risks associated with Margins Trading and Lending, and be fully responsible for any trading and non-trading activities under your Binance Account and Collateral Account. You should not engage in Transactions or invest in funds that are beyond your financial capacities;

  iii. You are fully responsible for knowing the true status of any position, even if Binance may present it incorrectly at any time;

  iv. You agree to keep enough Digital Assets in your Collateral Account, as required by Binance for Users' engagement in Margins Trading, and promptly repay your loan in full. Failure to keep enough assets or to timely repay the outstanding loan may result in forced liquidation of the assets in your Collateral Account;

  v. Even if with the ability to forcefully liquidate any position, Binance cannot guarantee to stop losses. If your assets are insufficient to repay the outstanding loan after the liquidation of your position, you are still liable for any further shortfall of assets;

  vi. Binance may take measures, in its discretion and on your behalf, to reduce your potential losses, including but not limited to, transferring assets from your Collateral Account into your Binance Account and/or vice versa;

  vii. During Binance system maintenance, you agree to be fully responsible for managing your Collateral Account under risks, including but not limited to, closing positions and repaying your loan.

  viii. You agree to conduct all Transactions, Margins Trading and/or borrowing on your own, and be fully responsible for your activities. Binance assumes no liability for any loss or damage caused by your use of any Binance services or your unawareness of the risks associated with the use of Digital Assets or with your use of Binance Services.

## 6. Lending Services

Unless otherwise provided by Binance, to borrow currencies, you must conclude with Binance a separate Lending Services User Agreement and open a special Collateral Account and/or finish other relevant procedures, following the completion of registration and identity verification for your Binance Account. You understand and agree that:

a. There are considerable risks involved in Lending Services, which include without limitation to risks of fluctuation of the borrowed Digital Assets' value, derivative risks and technical risks. You shall carefully consider and exercise clear judgment to evaluate your financial situation and the aforesaid risks to make any decision on using Lending Services, and you shall be responsible for all losses arising therefrom;

b. you shall cooperate to provide the information and materials related to identity verification and Lending Services as required by Binance, and be solely responsible for taking necessary security measures to protect the security of your Collateral Account and personal information;

c. you shall carefully read relevant Binance Platform Rules before using Lending Services, and be aware of, understand and observe the specific information and rules regarding the operations of Lending Services, and you undertake that the use of the assets borrowed shall conform to requirements of these Terms and related laws and regulations;

d. Binance has the full right to manage your Collateral Account and collateral during the period in which Lending Services are offered, and reserves the right, under the circumstances specified in the Lending Services User Agreement or these Terms, to implement various risk control measures, which include but are not limited to forced liquidation. Such steps may cause major losses to you and you shall be solely responsible for the outcomes of such measures;

e. Binance has the right to temporarily or permanently prohibit you from using Lending Services when it deems it necessary or reasonable, and to the maximum extent permitted by law, without liability of any kind to you.

## 7. Binance Savings Service

Binance offers Binance Savings, a service to provide Users with value-added services for their idle Digital Assets. To use Binance Savings service, you must conclude with Binance a separate Binance Savings Service User Agreement (/en/support/faq/360032559032) and open a special Binance Savings service account, following the completion of registration and identity verification for your Binance Account. When using Binance Savings service, you should note that:

a. Binance Savings assets will be used in cryptocurrency leveraged borrowing and other businesses.

b. When you use Binance Savings service, you will unconditionally authorize Binance to distribute and grant the leveraged interest according to Binance Platform Rules.

c. You shall abide by relevant laws and regulations to ensure that the sources of Digital Assets are legitimate and compliant when using Binance Savings service.

d. When you use Binance Savings service, you should fully recognize the risks of investing in Digital Assets and operate cautiously.

e. You agree that all investment operations conducted on Binance represent your true investment intentions and that unconditionally accept the potential risks and benefits of your investment decisions.

f. Binance reserves the right to suspend or terminate Binance Savings service. If necessary, Binance can suspend and terminate Binance Savings service at any time.

g. Due to network delay, computer system failures and other force majeure, which may lead to delay, suspension, termination or deviation of execution of Binance Savings service, Binance will use reasonable effort to ensure but not promise that Binance Savings service execution system runs stably and effectively. Binance does not take any responsibility if the final execution fails to match your expectations due to the above factors.

## 8. Staking Programs

Binance will from time to time launch Staking Programs for specific types of Digital Currencies to reward, as per certain rules, users who hold such Digital Currencies in their Binance Accounts. When participating in Staking Programs, you should note that:

a. Unless otherwise stipulated by Binance, Staking Programs are free of charge and Users may trade during the staking period;

b. Binance does not guarantee Users' proceeds under any Staking Program;

c. Binance has the right to initiate or terminate Staking Program for any Digital Currencies or modify rules on such programs in its sole discretion;

d. Users shall ensure that sources of the Digital Currencies they hold in Binance Accounts are legal and compliant and undertake to observe related laws and regulations. Otherwise, Binance has the right to take necessary steps in accordance with these Terms or Binance Platform Rules, including, without limitation, freezing Binance Accounts or deducting the Digital Currencies awarded to Users who violate the rules of respective Staking Programs.

## 9. Binance POS Service Agreement

a. Binance.com launched Binance POS service for Binance.com users to gain proceeds through idle cryptocurrency assets.

b. Binance POS assets will be used in cryptocurrency staking to gain proceeds and other businesses.

c. When you use Binance POS service, you will unconditionally authorize Binance.com to distribute the

2021/5/30下午3:52                                           條款 | Binance

staking interest according to the rules of the platform.

d. You shall abide by the relevant laws of the State to ensure that the sources of assets are legitimate and compliant when using Binance POS service.

e. When you use Binance POS service, you should fully recognize the risks of investment in cryptocurrency and operate cautiously.

f. You agree that all investment operations conducted on Binance.com represent your true investment intentions and that unconditionally accept the potential risks and benefits of your investment decisions.

g. Binance.com reserves the right to suspend or terminate Binance POS service. If necessary, Binance.com can suspend and terminate Binance POS service at any time.

h. Due to network delay, computer system failures and other force majeure, which may lead to delay, suspension or deviation of Binance POS service execution, Binance.com will use commercially reasonable effort to ensure but not promise that Binance POS service execution system run stably and effectively. Binance.com does not take any responsibility if the final execution doesn't match your expectations due to the above factors.

## IV. Liabilitys

## 1. Disclaimer of Warranties

TO THE MAXIMUM EXTENT PERMITTED UNDER APPLICABLE LAW, BINANCE SERVICES, BINANCE MATERIALS AND ANY PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE ARE OFFERED ON AN "AS IS" AND "AS AVAILABLE" BASIS, AND BINANCE EXPRESSLY DISCLAIMS, AND YOU WAIVE, ANY AND ALL OTHER WARRANTIES OF ANY KIND, WHETHER EXPRESS OR IMPLIED, INCLUDING, WITHOUT LIMITATION, WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE, TITLE OR NON-INFRINGEMENT OR WARRANTIES ARISING FROM COURSE OF PERFORMANCE, COURSE OF DEALING OR USAGE IN TRADE. WITHOUT LIMITING THE FOREGOING, BINANCE DOES NOT REPRESENT OR WARRANT THAT THE SITE, BINANCE SERVICES OR BINANCE MATERIALS ARE ACCURATE, COMPLETE, RELIABLE, CURRENT, ERROR-FREE, OR FREE OF VIRUSES OR OTHER HARMFUL COMPONENTS. BINANCE DOES NOT GUARANTEE THAT ANY ORDER WILL BE EXECUTED, ACCEPTED, RECORDED OR REMAIN OPEN. EXCEPT FOR THE EXPRESS STATEMENTS, AGREEMENTS AND RULES SET FORTH IN THESE TERMS, YOU HEREBY ACKNOWLEDGE AND AGREE THAT YOU HAVE NOT RELIED UPON ANY OTHER STATEMENT OR AGREEMENT, WHETHER WRITTEN OR ORAL, WITH RESPECT TO YOUR USE AND ACCESS OF BINANCE SERVICES. WITHOUT LIMITING THE FOREGOING, YOU HEREBY UNDERSTAND AND AGREE THAT BINANCE WILL NOT BE LIABLE FOR ANY LOSSES OR DAMAGES ARISING OUT OF OR RELATING TO: (A) ANY INACCURACY, DEFECT OR OMISSION OF DIGITAL ASSETS PRICE DATA, (B) ANY ERROR OR DELAY IN THE TRANSMISSION OF SUCH DATA, (C) INTERRUPTION IN ANY SUCH DATA, (D)

REGULAR OR UNSCHEDULED MAINTENANCE CARRIED OUT BY BINANCE AND SERVICE
INTERRUPTION AND CHANGE RESULTING FROM SUCH MAINTENANCE, (E) ANY DAMAGES

INCURRED BY OTHER USERS' ACTIONS, OMISSIONS OR VIOLATION OF THESE TERMS, (F) ANY
DAMAGE CAUSED BY ILLEGAL ACTIONS OF OTHER THIRD PARTIES OR ACTIONS WITHOUT
AUTHORIZED BY BINANCE; AND (G) OTHER EXEMPTIONS MENTIONED IN DISCLAIMERS AND
PLATFORM RULES ISSUED BY BINANCE.
THE DISCLAIMER OF IMPLIED WARRANTIES CONTAINED HEREIN MAY NOT APPLY IF AND TO THE
EXTENT IT IS PROHIBITED BY APPLICABLE LAW OF THE JURISDICTION IN WHICH YOU RESIDE.

## 2. Disclaimer of Damages and Limitation of Liability

TO THE MAXIMUM EXTENT PERMITTED BY APPLICABLE LAW, IN NO EVENT WILL BINANCE, ITS
AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS,
EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS BE LIABLE
FOR ANY INCIDENTAL, INDIRECT, SPECIAL, PUNITIVE, CONSEQUENTIAL OR SIMILAR DAMAGES OR
LIABILITIES WHATSOEVER (INCLUDING, WITHOUT LIMITATION, DAMAGES FOR LOSS OF DATA,
INFORMATION, REVENUE, PROFITS OR OTHER BUSINESSES OR FINANCIAL BENEFITS) ARISING
OUT OF BINANCE SERVICES, ANY PERFORMANCE OR NON-PERFORMANCE OF BINANCE SERVICES,
OR ANY OTHER PRODUCT, SERVICE OR OTHER ITEM PROVIDED BY OR ON BEHALF OF BINANCE AND
ITS AFFILIATES, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER THEORY
EVEN IF BINANCE HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES EXCEPT TO THE
EXTENT OF A FINAL JUDICIAL DETERMINATION THAT SUCH DAMAGES WERE A RESULT OF
BINANCE'S GROSS NEGLIGENCE, FRAUD, WILLFUL MISCONDUCT OR INTENTIONAL VIOLATION OF
LAW. SOME JURISDICTIONS DO NOT ALLOW THE EXCLUSION OR LIMITATION OF INCIDENTAL OR
CONSEQUENTIAL DAMAGES, SO THE ABOVE LIMITATION MAY NOT APPLY TO YOU.
NOTWITHSTANDING THE FOREGOING, IN NO EVENT WILL THE LIABILITY OF BINANCE, ITS
AFFILIATES AND THEIR RESPECTIVE SHAREHOLDERS, MEMBERS, DIRECTORS, OFFICERS,
EMPLOYEES, ATTORNEYS, AGENTS, REPRESENTATIVES, SUPPLIERS OR CONTRACTORS ARISING
OUT OF SERVICES OFFERED BY OR ON BEHALF OF BINANCE AND ITS AFFILIATES, ANY
PERFORMANCE OR NON-PERFORMANCE OF BINANCE SERVICES, OR ANY OTHER PRODUCT,
SERVICE OR OTHER ITEM, WHETHER UNDER CONTRACT, STATUTE, STRICT LIABILITY OR OTHER
THEORY, EXCEED THE AMOUNT OF THE FEES PAID BY YOU TO BINANCE UNDER THESE TERMS IN
THE TWELVE-MONTH PERIOD IMMEDIATELY PRECEDING THE EVENT GIVING RISE TO THE CLAIM
FOR LIABILITY.

## 3. Indemnification

You agree to indemnify and hold harmless Binance Operators, their affiliates, contractors, licensors,
and their respective directors, officers, employees and agents from and against any claims, actions,
proceedings, investigations, demands, suits, costs, expenses and damages (including attorneys' fees,
fines or penalties imposed by any regulatory authority) arising out of or related to (i) your use of, or
conduct in connection with, Binance Services, (ii) your breach or our enforcement of these Terms, or
(iii) your violation of any applicable law, regulation, or rights of any third party during your use of

Binance Services. If you are obligated to indemnify Binance Operators, their affiliates, contractors, licensors, and their respective directors, officers, employees or agents pursuant to these Terms,

Binance will have the right, in its sole discretion, to control any action or proceeding and to determine whether Binance wishes to settle, and if so, on what terms.

## V. Announcements

Please be aware that all official announcements, news, promotions, competitions and airdrops will be listed on /en/support/announcement .USERS UNDERTAKE TO REFER TO THESE MATERIALS REGULARLY AND PROMPTLY. BINANCE WILL NOT BE HELD LIABLE OR RESPONSIBLE IN ANY MANNER OF COMPENSATION SHOULD USERS INCUR PERSONAL LOSSES ARISING FROM IGNORANCE OR NEGLIGENCE OF THE ANNOUNCEMENTS.

## VI. Termination of Agreement

### 1. Suspension of Binance Accounts

You agree that Binance shall have the right to immediately suspend your Binance Account (and any accounts beneficially owned by related entities or affiliates), freeze or lock the Digital Assets or funds in all such accounts, and suspend your access to Binance for any reason including if Binance suspects any such accounts to be in violation of these Terms, our Privacy Policy, or any applicable laws and regulations. You agree that Binance shall not be liable to you for any permanent or temporary modification of your Binance Account, or suspension or termination of your access to all or any portion of Binance Services. Binance shall reserve the right to keep and use the transaction data or other information related to such Binance Accounts. The above account controls may also be applied in the following cases:

- The Binance Account is subject to a governmental proceeding, criminal investigation or other pending litigation;

- We detect unusual activities in the Binance Account;

- We detect unauthorized access to the Binance Account;

- We are required to do so by a court order or command by a regulatory/government authority.

### 2. Cancellation of Binance Accounts

In case of any of the following events, Binance shall have the right to directly terminate these Terms by cancelling your Binance Account, and shall enjoy the right but not the obligation to permanently freeze (cancel) the authorizations of your Binance Account on Binance and withdraw the corresponding Binance Account thereof:

- after Binance terminates services to you;

- you allegedly register or register in any other person's name as a Binance User again, directly or indirectly;

indirectly,

- the information that you have provided is untruthful, inaccurate, outdated or incomplete;

- when these Terms are amended, you state your unwillingness to accept the amended Terms by applying for cancellation of your Binance Account or by other means;

- you request that Binance Services be terminated; and

- any other circumstances where Binance deems it should terminate Binance Services.

Should your Binance Account be terminated, the account and transactional information that meet data retention standards will be securely stored for 5 years. In addition, if a transaction is unfinished during the account termination process, Binance shall have the right to notify your counterparty of the situation at that time. You acknowledge that a user-initiated account exit (right to erasure under GDPR or other equivalent regulations) will also be subjected to the termination protocol stated above.

If Binance is informed that any Digital Assets or funds held in your Binance Account are stolen or otherwise are not lawfully possessed by you, Binance may, but has no obligation to, place an administrative hold on the affected funds and your Binance Account. If Binance does lay down an administrative hold on some or all of your funds or Binance Account, Binance may continue such hold until such time as the dispute has been resolved and evidence of the resolution acceptable to Binance has been provided to Binance in a form acceptable to Binance. Binance will not involve itself in any such dispute or the resolution of the dispute. You agree that Binance will have no liability or responsibility for any such hold, or for your inability to withdraw Digital Assets or funds or execute trades during the period of any such hold.

## 3. Remaining Funds After Binance Account Termination

Except as set forth in paragraph 4 below, once a Binance Account is closed/withdrawn, all remaining account balance (which includes charges and liabilities owed to Binance) will be payable immediately to Binance. Upon payment of all outstanding charges to Binance (if any), Users will have 5 business days to withdraw all Digital Assets or funds from the account.

## 4. Remaining Funds After Binance Account Termination Due to Fraud, Violation of Law, or Violation of These Terms

Binance maintains full custody of the Digital Assets, funds and User data/information which may be turned over to governmental authorities in the event of Binance Accounts' suspension/closure arising from fraud investigations, investigations of violation of law or violation of these Terms.

## VII. No Financial Advice

Binance is not your broker, intermediary, agent, or advisor and has no fiduciary relationship or obligation to you in connection with any trades or other decisions or activities effected by you using Binance Services. No communication or information provided to you by Binance is intended as, or shall be considered or construed as, investment advice, financial advice, trading advice, or any other

sort of advice. Unless otherwise specified in these Terms, all trades are executed automatically, based on the parameters of your order instructions and in accordance with posted trade execution

procedures, and you are solely responsible for determining whether any investment, investment strategy or related transaction is appropriate for you according to your personal investment objectives, financial circumstances and risk tolerance, and you shall be solely responsible for any loss or liability therefrom. You should consult legal or tax professionals regarding your specific situation. Binance does not recommend that any Digital Asset should be bought, earned, sold, or held by you. Before making the decision to buy, sell or hold any Digital Asset, you should conduct your own due diligence and consult your financial advisors prior to making any investment decision. Binance will not be held responsible for the decisions you make to buy, sell, or hold Digital Asset based on the information provided by Binance.

## VIII. Compliance with Local Laws

It is Users' responsibility to abide by local laws in relation to the legal usage of Binance Services in their local jurisdiction as well as other laws and regulations applicable to Users. Users must also factor, to the extent of their local laws all aspects of taxation, the withholding, collection, reporting and remittance to their appropriate tax authorities.ALL USERS OF BINANCE SERVICES ACKNOWLEDGE AND DECLARE THAT THEIR FUNDS COME FROM LEGITIMATE SOURCES AND DO NOT ORIGINATE FROM ILLEGAL ACTIVITIES; USERS AGREE THAT BINANCE WILL REQUIRE THEM TO PROVIDE OR OTHERWISE COLLECT THE NECESSARY INFORMATION AND MATERIALS AS PER RELEVANT LAWS OR GOVERNMENT ORDERS TO VERIFY THE LEGALITY OF THE SOURCES AND USE OF THEIR FUNDS.Binance maintains a stance of cooperation with law enforcement authorities globally and will not hesitate to seize, freeze, terminate Users' accounts and funds which are flagged out or investigated by legal mandate.

## IX. Privacy Policy

Access to Binance Services will require the submission of certain personally identifiable information. Please review Binance's Privacy Policy at https://web.archive.org/web/20210530034249/https://www.binance.com/en/privacy for a summary of Binance's guidelines regarding the collection and use of personally identifiable information.

## X. Resolving Disputes: Forum, Arbitration, Class Action Waiver

PLEASE READ THIS SECTION CAREFULLY, AS IT INVOLVES A WAIVER OF CERTAIN RIGHTS TO BRING LEGAL PROCEEDINGS, INCLUDING AS A CLASS ACTION.

1. Notice of Claim and Dispute Resolution Period. Please contact Binance first! Binance wants to address your concerns without resorting to formal legal proceedings, if possible. If you have a dispute with Binance, then you should contact Binance and a ticket number will be assigned. Binance will attempt to resolve your dispute internally as soon as possible. The parties agree to negotiate in good faith to resolve the dispute (which discussions shall remain confidential and be subject to applicable

rules protecting settlement discussions from use as evidence in any legal proceeding).

In the event the dispute cannot be resolved satisfactorily, and you wish to assert a legal claim against Binance, then you agree to set forth the basis of such claim in writing in a "Notice of Claim," as a form of prior notice to Binance. The Notice of Claim must (1) describe the nature and basis of the claim or dispute, (2) set forth the specific relief sought, (3) provide the original ticket number, and (4) include your Binance account email. The Notice of Claim should be submitted to an email address or hyperlink provided in your correspondence with Binance. After you have provided the Notice of Claim to Binance, the dispute referenced in the Notice of Claim may be submitted by either Binance or you to arbitration in accordance with paragraph 2 of this Section, below. For the avoidance of doubt, the submission of a dispute to Binance for resolution internally and the delivery of a Notice of Claim to Binance are prerequisites to commencement of an arbitration proceeding (or any other legal proceeding). During the arbitration, the amount of any settlement offer made by you or Binance shall not be disclosed to the arbitrator.

**2. Agreement to Arbitrate and Governing Law.** You and Binance Operators agree that, subject to paragraph 1 above, any dispute, claim, or controversy between you and Binance (and/or Binance Operators) arising in connection with or relating in any way to these Terms or to your relationship with Binance (and/or Binance Operators) as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) will be determined by mandatory final and binding individual (not class) arbitration, except as set forth below under Exceptions to Agreement to Arbitrate. You and Binance Operators further agree that the arbitrator shall have the exclusive power to rule on his or her own jurisdiction, including without limitation any objections with respect to the existence, scope or validity of the Agreement to Arbitrate, or to the arbitrability of any claim or counterclaim. Arbitration is more informal than a lawsuit in court. THERE IS NO JUDGE OR JURY IN ARBITRATION, AND COURT REVIEW OF AN ARBITRATION AWARD IS LIMITED. There may be more limited discovery than in court. The arbitrator must follow this agreement and can award the same damages and relief as a court (including, if applicable, attorney fees), except that the arbitrator may not award declaratory or injunctive relief in favour of anyone but the parties to the arbitration. The arbitration provisions set forth in this Section will survive termination of these Terms. Arbitration Rules. The arbitration shall be subject to the HKIAC Administered Arbitration Rules (HKIAC. Rules) in force when the Notice of Arbitration is submitted, as modified by this Section X. The arbitration will be administered by the Hong Kong International Arbitration Centre (HKIAC). Unless the parties agree otherwise, there shall be only one arbitrator appointed in accordance with the HKIAC Rules. Any arbitration will be conducted in the English language. Regardless of the manner in which the arbitration is conducted, the arbitrator shall issue a reasoned written decision sufficient to explain the essential findings and conclusions on which the decision and award, if any, are based. JUDGMENT ON ANY ARBITRAL AWARD MAY BE GIVEN IN ANY COURT HAVING JURISDICTION OVER THE PARTY (OR OVER THE ASSETS OF THE PARTY) AGAINST WHOM SUCH AN AWARD IS RENDERED. Time for Filing: ANY ARBITRATION AGAINST BINANCE OPERATORS MUST BE COMMENCED BY FILING A REQUEST FOR ARBITRATION WITHIN ONE (1) YEAR, AFTER THE DATE THE PARTY ASSERTING THE CLAIM FIRST KNOWS OR REASONABLY SHOULD KNOW OF THE ACT, OMISSION OR DEFAULT GIVING RISE TO THE

CLAIM; AND THERE SHALL BE NO RIGHT TO ANY REMEDY FOR ANY CLAIM NOT ASSERTED WITHIN THAT TIME PERIOD. THIS ONE YEAR LIMITATION PERIOD IS INCLUSIVE OF THE INTERNAL DISPUTE

RESOLUTION PROCEDURE SET FORTH IN PARAGRAPH 1 OF THIS SECTION, ABOVE. THERE SHALL BE NO RIGHT TO ANY REMEDY FOR ANY CLAIM NOT ASSERTED WITHIN THAT TIME PERIOD. If applicable law prohibits a one-year limitation period for asserting claims, any claim must be asserted within the shortest time period permitted by applicable law. Process; Notice: The party who intends to seek arbitration after the expiration of the Dispute Resolution Period set forth in paragraph 1, above, must submit a request to the HKIAC in accordance with the HKIAC Rules. If we request arbitration against you, we will give you notice at the email address or mailing address you have provided. You agree that any notice sent to this email or mailing address shall be deemed effective for all purposes, including without limitation to determinations of adequacy of service. It is your obligation to ensure that the email address and/or mailing address on file with Binance is up-to-date and accurate. Seat of Arbitration: The seat of the arbitration shall be Hong Kong. Place of Hearing: The location of any in-person arbitration hearing shall be Hong Kong, unless otherwise agreed to by the parties. Governing Law: These Terms (including this arbitration agreement) shall be governed by, and construed in accordance with, the laws of Hong Kong. Confidentiality. The parties agree that the arbitration shall be kept confidential. The existence of the arbitration, any nonpublic information provided in the arbitration, and any submissions, orders or awards made in the arbitration (together, the "Confidential Information") shall not be disclosed to any non-party except the tribunal, the HKIAC, the parties, their counsel, experts, witnesses, accountants and auditors, insurers and reinsurers, and any other person necessary to the conduct of the arbitration. Notwithstanding the foregoing, a party may disclose Confidential Information to the extent that disclosure may be required to fulfill a legal duty, protect or pursue a legal right, or enforce or challenge an award in bona fide legal proceedings. This confidentiality provision shall survive termination of these Terms and of any arbitration brought pursuant to these Terms.

**3. Class Action Waiver.** You and Binance agree that any claims relating to these Terms or to your relationship with Binance as a user of Binance Services (whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, and whether the claims arise during or after the termination of these Terms) shall be brought against the other party in an arbitration on an individual basis only and not as a plaintiff or class member in a purported class or representative action. You and Binance further agree to waive any right for such claims to be brought, heard, or arbitrated as a class, collective, representative, or private attorney general action, to the extent permissible by applicable law. Combining or consolidating individual arbitrations into a single arbitration is not permitted without the consent of all parties, including Binance.

**4. Modifications.** Binance reserves the right to update, modify, revise, suspend, or make any future changes to Section X regarding the parties' Agreement to Arbitrate, subject to applicable law. You hereby consent and agree that it is your responsibility to ensure that your understanding of this Section is up to date. Subject to the applicable law, your continued use of your Binance account shall be deemed to be your acceptance of any modifications to Section X regarding the parties' Agreement to Arbitrate. You agree that if you object to the modifications to Section X, Binance may block access to your account pending closure of your account. In such circumstances, the Terms of Use prior to

modification shall remain in full force and effect pending closure of your account.

**5. Severability.** If any portion of these Terms are adjudged to be invalid or unenforceable for any reason or to any extent, the remainder of these Terms will remain valid and enforceable and the invalid or unenforceable portion will be given effect to the greatest extent permitted by law. pending closure of your account.

## XI. Miscellaneous

**1. Independent Parties.** Binance is an independent contractor but not an agent of you in the performance of these Terms. These Terms shall not be interpreted as facts or evidence of an association, joint venture, partnership, or franchise between the parties.

**2. Entire Agreement.** These Terms constitute the entire agreement between the parties regarding use of Binance Services and will supersede all prior written or oral agreements between the parties. No usage of trade or other regular practice or method of dealing between the parties will be used to modify, interpret, supplement, or alter the terms herein.

**3. Interpretation and Revision.** Binance reserves the right to alter, revise, modify, and/or change these Terms at any time. All changes will take effect immediately upon being published on Binance websites. It is your responsibility to regularly check relevant pages on our websites/applications to confirm the latest version of these Terms. If you do not agree to any such modifications, your only remedy is to terminate your usage of Binance Services and cancel your account. You agree that, unless otherwise expressly provided in these Terms, Binance will not be responsible for any modification or termination of Binance Services by you or any third party, or suspension or termination of your access to Binance Services.

**4. Force Majeure.** Binance will not be liable for any delay or failure to perform as required by these Terms because of any cause or condition beyond Binance's reasonable control.

**5. Severability.** If any portion of these Terms is held invalid or unenforceable, such invalidity or enforceability will not affect the other provisions of these Terms, which will remain in full force and effect, and the invalid or unenforceable portion will be given effect to the greatest extent possible.

**6. Assignment.** You may not assign or transfer any right to use Binance Services or any of your rights or obligations under these Terms without prior written consent from Binance, including any right or obligation related to the enforcement of laws or the change of control. Binance may assign or transfer any or all of its rights or obligations under these Terms, in whole or in part, without notice or obtaining your consent or approval.

**7. Waiver.** The failure of one party to require performance of any provision will not affect that party's right to require performance at any time thereafter. At the same time, the waiver of one party to seek recovery for the other party's violation of these Terms or any provision of applicable terms shall not

constitute a waiver by that party of any subsequent breach or violation by the other party or of the provision itself.

**8. Third-Party Website Disclaimer.** Any links to third-party websites from Binance Services does not imply endorsement by Binance of any product, service, information or disclaimer presented therein, nor does Binance guarantee the accuracy of the information contained on them. If you suffer loss from using such third-party product and service, Binance will not be liable for such loss. In addition, since Binance has no control over the terms of use or privacy policies of third-party websites, you should read and understand those policies carefully.

**9. Matters Related to Apple Inc.** If you use any device manufactured by Apple Inc. to participate in any commercial activities or reward programs through Binance Services, such activities and programs are provided by Binance and are not associated with Apple Inc. in any manner.

**10. Contact Information.** For more information on Binance, you may refer to the company and license information found on Binance websites. If you have questions regarding these Terms, please feel free to contact Binance for clarification via our Customer Support team at https://web.archive.org/web/20210530034249/https://www.binance.com/en/support/requests/new.

About Us                                                                                          +

Products                                                                                          +

Service                                                                                           +

Support                                                                                           +

Learn                                                                                             +

Community

English

Binance © 2021

# EXHIBIT 3



# 2018 HKIAC ADMINISTERED ARBITRATION RULES

# HONG KONG INTERNATIONAL ARBITRATION CENTRE ADMINISTERED ARBITRATION RULES 2018

## Introduction

These Rules have been adopted by the Council of the Hong Kong International Arbitration Centre (HKIAC) for use by parties who seek the procedural flexibility and cost-effectiveness of an arbitration administered by HKIAC.

## Application

These Rules may be adopted in a written agreement at any time before or after a dispute has arisen, and may be adopted for use in both domestic and international arbitrations commenced under a contract or treaty. Provisions regarding the scope of application of these Rules are set out in Article 1.

## Effectiveness

These Rules have been adopted to take effect from 1 November 2018.

## Suggested Clauses

1. The following model clause may be adopted by the parties to a contract who wish to refer any future disputes to arbitration in accordance with these Rules:

   "Any dispute, controversy, difference or claim arising out of or relating to this contract, including the existence, validity, interpretation, performance, breach or termination thereof or any dispute regarding non-contractual obligations arising out of or relating to it shall be referred to and finally resolved by arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules in force when the Notice of Arbitration is submitted.

   \* The law of this arbitration clause shall be ... *(Hong Kong law)*.

   The seat of arbitration shall be ... *(Hong Kong)*.

   \*\* The number of arbitrators shall be ... *(one or three)*. The arbitration proceedings shall be conducted in ... *(insert language)*. "

2

\*     Optional. This provision should be included particularly where the law of the substantive contract and the law of the seat are different. The law of the arbitration clause potentially governs matters including the formation, existence, scope, validity, legality, interpretation, termination, effects and enforceability of the arbitration clause and identities of the parties to the arbitration clause. It does not replace the law governing the substantive contract.

\*\*    Optional

2.    Parties to an existing dispute in which neither an arbitration clause nor a previous agreement with respect to arbitration exists, who wish to refer such dispute to arbitration under the HKIAC Administered Arbitration Rules, may agree to do so in the following terms:

"We, the undersigned, agree to refer to arbitration administered by the Hong Kong International Arbitration Centre (HKIAC) under the HKIAC Administered Arbitration Rules any dispute, controversy, difference or claim (including any dispute regarding non-contractual obligations) arising out of or relating to:

(Brief description of contract under which disputes, controversies, differences or claims have arisen or may arise.)

The law of this arbitration agreement shall be … *(Hong Kong law)*.

The seat of arbitration shall be ... *(Hong Kong)*.

\*\* The number of arbitrators shall be ... *(one or three)*. The arbitration proceedings shall be conducted in ... *(insert language)*.


Signed: _____ (Claimant)

Signed: _____ (Respondent)

Date: _____ "

\*     Optional. This provision should be included particularly where the law of the substantive contract and the law of the seat are different. The law of the arbitration agreement potentially governs matters including the formation, existence, scope, validity, legality, interpretation, termination, effects and enforceability of the arbitration agreement and identities of the parties to the arbitration agreement. It does not replace the law governing the substantive contract.

\*\*    Optional

**3**

# TABLE OF CONTENTS

**SECTION I.   GENERAL RULES**

Article 1    • Scope of Application ........................................7

Article 2    • Interpretation of Rules ....................................7

Article 3    • Written Communications and
             Calculation of Time Limits .............................9

**SECTION II.   COMMENCEMENT OF THE
             ARBITRATION**

Article 4    • Notice of Arbitration .....................................11

Article 5    • Answer to the Notice of Arbitration............12

**SECTION III. THE ARBITRAL TRIBUNAL**

Article 6    • Number of Arbitrators ...................................15

Article 7    • Appointment of a Sole Arbitrator .................15

Article 8    • Appointment of Three Arbitrators................16

Article 9    • Confirmation of the Arbitral Tribunal..........17

Article 10   • Fees and Expenses of the Arbitral Tribunal..18

Article 11   • Qualifications and Challenge of
             the Arbitral Tribunal.......................................19

Article 12   • Replacement of an Arbitrator ......................21

**SECTION IV. CONDUCT OF ARBITRATION**

Article 13   • General Provisions .........................................22

Article 14   • Seat and Venue of the Arbitration ................23

Article 15   • Language ..........................................................23

Article 16   • Statement of Claim .........................................24

Article 17   • Statement of Defence .....................................24

Article 18   • Amendments to the Claim or Defence .........25

Article 19   • Jurisdiction of the Arbitral Tribunal.............25

Article 20   • Further Written Statements...........................27

Article 21   • Time Limits .....................................................27

Article 22   • Evidence and Hearings ..................................27

Article 23 • Interim Measures of Protection and Emergency Relief..........................28

Article 24 • Security for Costs ...........................30

Article 25 • Tribunal-Appointed Experts.........................30

Article 26 • Default...............................31

Article 27 • Joinder of Additional Parties ......................31

Article 28 • Consolidation of Arbitrations ......................35

Article 29 • Single Arbitration under Multiple Contracts ..........................38

Article 30 • Concurrent Proceedings...............................38

Article 31 • Closure of Proceedings.................................38

Article 32 • Waiver................................39

**SECTION V. AWARDS, DECISIONS AND ORDERS OF THE ARBITRAL TRIBUNAL**

Article 33 • Decisions .........................................40

Article 34 • Costs of the Arbitration ................................40

Article 35 • Form and Effect of the Award .....................41

Article 36 • Applicable Law, Amiable Compositeur........42

Article 37 • Settlement or Other Grounds for Termination ......................................43

Article 38 • Correction of the Award ...............................44

Article 39 • Interpretation of the Award...........................44

Article 40 • Additional Award...........................................45

Article 41 • Deposits for Costs .........................................45

**SECTION VI. OTHER PROVISIONS**

Article 42 • Expedited Procedure .....................................47

Article 43 • Early Determination Procedure....................48

Article 44 • Disclosure of Third Party Funding of Arbitration ........................................50

Article 45 • Confidentiality................................................50

Article 46 • Exclusion of Liability ....................................51

**SCHEDULE 1**
**REGISTRATION AND ADMINISTRATIVE FEES**...........53

**SCHEDULE 2**
**ARBITRAL TRIBUNAL'S FEES, EXPENSES, TERMS**
**AND CONDITIONS – Based on Hourly Rates**...................55

**SCHEDULE 3**
**ARBITRAL TRIBUNAL'S FEES, EXPENSES, TERMS**
**AND CONDITIONS – Based on Sum in Dispute**.............59

**SCHEDULE 4**
**EMERGENCY ARBITRATOR PROCEDURES**..................63

**Members of HKIAC Rules Revision Committee**............68

**Acknowledgements**...............................................................68

17.2 The Statement of Defence shall reply to the particulars of the Statement of Claim (set out in Article 16.2(a) to (c)). If the Respondent has raised an objection to the jurisdiction or to the proper constitution of the arbitral tribunal, the Statement of Defence shall contain the factual and legal basis of such objection.

17.3 Where there is a counterclaim, set-off defence or cross-claim, the Statement of Defence shall also include the following particulars:

   (a)   a statement of the facts supporting the counterclaim, set-off defence or cross-claim;

   (b)   the points at issue;

   (c)   the legal arguments supporting the counterclaim, set-off defence or cross-claim; and

   (d)   the relief or remedy sought.

17.4 The Respondent shall annex to its Statement of Defence all supporting materials on which it relies.

17.5 The arbitral tribunal may vary any of the requirements in Article 17 as it deems appropriate.

## Article 18 –   Amendments to the Claim or Defence

18.1 During the course of the arbitration, a party may amend or supplement its claim or defence, unless the arbitral tribunal considers it inappropriate to allow such amendment having regard to the circumstances of the case. However, a claim or defence may not be amended in such a manner that the amended claim or defence falls outside the jurisdiction of the arbitral tribunal.

18.2 HKIAC may adjust its Administrative Fees and the arbitral tribunal's fees (where appropriate) if a party amends its claim or defence.

## Article 19 –   Jurisdiction of the Arbitral Tribunal

19.1 The arbitral tribunal may rule on its own jurisdiction under these Rules, including any objections with respect to the existence, validity or scope of the arbitration agreement.

19.2 The arbitral tribunal shall have the power to determine the existence or validity of any contract of which an arbitration agreement forms a part. For the purposes of Article 19, an arbitration agreement which forms part of a contract, and which provides for arbitration under these Rules, shall be treated as an agreement independent of the other terms of the contract. A decision by the arbitral tribunal that the contract is null and void shall not necessarily entail the invalidity of the arbitration agreement.

19.3 A plea that the arbitral tribunal does not have jurisdiction shall be raised if possible in the Answer to the Notice of Arbitration, and shall be raised no later than in the Statement of Defence, or, with respect to a counterclaim, in the Defence to the Counterclaim. A party is not precluded from raising such a plea by the fact that it has designated or appointed, or participated in the designation or appointment of, an arbitrator. A plea that the arbitral tribunal is exceeding the scope of its authority shall be raised as soon as the matter alleged to be beyond the scope of its authority is raised during the arbitration. The arbitral tribunal may, in either case, admit a later plea if it considers the delay justified.

19.4 Subject to Article 19.5, if a question arises as to:

(a) the existence, validity or scope of the arbitration agreement; or

(b) whether all of the claims have been properly made in a single arbitration pursuant to Article 29; or

(c) the competence of HKIAC to administer an arbitration;

before the constitution of the arbitral tribunal, the arbitration shall proceed and any such question shall be decided by the arbitral tribunal once constituted.

19.5 The arbitration shall proceed only if and to the extent that HKIAC is satisfied, prima facie, that an arbitration agreement under the Rules may exist or the arbitration has been properly commenced under Article 29. Any question as to the jurisdiction of the arbitral tribunal shall be decided by the arbitral tribunal once constituted, pursuant to Article 19.1.

19.6   HKIAC's decision pursuant to Article 19.5 is without prejudice to the admissibility or merits of any party's claim or defence.

## Article 20 – Further Written Statements

The arbitral tribunal shall decide which further written statements, if any, in addition to the Statement of Claim and the Statement of Defence, shall be required from the parties and shall set the time limits for communicating such statements.

## Article 21 – Time Limits

21.1   The time limits set by the arbitral tribunal for the communication of written statements should not exceed 45 days, unless the arbitral tribunal considers otherwise.

21.2   The arbitral tribunal may, even in circumstances where the relevant time limit has expired, extend time limits where it concludes that an extension is justified.

## Article 22 – Evidence and Hearings

22.1   Each party shall have the burden of proving the facts relied on to support its claim or defence.

22.2   The arbitral tribunal shall determine the admissibility, relevance, materiality and weight of the evidence, including whether to apply strict rules of evidence.

22.3   At any time during the arbitration, the arbitral tribunal may allow or require a party to produce documents, exhibits or other evidence that the arbitral tribunal determines to be relevant to the case and material to its outcome. The arbitral tribunal shall have the power to admit or exclude any documents, exhibits or other evidence.

# EXHIBIT 4

Arbitration Ordinance

# Part 3

# Arbitration Agreement

*(Format changes—E.R. 1 of 2018)*

**19.** **Article 7 of UNCITRAL Model Law (Definition and form of arbitration agreement)**

(1) Option I of Article 7 of the UNCITRAL Model Law, the text of which is set out below, has effect—

"*Option I*

*Article 7.   Definition and form of arbitration agreement*

(1) "Arbitration agreement" is an agreement by the parties to submit to arbitration all or certain disputes which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not. An arbitration agreement may be in the form of an arbitration clause in a contract or in the form of a separate agreement.

(2) The arbitration agreement shall be in writing.

(3) An arbitration agreement is in writing if its content is recorded in any form, whether or not the arbitration agreement or contract has been concluded orally, by conduct, or by other means.

(4) The requirement that an arbitration agreement be in writing is met by an electronic communication if the information contained therein is accessible so as to be useable for subsequent reference; "electronic communication" means any communication that the parties make by means of data messages; "data

Last updated date
1.2.2018

Arbitration Ordinance

message" means information generated, sent, received or stored by electronic, magnetic, optical or similar means, including, but not limited to, electronic data interchange (EDI), electronic mail, telegram, telex or telecopy.

(5) Furthermore, an arbitration agreement is in writing if it is contained in an exchange of statements of claim and defence in which the existence of an agreement is alleged by one party and not denied by the other.

(6) The reference in a contract to any document containing an arbitration clause constitutes an arbitration agreement in writing, provided that the reference is such as to make that clause part of the contract.".

(2)  Without affecting subsection (1), an arbitration agreement is in writing if—

(a)  the agreement is in a document, whether or not the document is signed by the parties to the agreement; or

(b)  the agreement, although made otherwise than in writing, is recorded by one of the parties to the agreement, or by a third party, with the authority of each of the parties to the agreement.

(3)  A reference in an agreement to a written form of arbitration clause constitutes an arbitration agreement if the reference is such as to make that clause part of the agreement.

**20.  Article 8 of UNCITRAL Model Law (Arbitration agreement and substantive claim before court)**

(1)  Article 8 of the UNCITRAL Model Law, the text of which is set out below, has effect—

*"Article 8.   Arbitration agreement and substantive claim before court*

Arbitration Ordinance

(1) A court before which an action is brought in a matter which is the subject of an arbitration agreement shall, if a party so requests not later than when submitting his first statement on the substance of the dispute, refer the parties to arbitration unless it finds that the agreement is null and void, inoperative or incapable of being performed.

(2) Where an action referred to in paragraph (1) of this article has been brought, arbitral proceedings may nevertheless be commenced or continued, and an award may be made, while the issue is pending before the court.".

(2)   If a dispute in the matter which is the subject of an arbitration agreement involves a claim or other dispute that is within the jurisdiction of the Labour Tribunal established by section 3 (Establishment of tribunal) of the Labour Tribunal Ordinance (Cap. 25), the court before which an action has been brought may, if a party so requests, refer the parties to arbitration if it is satisfied that—

(a)   there is no sufficient reason why the parties should not be referred to arbitration in accordance with the arbitration agreement; and

(b)   the party requesting arbitration was ready and willing at the time the action was brought to do all things necessary for the proper conduct of the arbitration, and remains so.

(3)   Subsection (1) has effect subject to section 15 (Arbitration agreements) of the Control of Exemption Clauses Ordinance (Cap. 71).

(4)   If the court refuses to refer the parties to arbitration, any provision of the arbitration agreement that an award is a condition precedent to the bringing of legal proceedings

Arbitration Ordinance

in respect of any matter is of no effect in relation to those proceedings.

(5)    If the court refers the parties in an action to arbitration, it must make an order staying the legal proceedings in that action.

(6)    In the case of Admiralty proceedings—

(a)    the reference of the parties to arbitration and an order for the stay of those proceedings may, despite subsections (1) and (5), be made conditional on the giving of security for the satisfaction of any award made in the arbitration; or

(b)    if the court makes an order under subsection (5) staying those proceedings, the court may (where property has been arrested, or bail or other security has been given to prevent or obtain release from arrest, in those proceedings) order that the property arrested, or the bail or security given, be retained as security for the satisfaction of any award made in the arbitration.

(7)    Subject to any provision made by rules of court and to any necessary modifications, the same law and practice apply to the property, bail or security retained in pursuance of an order under subsection (6) as would apply if the property, bail or security retained were held for the purposes of proceedings in the court making the order.

(8)    A decision of the court to refer the parties to arbitration under—

(a)    article 8 of the UNCITRAL Model Law, given effect to by subsection (1); or

(b)    subsection (2),

is not subject to appeal.

Arbitration Ordinance

(9)     The leave of the court making a decision to refuse to refer the parties to arbitration under—

(a)     article 8 of the UNCITRAL Model Law, given effect to by subsection (1); or

(b)     subsection (2),

is required for any appeal from that decision.

(10)    A decision or order of the court under subsection (6) is not subject to appeal.

**21.     Article 9 of UNCITRAL Model Law (Arbitration agreement and interim measures by court)**

Article 9 of the UNCITRAL Model Law, the text of which is set out below, has effect—

*"Article 9.   Arbitration agreement and interim measures by court*

It is not incompatible with an arbitration agreement for a party to request, before or during arbitral proceedings, from a court an interim measure of protection and for a court to grant such measure.".

**22.     Whether agreement discharged by death of a party**

(1)     Unless otherwise agreed by the parties, an arbitration agreement is not discharged by the death of a party and may be enforced by or against the personal representatives of that party.

(2)     Subsection (1) does not affect the operation of any enactment or rule of law by virtue of which a substantive right or obligation is extinguished by death.

———————

# EXHIBIT 5

A   **B + B CONSTRUCTION LTD v SUN ALLIANCE AND LONDON INSURANCE PLC**

COURT OF APPEAL
CIVIL APPEAL NO 18 OF 2000

B   GODFREY VP, WOO AND RIBEIRO JJA
11 APRIL, 3 MAY 2000

C   **Insurance – Employee's compensation insurance – Policy taken out by sub-contractor with insurer – 'Insured' referred to sub-contractor 'and his contractors' – Principal contractor adjudged to pay compensation to sub-contractor's injured employee – Whether principal contractor entitled to claim on the insurer – Employees' Compensation Ordinance (Cap 282) s 24(1), (2)**

D   **Building and Construction – Employee's compensation insurance policy – Policy taken out by sub-contractor – 'Insured' referred to sub-contractor 'and his contractors' – Principal contractor adjudged to pay compensation to sub-contractor's injured employee – Whether principal contractor entitled to claim on the insurer – Employees' Compensation Ordinance (Cap 282) s 24(1), (2)**

E   **保險 – 僱員補償保險 – 保險單由次承判商向承保人取得 – 「受保人」指次承判商「及其承辦商」– 總承判商被裁定須向次承判商的受傷僱員作出補償 – 總承判商是否有權向承保人提出申索 – 《僱員補償條例》(第 282 章) 第 24(1), (2) 條**

F   **建築與建造 – 僱員補償保險單 – 保險單由次承判商取得 – 「受保人」指次承判商「及其承辦商」– 總承判商被裁定須向次承判商的受傷僱員作出補償 – 總承判商是否有權向承保人提出申索 – 《僱員補償條例》(第 282 章) 第 24(1), (2) 條**

G   **:** On 5 October 1994 the plaintiff as principal contractor subcontracted its construction work to Pak Kee Transportation Co Ltd (Pak Kee). Under the sub-contract Pak Kee was obliged to provide employee's compensation insurance. The policy should have been taken out in joint names ie itself as sub-contractor and the plaintiff as principal contractor, but this was not done.

H   Earlier in January 1994 Pak Kee had taken out an insurance policy with the defendant under which the 'insured' was described as 'Pak Kee and his contractors'. The policy was expressed to cover claims in respect of injury to 'any employee in the insured's immediate service' and excluded liability for 'employees of contractors to the insured'.

I   On 8 October 1994 Pak Kee's employee, Cheung Ping, suffered serious injuries in a work-related accident, which accident was found to have been wholly caused by the negligence of an employee of the plaintiff.

As a result of actions brought by Mr Cheung, the plaintiff was held liable to pay Mr Cheung damages for negligence as well as to reimburse Pak Kee for employee's compensation and costs which it had paid to Mr Cheung.

The plaintiff subsequently brought an action against the defendant as the insurer of the insurance policy for an indemnity in respect of sums which it had been adjudged to pay to Mr Cheung and Pak Kee. At the hearing for summary judgment brought by the plaintiff, the defendant's summons to strike out the plaintiff's claim was dismissed by the judge and judgment was granted to the plaintiff against the defendant.

The defendant appealed against the decision arguing that on the true construction of the policy the words 'and his contractors' included only sub-contractors of the sub-contractor and not the principal contractor.

**Held, allowing the appeal:**

per Godfrey VP (Ribeiro JA agreeing):

(1) Even assuming that the policy was intended to inure for the benefit of the plaintiff as well as for the benefit of the defendant, the plaintiff's claim would fall foul of the well-settled rule that, on the face of it, a contract between two parties for the benefit of a third party was not enforceable by the third party. In the event, the defendant did not take the point below that the plaintiff was not a party to the contract, the court must proceed on the footing that the plaintiff's claim, if otherwise good, was enforceable in the usual way. Dicta of Viscount Haldane LC in *Dunlop Pneumatic Tyre Co Ltd v Selfridge & Co Ltd* [1915] AC 847 at 853 considered. *Trident General Insurance Co Ltd v McNiece Bros Pty Ltd* (1988) 80 ALR 574 distinguished (at 300I-302D).

(2) As the policy between the insurer and the defendant expressly excluded liability to 'employees of contractors to the Insured', it was impossible to construe the words 'and his contractors' as imposing any liability on the insurer in relation to injuries to an employee of a sub-contractor of the sub-contractor. If those words did not include any liability in respect of such employees, they must refer to any contractor with whom the sub-contractor entered into contract (and so might be read as including a reference to the contractor ie, the plaintiff in the present case). This construction was supported by an interpretation of s 24 of the Employees' Compensation Ordinance (Cap 282) which suggested that the liability to pay compensation to an injured employee fell not only upon the sub-contractor employing him but also upon the contractor who had sub-contracted the work or part of it to the sub-contractor. In effect, the contractor should insure himself against the same risk. This was not the case with the plaintiff (at 302E-303G).

per Woo JA:

(3) The judge was right to adopt the rule of contra proferentum that in the event of an ambiguity, in this case the word 'contractors', it should be interpreted against the party who relied on the provision. Therefore, the rule militated against the defendant's argument that the words 'contractors' in the schedule clearly and unequivocally meant Pak Kee's sub-contractors and not including the plaintiff as Pak Kee's principal contractor. However, looking at the whole scheme of the policy and its various provisions, the judge's interpretation and the plaintiff's contention strained the language of the relevant terms of the policy and in

B + B Construction Ltd v
**[2000] 2 HKC**   Sun Alliance and London Insurance plc (Godfrey VP)   **297**

**A**   particular, failed to take into account Condition 1, which required a consistent construction of words appearing in the policy. There was no justifiable reason to differentiate between the terms 'insured' and 'contractors' set out in various provisions. Attaching a different meaning to certain words in different parts of the policy flew in the face of Condition 1 and widened the ambit of the policy's coverage (at 305D-308I).

**B**

**Cases referred to**

*Albert v Motor Insurers' Bureau* [1972] AC 301, [1971] 2 All ER 1345, [1971] 3 WLR 291

*Dunlop Pneumatic Tyre Co Ltd v Selfridge & Co Ltd* [1915] AC 847, [1914-15] All ER Rep 333, 84 LJKB 1680

**C**

*Trident General Insurance Co Ltd v McNiece Bros Pty Ltd* (1988) 80 ALR 574

**Legislation referred to**

Employees' Compensation Ordinance (Cap 282) s 24(1), (2)

Rules of the High Court (Cap 4) O 14, O 42 r 5B(6)

**D**

**Other source referred to**

McGillivray *Insurance Law* (9th Ed) p 277

[*Editorial note*: for further discussion of insurance and indemnities in building and construction contracts generally see *Halsbury's Laws of Hong Kong* Vol 3, Building and Construction [65.023]-[65.025]; as to sub-contract and assignment generally see further McInnis *Hong Kong Construction Law* (Butterworths) Vol 1, XIII; see also XIII[519] as to the principle that a third party cannot sue for damages on a contract to which he is not a party.]

**E**

**F**   **Appeal**

This was an appeal from the decision of Yam J of 4 January 2000 giving judgment to B + B Construction Ltd, the plaintiff principal contractor, that it was entitled to be indemnified by its sub-contractor's insurer, Sun Alliance and London Insurance plc, in respect of compensation paid to an employee of the sub-contractor who had been injured in the course of work. The facts appear sufficiently in the following judgment.

**G**

*Audrey Eu SC and Mohan Bharwaney (Deacons Graham & James) for the appellant/defendant.*

*Warren Chan SC and Selina Lau (Ip Kwan & Co) for the respondent/plaintiff.*

**H**

**Godfrey VP:** *Introduction*

This is an appeal from Yam J, who on 4 January 2000 gave judgment under O 14 of the Rules of the High Court in favour of the plaintiff B + B Construction Ltd (the contractor) against the defendant Sun Alliance and London Insurance plc (the insurer) for $759,797.05 together with interest and costs. The contractor claims to be entitled to be indemnified by the insurer in respect of the sums the contractor has had to pay (1) to an

**I**

A

employee of a sub-contractor, Pak Kee Transportation Co Ltd (the sub-contractor) who had been injured by the negligence of an employee of the contractor; (2) to the sub-contractor, in reimbursement of the sum the sub-contractor had had to pay to its own injured employee by way of employee's compensation; and (3) in settlement of everybody else's costs. The contractor's claim for this indemnity against the insurer is not made under an insurance policy effected by the contractor itself, it is made under an insurance policy effected by the sub-contractor, in the Schedule to which policy 'the Insured' is described as 'Pak Kee Transportation Company Limited *and his contractors*' (emphasis added). The judge, holding that the words I have emphasised were apt to confer on the contractor a right to claim against the insurer for the indemnity it wanted, gave judgment against the insurer accordingly. The insurer now appeals.

B

C

*Background*

D

The policy in question is dated 3 January 1994 and is described as an 'Employee's Compensation Insurance' policy. It was effected by the sub-contractor with the insurer, as I have said. It recites as follows:

Whereas the Insured carrying on the Business described in the Schedule and no other for the purpose of this insurance by a proposal and declaration which shall be the basis of this contract and is deemed to be incorporated herein has applied to the Company for the insurance hereinafter contained and has paid or agreed to pay the Premium as consideration for such insurance

E

The operative part of the policy reads as follows:

F

Now this Policy Witnesseth that if any employee in the Insured's immediate service shall sustain bodily injury by accident or disease caused during the Period of Insurance and arising out of and in the course of his employment by the Insured in the Business

The Company will subject to the Jurisdiction Clause and the other terms exceptions and conditions contained herein or endorsed hereon (all of which are hereinafter collectively referred to as the Terms of this Policy) indemnify the Insured against liability at law (including liability under the Legislation set out in the Schedule) to pay compensation and claimant's costs and expenses in respect of such injury and will in addition pay all costs and expenses incurred with its written consent

G

H

The policy contains a number of exceptions; the introductory words, and the first exception, read as follows:

Exceptions

The Company shall not be liable in respect of

I

1    the Insured's liability to employees of contractors to the Insured

**A**  The policy also contains a number of conditions, of which 1 and 8 are relevant; these read as follows:

Conditions

**B**  1.  This Policy and the Schedule shall be read together as one contract and any word or expression to which a specific meaning has been attached in any part of this Policy or of the Schedule shall bear such specific meaning wherever it may appear

…

**C**  8.  The first premium and all renewal premiums that may be accepted are to be regulated by the amount of salaries and wages and other earnings paid by the Insured to employees during each Period of Insurance. The name of every employee together with the amount of salary wages and other earnings shall be properly recorded and the Insured shall at all times allow the Company to inspect such records and shall supply the Company **D**  with a correct account of all such salaries wages and other earnings paid during any Period of Insurance within one month from the expiry date of such Period of Insurance. If the amount so paid shall differ from the amount on which premium has been paid the difference in premium shall be met by a further proportionate payment to the Company or by a refund by the Company as the case may be

**E**  In the Schedule to the policy, 'the Company' is described as the insurer; the 'class of insurance' is described as employee compensation; 'the Insured' is described as I have already indicated; the business is described as: 'Transp./Forwarding Agent/Site Contractor'; and the geographical area is described as 'HK'. I reproduce below the references in the **F**  Schedule to staff:

: On 5 October 1994, the contractor engaged the sub-contractor to

| S/NO | CATEGORY OF STAFF | NO-OF-EMPL | EST. ANNUAL WAGE |
|------|-------------------|------------|------------------|
| 1 | CLERICAL STAFF | 4 | 418000.00HK$ |
| 2 | DRIVER/DELIVERY/ MOTORCRANE OPR | 5 | 700000.00 |
| 3 | DELIVERY/TALLYMAN/ FOREMAN/SITE WORKER          W51 | 2 | 300000.00 |
| 4 | DELIVERY/STEVEDORE/ SITE WORKER          W51 | 6 | 499200.00 |
| 5 | CASUAL DELIVERY/ WELDER/SITE WORKER          W51 | 6 | 624000.00 |
| | | TOTAL: | 2541200.00 |

**I**  provide labour for the carrying out of H-piles driven works under a sub-contract which (by cl 13(1) and the Fifth Schedule) obliged the sub-contractor to provide employee's compensation insurance 'for his labour and for those his own sub-contractors [*sic*.]'. It stipulates that 'The

workmen's compensation insurance policy shall be taken out in joint name of the sub-contractor and [the contractor]'; but this was not done.

On 8 October 1994, one Cheung Ping (the employee), an employee of the sub-contractor, was injured at the site of the contractor's works in an accident which was wholly the fault of an employee of the contractor. As I have already indicated, it is the sums which the contractor has had to pay out as a result of this accident which the contractor now seeks to recover from the insurer.

*The issue*

The parties accepted below that the central question to be decided was whether, on the true construction of the policy, in particular, those words in the policy which described 'The Insured' as '[the Sub-contractor] *and his contractors*', the contractor was or was not entitled to the benefit of the cover provided by the policy, and that the decision of the court upon that question would be dispositive of the action.

*The insurer's case*

The insurer says that the words 'and his contractors' are apt to include only sub-contractors of the sub-contractor, and that on the true construction of the policy, the contractor has no valid claim on the insurer.

*The contractor's case*

The contractor says that the words are apt to include the contractor as well as the sub-contractors of the sub-contractor, and that on the true construction of the policy, its claim is covered by the policy.

*The judgment below*

The judge agreed with the contractor.

*A preliminary question*

Before I proceed to consider whether the judge was right to accept the construction of the policy, in particular of the words 'and his contractors', suggested by the contractor, the question suggests itself as to how the contractor, which did not effect the policy; is not named as a party to it; and gave no consideration for it, can claim any benefit under the policy at all.

Even assuming, in favour of the contractor, that the policy *was* intended to inure for the benefit of the contractor as well as for the benefit of the sub-contractor, the contractor's claim would fall foul of the well-settled (although much criticised) rule that, on the face of it, a contract between two parties for the benefit of a third party is not enforceable by

**A**   the third party, who is, as it is sometimes put, 'a stranger to the consideration'. I am aware, of course, that there are some statutory exceptions to the rule, but none of these would apply to the present case. I am also aware of the proposals before the legislature in England and Wales for the reform of the rule; and of the judicial abrogation of the rule

**B**   effected in Australia by the decision of the High Court (split 4 to 3) in *Trident General Insurance Co Ltd v McNiece Bros Pty Ltd* (1988) 80 ALR 574, a case the facts of which bear many similarities to our own. In that case, Mason CJ and Wilson J held that the rules that only a party to a contract can sue on it, and that consideration must move from the promisee, do not apply to a policy of insurance; Toohey J held that:

**C**

> When an insurer issues a liability insurance policy, identifying the assured in terms that evidence an intention on the part of both insurer and assured that the policy will indemnify as well those with whom the assured contracts for the purpose of the venture covered by the policy, and it is reasonable to expect that such a contractor may order its affairs by reference to the existence of the

**D**
> policy, the contractor may sue the insurer on the policy, notwithstanding that the contractor is not a party to the contract between the insurer and assured;

and Gaudron J held that a promisor who has accepted an agreed consideration for a promise to benefit a third party comes under an

**E**   obligation to the third party to fulfil that promise and the third party acquires a right to bring an action to secure the benefit of that promise.

But here, in Hong Kong, the law remains as magisterially stated by Viscount Haldane LC in *Dunlop Pneumatic Tyre Co Ltd v Selfridge & Co Ltd* [1915] AC 847 at 853:

**F**
> My Lords, in the law of England certain principles are fundamental. One is that only a person who is a party to a contract can sue on it. Our law knows nothing of a jus quaesitum tertio arising by way of contract. Such a right may be conferred by way of property, as, for example, under a trust, but it cannot be conferred on a stranger to a contract as a right to enforce the contract in personam. A second principle is that if a person with whom a contract not

**G**
> under seal has been made is to be able to enforce it consideration must have been given by him to the promisor or to some other person at the promisor's request. These two principles are not recognized in the same fashion by the jurisprudence of certain Continental countries or of Scotland, but here they are well established. A third proposition is that a principal not named in the contract may sue upon it if the promisee really contracted as his agent. But

**H**
> again, in order to entitle him so to sue, he must have given consideration either personally or through the promisee, acting as his agent in giving it.

However, the insurer in our case raised no point below upon these principles. In these circumstances, I think the insurer must be treated as

**I**   having agreed to accept liability to the contractor if the policy is to be construed as the contractor contends. A similar situation arose in *Albert v Motor Insurers' Bureau* [1972] AC 301. In that case, the House of Lords

upheld the plaintiff Mrs Albert's claim against the defendant, which    **A**
declined to take the point that its agreement, made with the Minister of
Transport, was not enforceable by the plaintiff (who, of course, was not a
party to that agreement). Lord Donovan said (at p 320):

> Mrs. Albert is not a party to that agreement. Breach of it by the bureau does    **B**
> not under English law give her any right of action. A number of cases have
> been brought against the bureau by persons in a similar position to hers but the
> bureau has never, and says it never will, take the point that such a plaintiff has
> no cause of action.
>    The courts deal with the determination of legal rights and the Minister and
> his successors are the only persons entitled to sue the bureau for breach of the    **C**
> agreement. I do not regard the present practice as satisfactory. This House is
> asked to say that judgment should be given in favour of Mrs. Albert when it is
> clear that she has no cause of action.

But, however 'unsatisfactory' it is, if a defendant does not take the point,
in answer to the plaintiff's claim on a contract, that the plaintiff was not a
party to the contract, the court must, I think, proceed on the footing that    **D**
the plaintiff's claim, if otherwise good, is enforceable in the usual way.

*The question of construction*

It will be recalled that the policy is expressed to cover claims in respect of    **E**
injury to 'any employee in the Insured's *immediate* service' (emphasis
added) and that it excludes liability to 'employees of contractors to the
Insured'. In these circumstances, it seems to me, with respect, to be
impossible to construe the words 'and his contractors' as imposing any
liability on the insurer in relation to injuries to an employee of a sub-
contractor of the sub-contractor. If those words do not include any    **F**
liability in respect of such employees, then, if they are to be given any
meaning at all, they must refer to any contractor with whom the sub-
contractor enters into contracts (and so may be read as including a
reference to the contractor in the present case). But what is the point of
the reference to such contractors? The answer is not immediately    **G**
obvious; but it lies, in my opinion, in the provisions of s 24 of the
Employees' Compensation Ordinance (Cap 282).
    Section 24 provides, in sub-ss (1) and (2), as follows:

> (1) Where any person (in this section referred to as the principal contractor),    **H**
>     in the course of or for the purposes of his trade or business, contracts with
>     a sub-contractor for the execution by or under the sub-contractor of the
>     whole or any part of any work undertaken by the principal contractor, the
>     principal contractor shall be liable to pay to any employee employed by
>     that sub-contractor or by any other sub-contractor in the execution of the
>     work any compensation under this Ordinance which the principal
>     contractor would have been liable to pay if that employee had been    **I**
>     immediately employed by him; and where compensation is claimed from

B + B Construction Ltd v

**[2000] 2 HKC**          Sun Alliance and London Insurance plc (Godfrey VP)          **303**

**A**       or proceedings are taken against the principal contractor, then, in the application of this Ordinance, references to the principal contractor shall be substituted for references to the employer, except that the amount of any compensation calculated by reference to earnings shall be calculated by reference to the earnings of the employee under the employer by whom he is immediately employed.

**B**

(2) Where the principal contractor is liable to pay compensation under this section, he shall be entitled to be indemnified by any person who would have been liable to pay compensation to the employee independently of this section.

**C**

The effect, in a case like this, is to impose liability to pay compensation to an injured employee not only upon the sub-contractor employing him but also upon the contractor who has sub-contracted the work or part of it to the sub-contractor. So, not only does the sub-contractor need to insure himself against the risk of having to pay compensation to an injured

**D**       employee of the sub-contractor; the contractor, too, needs to insure himself against the risk of having to pay compensation to an injured employee of the sub-contractor; the contractor, too, needs to insure himself against that same risk. That is why, of course, the sub-contract of 5 October 1994 provided not only for the sub-contractor to provide

**E**       employee's compensation insurance for his labour, but also for the policy to 'be taken out in joint name of the sub-contractor and [the contractor].' If that had been done (in fact, it was not done) the contractor would have protected itself against its liability to pay compensation to an employee in the sub-contractor's immediate service if the sub-contractor failed to do so. Against this consideration, the words 'and his contractors' used here

**F**       make sense; they are apt to cover, as a matter of construction, the liability to pay compensation to such an employee of both the sub-contractor and the contractor.

**G**

*Conclusion*

But the claims against which the contractor seeks to be indemnified in these proceedings are claims made against it in consequence of the negligence of its own employee. Against such claims it must, in my

**H**       judgment, look to its own employer's liability insurance. Its claim is wholly outside the scope of the sub-contractor's employees' compensation policy. Even if it had been named in and had become a party to that policy, it would have now no claim on the insurer except for

**I**       whatever compensation it had been held liable to pay, through no fault of its own, to the employee of a sub-contractor who was unable to get paid by his immediate employer. That is not the case here at all.

*Result*

A

For these reasons, I differ from the judge's conclusion as to the true construction of the policy. I would allow this appeal accordingly, and subject to the provisions of O 42 r 5B(6) of the Rules of the High Court, I would order that the insurers' costs, here and below, be taxed and paid by the contractor to the insurers.

B

**Woo JA:** Mr Cheung Ping was an employee of Pak Kee Transportation Co Ltd (Pak Kee) and Pak Kee was a sub-contractor of the plaintiff. While, as assigned by Pak Kee, Mr Cheung was effecting the removal of a stack of H-piles for the plaintiff, he met with an accident and was seriously injured. The injury gave rise to two actions, one in the District Court under the Employees' Compensation Ordinance against Pak Kee, and another in the High Court under the common law against both Pak Kee and the plaintiff. Mr Cheung succeeded in obtaining judgment against Pak Kee for employees' compensation in the District Court action. In the High Court action, in which Pak Kee joined the plaintiff as a third party, it was held that the accident was caused by the negligence of an employee of the plaintiff. As a result, the plaintiff was liable alone to pay Mr Cheung damages for negligence and liable to reimburse Pak Kee for the employees' compensation and costs that it had paid to Mr Cheung in the District Court action.

C

D

E

In the sub-contract awarded by the plaintiff to Pak Kee, Pak Kee was obliged to provide employees' compensation insurance to cover damages payable to its workers and workers of its sub-contractors with which the sub-contract works were concerned, as provided by cl 13(1) of the sub-contract and the Fifth Schedule thereto. However, the insurance policy with which this court is concerned had already been taken out by Pak Kee with the defendant.

F

The action from which the appeal is now brought was instituted by the plaintiff against the defendant as the insurer of the insurance policy for an indemnity for what it had been adjudged to pay Mr Cheung and Pak Kee in the High Court action.

G

The plaintiff made an application for summary judgment against the defendant and the defendant took out a summons to strike out the plaintiff's claim. The summonses went before Yam J, who dismissed the defendant's summons and granted judgment to the plaintiff against the defendant.

H

This appeal turns on the proper construction of the terms of the insurance policy. The relevant terms are set out below for closer examination.

The policy begins with a recital:

I

Whereas the Insured carrying on the Business described in the Schedule and no other for the purpose of this insurance …

**A**   It continues:

> Now this Policy Witnesseth that if any employee in the Insured's immediate service shall sustain bodily injury by accident … and arising out of and in the course of his employment by the Insured in the Business
>
> **B**   The Company (ie, the defendant insurer) will subject to … the … terms exceptions and conditions contained herein or endorsed hereon … indemnify the Insured against liability at law …

The only relevant exception is Exception 1, set out below:

> The Company shall not be liable in respect of

**C**   > 1   the Insured's liability to employees of contractors to the Insured.

In the Schedule to the policy, against the item 'Insured', there appears 'PAK KEE TRANSPORTATION COMPANY LIMITED AND HIS CONTRACTORS'. Under the Schedule, the types of employees and their numbers (but not names) are also set out, with a column of their estimated

**D**   annual wages.

The judge held that the plaintiff, as a contractor of Pak Kee, was encompassed by the 'Insured' in the Schedule. The plaintiff must therefore be considered as one of the insured. The defendant's argument against that ruling is that the words 'HIS CONTRACTORS' in the Schedule clearly and unequivocally mean Pak Kee's sub-contractors

**E**   performing the business or part of it for Pak Kee, and cannot be construed as including the plaintiff who was not Pak Kee's sub-contractor but Pak Kee's principal contractor. As the word 'CONTRACTORS' is unqualified as to show clearly whether it is to include sub-contractors alone, I am of

**F**   the view that the rule of construction that in case of an ambiguity, the interpretation that is against the party who relies on the provision should be adopted, or in other words, the rule of *contra proferentum*, militates against the defendant's argument. The judge was right in adopting the construction as he did.

**G**   However, this meaning of the insured being inclusive of the plaintiff as a contractor of Pak Kee should be adopted throughout regarding the interpretation of other provisions of the policy, for Condition 1 of the policy expressly provides:

> This Policy and the Schedule shall be read together as one contract and any
> **H**   word or expression to which a specific meaning has been attached in any part of this Policy or of the Schedule shall bear such specific meaning wherever it may appear.

With this in mind, the provision in the body of the policy to cover the contingency that 'if any employee in the Insured's immediate service

**I**   shall sustain bodily injury by accident … arising out of and in the course of his employment by the Insured in the Business' (the main provision) and Exception 1 that the defendant shall not be liable in respect of 'the

Insured's liability to employees of contractors to the Insured' must now be examined.

As said before, the 'Insured' in the Schedule includes Pak Kee and the plaintiff, each one of Pak Kee and the plaintiff is an insured under the policy. The main provision therefore covers Pak Kee for its liability for the bodily injuries suffered by any employee in its immediate service, and similarly covers the plaintiff's liability for the bodily injuries of any employee in the plaintiff's immediate service. By the same token, Exception 1 excludes liability of the defendant in respect of Pak Kee's liability towards the employees of Pak Kee's contractors, and also excludes the plaintiff's liability towards the employees of the plaintiff's contractors. Pak Kee is the plaintiff's contractor, because the word 'contractors' should, pursuant to Condition 1, similarly be construed as to cover principal contractor and sub-contractor. Exception 1 therefore excludes liability of the defendant towards the plaintiff in respect of Mr Cheung who was the employee of the plaintiff's sub-contractor, Pak Kee, and not in the plaintiff's immediate service.

The judge held otherwise. He construed the main provision and Exception 1 in such a way that the 'Insured' therein was meant to refer exclusively to Pak Kee and not the plaintiff. Mr Warren Chan SC on behalf of the plaintiff, seeks to support the judge's interpretation with some interesting arguments. He contends that the word 'CONTRACTORS' which was typed onto the Schedule should bear the same meaning as the 'contractors' in Exception 1 which appears in the printed form of the policy, ie, both should mean Pak Kee's contractors. In such a way, the word 'contractors' in Exception 1 only means Pak Kee's contractors and does not mean to include, in the facts of the present case means, the plaintiff. On the other hand, Mr Chan contends that the word 'Insured' in the Schedule and in Exception 1 should bear different meanings because the word 'CONTRACTORS' was typed in the Schedule whereas the main provision and Exception 1 in their entirety were in printed standard form. He refers to *McGillivray on Insurance Law* (9th Ed) at p 277 for assistance, which reads:

> **Written and printed clauses.** Where a policy contains clauses in print and type the court will endeavour to give effect to both equally, but, if it is plain that a written clause manifestly cannot be reconciled with one or more printed conditions, the former overrides the latter, inasmuch as the written words are the immediate language and terms selected by the parties themselves for the expression of their meaning with relation to the particular risk and the printed words are a general formula applied equally to all insurances in the same class of risk.

The contended construction of the word 'CONTRACTORS' is to ignore the word 'HIS' that precedes 'CONTRACTORS' in the Schedule which differs from 'contractors to the Insured' in Exception 1, and also

B + B Construction Ltd v
**[2000] 2 HKC**     Sun Alliance and London Insurance plc (Woo JA)     **307**

**A**  disregards the proper interpretation of the repeated printed word 'Insured' to include the plaintiff that appears in the main provision and the Schedule, and also in Exception 1, without which proper interpretation the plaintiff's liability towards any employee, be he in the plaintiff's immediate service or otherwise, would not be covered by the policy.

**B**  Where the word 'Insured' in the Schedule is given the meaning of Pak Kee and Pak Kee's contractors, it will include the plaintiff as one of the 'Insured' for being one of Pak Kee's contractors. As the plaintiff is an 'Insured', its liability towards employees in its immediate service is a risk covered by the main provision and not excluded by Exception 1. There is nothing irreconcilable in attaching the same meaning to the word

**C**  'Insured' in the various provisions of the policy. By the same token, where the word 'CONTRACTORS' in the Schedule is construed as including both principal contractors and sub-contractors, the same word in Exception 1 should properly be given the same meaning. Again there is nothing irreconcilable, and this approach will give effect to Condition 1

**D**  by which all parties to the contract of insurance are bound.

Mr Chan, however, prays in aid the type-written table of the types, numbers and estimated annual wages of employees in the Schedule to support his argument that the printed words would be in conflict with the type-written words if the word 'Insured' in the main provision and

**E**  Exception 1 were not construed as meaning Pak Kee to the exclusion of the plaintiff. He stresses that the employees set out in the Schedule were the employees of Pak Kee, that the premium for the insurance was calculated with reference to the estimated total annual wages, and that the object of the typed words 'AND HIS CONTRACTORS', which must be

**F**  given some meaning, was to protect the plaintiff from any potential liability that it might face, towards injuries suffered by Pak Kee's employees. Bearing in mind such object, so the argument continues, the policy can only be reasonably construed as covering the plaintiff's liability towards Pak Kee's employees and not the plaintiff's own

**G**  employees. If the word 'Insured' in the main provision and Exception 1 is not construed as exclusively referring to Pak Kee alone, the object could not have been achieved.

In my opinion, the arguments of Mr Chan must be rejected. There is no indication in the policy itself that the employees enumerated in the

**H**  Schedule were those of Pak Kee's and not the plaintiff's or, for that matter, not those in the immediate service of Pak Kee's sub-contractors. Even if Mr Chan is right in saying, as he seeks support from Mr Bharwaney's agreement before Yam J, that the employees in the Schedule were Pak Kee's own employees, it does not follow that the construction of

**I**  the word 'Insured' in the main provision and Exception 1 to mean Pak Kee or the plaintiff is necessarily contrary to or inevitably defeats the alleged object for adding the words 'AND HIS CONTRACTORS' after

Pak Kee's name in the Schedule. The object, as postulated, is to protect
the plaintiff from any potential liability that it might have towards Pak
Kee's employees. Insofar as the policy covers Pak Kee's liability towards
such employees as required by the Employees' Compensation Ordinance,
the plaintiff's liability under the Ordinance towards the same employees
as the main contractor would have been covered. The words 'AND HIS
CONTRACTORS' purport to give the plaintiff a separate right to seek
coverage by the policy in the event that the defendant could justifiably
repudiate any claim brought by Pak Kee pursuant to the terms of the
policy. These type-written words in the Schedule do not require the
construction of the word 'Insured' where it is printed in different parts of
the policy in the schizophrenic way as suggested by Mr Chan.

   Moreover, the alleged object cannot properly be considered as relevant
to affect the construction of the policy, because the policy had been taken
out by Pak Kee as early as January 1994 before it was awarded the sub-
contract by the plaintiff in October 1994. The policy should properly be
looked at to see if its terms cover the risks for which the plaintiff seeks to
be reimbursed without reference to the alleged object. Although Pak Kee
and the plaintiff might have examined the policy to consider whether it
was sufficient to achieve the alleged object, their understanding of the
policy's coverage cannot legitimately have any bearing on the defendant's
rights and obligations under it.

   I am of the view that the judge's interpretation and Mr Chan's
contentions strain the language of the relevant terms of the policy and in
particular, fail to take into account Condition 1. There is no justifiable
reason to differentiate between the term 'Insured' used in the Schedule, in
Exception 1 and in the main provision or the word 'contractors' used in
both the Schedule and Exception 1. Attaching a different meaning to these
words in different parts of the policy flies in the face of Condition 1 and
widens the ambit of the coverage of the policy, which was after all
expressly entitled and classified as an Employees' Compensation Policy.
It would enlarge the insurer's coverage in two respects: first, to include
the insured's liability for damages for personal injuries suffered by not
only his own employees but also employees of its contractors; and
second, to include the insured's liability not only under the Employees'
Compensation Ordinance and as an employer, but also to include his own
liability and his vicarious liability for his employees under the common
law towards third parties not in his employ. Looking at the whole scheme
of the policy and its various provisions, the approaches of the judge and
Mr Chan cannot be justified.

   In the circumstances, I too would allow the appeal with costs here and
below.

B + B Construction Ltd v

[2000] 2 HKC    Sun Alliance and London Insurance plc (Ribeiro JA)    **309**

A    **Ribeiro JA:** I agree entirely with Godfrey VP's judgment and have nothing to add.

Reported by Shin Su Wen

B                        _____

C

D

E

F

G

H

I

# EXHIBIT 6

## QUEEN'S BENCH DIVISION (COMMERCIAL COURT)

### Jan. 21, 1988

### OVERSEAS UNION INSURANCE LTD.
v.
### AA MUTUAL INTERNATIONAL INSURANCE CO. LTD.

#### Before Mr. Justice Evans

**Reinsurance — Stay of action — Arbitration clause — Defendants claimed under reinsurance agreement and appointed arbitrator — Plaintiffs denied liability alleging oral agreement — Whether oral agreement a collateral agreement — Whether reinsurance agreement should be rectified — Whether claims within the scope of the arbitration clause — Whether agreement illegal — Whether action should be stayed — Arbitration Act, 1975, s.1.**

The defendants were the English subsidiary of South African insurers (AAMIA) and both authorized Winchester Fox & Co. Ltd. to underwrite insurance on their behalf. Winchester Fox also acted as underwriting agents for the plaintiffs and there were frequent occasions when they arranged for the plaintiffs, or if need be the defendants, to "front" for business which they had accepted on behalf of the other insurer.

After AAMIA's London business was transferred to the defendants it was realized that the outstanding risks were such that they were likely to impose a greater liability on the defendants than had been estimated at the time of transfer. The resulting need for AAMIA to provide further capital or funds for the defendants could not be met without obtaining exchange control permission from the South African Government.

In the result on Nov.10, 1981 a General Account Excess of Loss Agreement was signed between the plaintiffs and defendants by which the plaintiffs undertook to pay all claims paid by the defendants in excess of a total figure of £150,000. The premium was £20,000, the proper law was English and the arbitration clause provided inter alia:

> All disputes or differences . . . in respect of this Reinsurance shall be referred to two arbitrators . . . This Reinsurance shall be deemed a submission to arbitration within the meaning of the Arbitration Act for the time being in force . . . The Arbitrator and the Umpire shall interpret this Reinsurance as an honourable engagement and they shall make their award with a view of effecting the general purpose of this Reinsurance in a reasonable manner, rather than in accordance with a literal interpretation of the language . . .

There was a further agreement made on back to back terms between the plaintiffs as reinsured and AAMIA as reinsurer whereby AAMIA undertook to pay to the plaintiffs all amounts paid by them under the reinsurance agreement.

The defendants claimed under the agreement and appointed their arbitrator in March 1987. The plaintiffs brought an action claiming declaratory and other relief to establish they were not liable to pay the sums claimed. The plaintiffs contended that there was an oral agreement between AAMIA and themselves that they would not be required to make any payment to the defendants until they had received the amount in question from AAMIA. They argued that what was agreed gave rise to a separate or collateral contract alongside the written agreements and that if the reinsurance agreement was intended to embody the whole of the agreement they claimed rectification.

The defendants applied to stay the action pursuant to s. 1 of the Arbitration Act 1975. The plaintiffs however contended that the claims under the collateral contract and the claims for rectification were not within the scope of the arbitration clause. They further objected to the proposed stay on the ground that the true nature of the transaction was such as to infringe the exchange control regulations of South Africa and that as a result the agreement was illegal and void or wholly unenforceable.

————Held, by Q.B. (Com. Ct.) (Evans, J.), that (1) the words "Disputes or differences" in the arbitration clause meant disputed claims together with any wider meaning which might be derived from the use of "differences" as well as "disputes"; the context was a reinsurance transaction which the parties had agreed to record in writing at least in part; there was no clear indication that they intended the arbitrators to have no jurisdiction outside the written terms and there were good commercial reasons why they should envisage that all disputes concerning the transaction generally would be regarded as coming within the words "in respect of this Reinsurance" (see p. 70, col. 1);

(2) the clause included the plaintiffs' disputed claims not only that there was an implied term of the reinsurance agreement but also alternatively that there was a collateral contract or that the agreement should be rectified by the addition of an express term (see p. 70, col. 1);

(3) the plaintiffs' submissions that the reinsurance agreement was null and void would be rejected; there was no evidence that the agreements were not valid or that they were a sham or device or were inoperable in accordance with their terms save by reference to the exchange control regulations; and there was no evidence that the exchange control regulations required express consent for any payment to a subsidiary whether under a reinsurance treaty or not; the defendants had succeeded in establishing the existence of an agreement to arbitrate and the application for a stay would be granted (see p. 71, cols. 1 and 2; p. 72, col. 1).

————Ashville Investments Ltd. v. Elmer Contractors Ltd., [1988] 2 Lloyd's Rep. 73, considered.

Per Mr. Justice Evans, (at p. 72): . . . Although the [arbitration] clause may entitle the arbi-

## LLOYD'S LAW REPORTS

EVANS, J.]      **Overseas Union Insce. v. AA Mutual**      [Q.B. (Com. Ct.)

trators "to view the matter more leniently" . . . than a Court would do, I am doubtful whether they can embark on any other inquiry than what the law requires, namely finding the natural and proper meaning of the words used in the particular context . . . The equity clause [i.e. the third paragraph of the arbitration clause] does however emphasize that commercial arbitrators may draw upon their own experience and knowledge of commercial matters without formal proof.

---

The following cases were referred to in the judgment:

Ashville Investments Ltd. v. Elmer Contractors Ltd., [1988] 2 Lloyd's Rep. 73;

Belfort v. Orion, [1962] 2 Lloyd's Rep. 32;

Crane v. Hegeman-Harris, [1939] 4 All E.R. 68;

Czarnikow Ltd. v. Roth Schmidt & Co., (C.A.) (1922) 12 Ll.L.Rep. 195; [1922] 2 K.B. 478;

*Damianos*, The (C.A.) [1971] 1 Lloyd's Rep. 502; [1971] 2 Q.B. 588;

Eagle Star Insurance Co. Ltd. v. Yuval Insurance Co. Ltd., (C.A.) [1978] 1 Lloyd's Rep. 357;

*Evje*, The (H.L.) [1974] 2 Lloyd's Rep. 57; [1975] A.C. 797;

Faghirzadeh v. Rudolf Wolff (S.A.) (Pty.) Ltd., [1977] 1 Lloyd's Rep. 630;

Heyman v. Darwins Ltd., (H.L.) (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356;

Home Insurance Co. v. Administratia Asigurilor de Stat, [1983] 2 Lloyd's Rep. 674;

Lawson v. Wallasey Local Board, (1883) 11 Q.B.D. 229;

MacKender v. Feldia A. G., (C.A.) [1966] 2 Lloyd's Rep. 449; [1967] 2 Q.B. 590;

*Marques de Bolarque*, The [1980] 2 Lloyd's Rep. 186;

Printing Machinery Ltd. v. Linotype Ltd., [1912] 1 Ch. 566;

Tatem v. Reeve, [1893] 1 Q.B. 44;

United City Merchants Ltd. v. Royal Bank of Canada, (H.L.) [1982] 2 Lloyd's Rep. 1; [1983] 1 A.C. 168.

---

This was an application by the defendants, AA Mutual International Insurance Co. Ltd., to stay an action brought by the plaintiffs, Overseas Union Insurance Ltd., for declaratory and other relief in order to establish that they were not liable to pay the sums claimed by the defendants under the reinsurance agreement between the plaintiffs and the defendants.

Mr. Julian Flaux (instructed by Messrs. Holman Fenwick & Willan) for the plaintiffs; Mr. Jonathan Gaisman (instructed by Messrs. Macfarlanes) for the defendants.

The further facts are stated in the judgment of Mr. Justice Evans.

Judgment was delivered in open Court.

### JUDGMENT

**Mr. Justice EVANS:** This application concerns a reinsurance agreement No. X1001 dated Nov. 10, 1981, between the defendants, the original insurers, as reinsured and the plaintiffs as reinsurers. The defendants have a claim under the agreement, which they referred to arbitration by the appointment of an arbitrator in March, 1987. The plaintiffs thereupon commenced this action, claiming declaratory and other relief in order to establish that they are not liable to pay the sums claimed. The defendants apply for the action to be stayed pursuant to s. 1 of the Arbitration Act, 1975. The plaintiffs are a Singaporean company and so the stay must be ordered, if s. 1 applies.

There is also an application by the plaintiffs for summary judgment under R.S.C., O. 14, but this has not been pursued at the hearing before me. It has been referred to only in connection with the question of its costs, to which I shall return.

This judgment is given in open Court at the request of the parties. Their particular reason for making this request is the fact that the argument as to the scope of the arbitration clause has involved reference to a recent Court of Appeal judgment which so far is unreported, save in The Times newspaper on May 29, 1987, (*Ashville Investments Ltd. v. Elmer Contractors Ltd.*). The full transcript shows that the judgment is of considerable general importance in arbitration law, and I hope that it will be fully reported as soon as convenient (*see* [1988] 2 Lloyd's Rep. 73).

The newspaper report was produced by Mr. Julian Flaux, Counsel for the plaintiffs, even though the judgment weighs against his contentions in this case. I gratefully acknowledge the Court's indebtedness to him for this example of good professional conduct, and at the same time I express my thanks to him and to Mr. Gaisman, Counsel for the defendants, for their excellent submissions.

*The facts*

The defendants are the English subsidiary of South African insurers, AA Mutual Insurance Association Ltd., whom I will call "AAMIA".

The defendants were incorporated in 1979 or 1980. Before that date AAMIA had done insurance business in London through a branch office. Mr. Warren Plummer was, before his retirement, the chief executive and managing director of AAMIA and when the defendants were incorporated he became its chief executive and managing director also.

AAMIA and in due course the defendants authorized Winchester Fox & Co. Ltd. to underwrite insurance on their behalf. Winchester Fox similarly acted as underwriting agents for the plaintiffs and there were frequent occasions, according to Mr. Plummer's affidavit, when they arranged for the plaintiffs, or if need be the defendants, to "front" for business which they had accepted on behalf of the other insurer. This was done for various reasons, and the practice has not been criticised on behalf of either party during the hearing of the present application before me.

After AAMIA's London business was transferred to the defendants, Mr. Plummer realized that the outstanding risks were such that they were likely to impose greater liabilities on the defendants than had been estimated at the time of the transfer. The resulting need for AAMIA to provide further capital or funds for the defendants could not be met without obtaining exchange control permission from the South African government. There is a conflict of evidence between Mr. Plummer and Mr. Burbridge, the then deputy chairman and executive director of Winchester Fox, in their respective affidavits, as to the contents of whatever discussion took place between them about this problem. In the result, the General Account Excess of Loss Agreement No. X1001 was signed by Mr. Plummer on behalf of the defendants and by Winchester Fox on behalf of the plaintiffs on Nov. 10, 1981. It describes itself as a memorandum of agreement by which the plaintiffs undertake to pay —

> . . . all claims paid by [the defendants] in excess of a total figure of £150,000 after the 1st July 1981 in respect of its open 3-year account for the calendar year 1979 for General Business, Property Business and/or Aviation Business [art. 1].

The premium was £20,000 (art. 3) and the proper law was English (art. 10). The arbitration clause reads as follows:

*Article 9.*
All disputes or differences between the Company and the Reinsurer hereon in respect of this Reinsurance shall be referred to two Arbitrators, one to be chosen by each party, and such Arbitrators shall first choose an Umpire before entering upon the reference . . . This Reinsurance shall be deemed a submission to arbitration within the meaning of the Arbitration Act for the time being in force . . . The Arbitrators and the Umpire shall interpret this Reinsurance as an honourable engagement and they shall make their award with a view of effecting the general purpose of this Reinsurance in a reasonable manner, rather than in accordance with a literal interpretation of the language, the true intention of the parties being that the Reinsurer shall follow the fortunes of the Company. The Arbitration shall take place in London . . .

It is not suggested that this agreement, standing alone, was not on its face a valid and proper reinsurance agreement. For a payment of £20,000, the defendants were covered against having to pay total losses in excess of £150,000 in respect of the period and risks in question. In this way, they were safeguarded against having to obtain further capital or other funds on account of any such excess, if it should materialize.

But there was a further agreement made on back-to-back terms between the plaintiffs, as reinsured, and AAMIA, as reinsurers, on the same day, and likewise signed by Winchester Fox on behalf of the plaintiffs and by Mr. Plummer for AAMIA. For the same premium of £20,000, AAMIA undertook to pay to the company —

> . . . all amounts paid by it in respect of Reinsurance Agreement No. X1001 and/or to indemnify it in respect of losses arising out of such contract (art. 1).

This further agreement therefore was in form a retrocession to the South African parent company of the risks which the English subsidiary, the defendants, had reinsured with the plaintiffs. The premiums being the same, the plaintiffs undertook their obligations under the two agreements for no apparent reward.

The plaintiffs' evidence, primarily Mr. Burbridge's affidavit, explains why this was done. He says that Mr. Plummer explained the exchange control difficulty to him and suggested the two-stage reinsurance agreement which in fact was made. He also stated, according to Mr. Burbridge, that the plaintiffs would not be required, as reinsurers, to pay the defendants, before they, the plaintiffs, had received payment from AAMIA under the

further agreement. Mr. Plummer disputes this account, in an affidavit which was served very late, which is defective in certain respects, not least because it is in general and somewhat vague terms, and which fails to provide any alternative explanation for the making of the two agreements which Mr. Plummer himself signed on Nov. 10, 1981. It is not appropriate for me to attempt to resolve this conflict of affidavit evidence, and for the purposes of this application I shall assume that Mr. Burbridge's account is entirely accurate.

*The issues*

In substance, therefore, the plaintiffs say, in reply to the defendants' claim under the reinsurance agreement, that there was an oral agreement between Mr. Burbridge and Mr. Plummer that they, the plaintiffs, would not be required to make any payment to the defendants until they had received the amount in question from AAMIA. They have not received payment from AAMIA, nor are they likely to do so, because AAMIA is now in liquidation and is presumed to be insolvent. They rely on the oral agreement, which is not recorded or referred to in the reinsurance agreement itself, effectively as a complete defence to the defendants' claims.

It is by no means unusual for a party against whom a claim is made under a written agreement to refuse payment by reference to an oral agreement or understanding alleged to have been made before or at the same time as the written agreement was signed. It is also common in such cases for the defendant's contentions to be translated into legal terms in a number of alternative ways, all of them relying on the basic factual assertion that the statements giving rise to the oral agreement or understanding were made. The plaintiffs' claim in this action is no exception. They say, firstly, that there was an *implied term* of the reinsurance agreement, to the effect which they allege. They say, secondly, that what was agreed gave rise to a separate or "*collateral*" contract, alongside the written agreement. Thirdly, if, contrary to their primary contention, the reinsurance agreement was intended to embody the whole of the agreement, they claim *rectification* of the agreement so as to express the oral agreement alleged.

The plaintiffs concede that the dispute regarding an implied term is within the scope of the arbitration clause and must therefore be referred to arbitration. But they deny this with regard to the claim under a collateral contract and the claim for rectification, and the first issue

on this application is whether those two claims have also to be referred to arbitrators appointed or to be appointed under art. 9.

Secondly, the plaintiffs raise a further objection to the proposed stay of proceedings in favour of arbitration. They say that the true nature of the transaction of which the reinsurance agreement formed part was such as to infringe exchange control regulations in South Africa, and that the agreement is illegal and void or wholly unenforceable as a result. This contention of course goes much further than the plaintiffs' claims in the action, which presume the existence of a valid and enforceable contract, and the plaintiffs acknowledge their need to amend the points of claim, if the contention is to be pursued in the action.

*(1) Construction*

I have referred already to the recent Court of Appeal judgment in the *Ashville* case. Its importance lies in the fact that the Court, in three considered judgments (Lord Justice May, Lord Justice Balcombe and Lord Justice Bingham), has affirmed that the question whether a dispute, or "difference" as clauses sometimes say, falls within a relevant arbitration clause is primarily a question of construction of the clause itself in the circumstances of the particular case. This is subject to one rule of law which was stated in clear terms in *Heyman v. Darwins Ltd.*, (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356, namely, that arbitrators can never have jurisdiction to decide whether there was or was not a valid contract under which, if it exists, that jurisdiction arises. This rule owes as much to logic as it does to authority, and it does not extend to disputes as to whether what was initially a valid contract has been or may be avoided e.g. for misrepresentation (compare *Mackender v. Feldia A. G.*, [1966] 2 Lloyd's Rep. 449; [1967] 2 Q.B. 590) or has been discharged e.g. by frustration or by wrongful repudiation and acceptance (*Heyman v. Darwins*, sup.). Beyond this rule, the question is always one of construction, giving the words of the arbitration clause their natural and proper meaning in the circumstances of the case (per Lord Justice May, post, at p. 75). This means in turn that reported decisions in earlier cases, even of high authority, cannot necessarily be binding in later cases, unless exceptionally the relevant words and all the relevant circumstances are the same in both cases. Even then, the binding nature of the earlier decision would only become relevant if the Court in the later case, if unaided by authority, would reach a contrary conclusion as to

the natural and proper meaning of the words in question.

For my part, I respectfully and gratefully welcome the *Ashville* judgments, not as a "seachange" in the Court's approach to such cases (a phrase suggested in argument before me) but because they make it possible to view earlier authorities in a proper perspective and to consider the scope and effect of arbitration clauses without the restrictions which are imposed if it is said that particular forms of words must necessarily have the same effect, and include or exclude certain kinds of claim, in all cases, regardless of the circumstances of each particular case. The comprehensive discussion in Mustill & Boyd's Commercial Arbitration necessarily sets out the authorities by reference to the individual phrases whose meaning has been described or commented upon in reported cases (see pp. 86–88). Now, it is possible to consider the matter in a wider perspective. The only sure guide in deciding whether a particular dispute is or is not within the scope of an arbitration clause is the intention of the parties as expressed in the clause, unless a deviation is compelled by authority in any particular case. This should also reduce the number of cases where, no doubt to the amazement of the parties if they hear it, the lawyers engage in minute semantic analysis in the guise of ascertaining what the parties' intentions were.

There is, I suggest, a broad distinction which may be drawn between those clauses which refer to arbitration only those disputes which may arise regarding the rights and obligations which are created by the contract itself, and other clauses which show an intention to refer some wider class or classes of disputes. This distinction is obviously clear and justified as a matter of law. It may also be one which would be recognized by the parties whose contract it is, for at the very least, by making the contract, they demonstrate their agreement to create a new category of legal rights and obligations, legally enforceable between themselves. Disputes regarding this category may well be described, as a matter of language, as ones arising "under" the contract, and this meaning of that phrase has been authoritatively recognized and established e.g. by the House of Lords in *Heyman v. Darwins* and by the Court of Appeal in *Ashville*. Conversely, if the parties agree to refer disputes arising "in relation to" or "in connection with" their contract, a fortiori if the clause covers disputes arising "during the execution of this contract" (*The Damianos*, [1971] 1 Lloyd's Rep. 502; [1971] 2 Q.B. 588) or in relation to "the work to be carried out here-

under", a common form in construction contracts, then both as a matter of language and of authority some wider category may be intended. *Ashville* itself holds, understandably, and in my respectful opinion consistently with earlier authorities, that "in connection with this contract" is wide enough to include a claim for rectification of the contract.

It is also important, in my judgment, to take account of the whole of the relevant words or phrases, not merely the individual words or phrases which are their component parts. "In relation to the contract" may well be narrower than "in relation to the works" or, in a shipping case, "arising in the course of the voyage". Similarly, the kind of contract may be important, for the relevant circumstances in shipping, construction and, as here, reinsurance contracts are not necessarily the same and they may well be different. In *Ashville*, for example, Lord Justice Bingham placed some emphasis on the detailed provisions for dispute resolution commonly found in construction contracts, such as the one involved there.

The only further general observation which I venture to make is to express my respectful agreement with Lord Justice May's rejection of the notion that the construction of arbitration clauses should be influenced by some supposed judicial attitude towards arbitration clauses, whether of disapproval in earlier days or of greater keenness more recently. Whatever the position was, or may have been, the question is one of construction, and construction alone (see *post*, p. 75).

*The authorities*

In deference to the submissions of Counsel, and notwithstanding the implications of the *Ashville* judgment, I should refer briefly to the decided cases which were cited to me.

Three were concerned with claims for rectification, which were held to be outside the arbitrator's jurisdiction in *Printing Machinery v. Linotype*, [1912] 1 Ch. 566, where the contract was a deed and the material words of the clause were "in relation to these presents", and in the leading case of *Crane v. Hegeman-Harris*, [1939] 4 All E.R. 68, where the parties entered into a special submission to arbitration in respect of differences which had arisen between them concerning the proper construction of a previous agreement. The Court of Appeal held that the special submission did not include a claim made subsequently for rectification of the previous agreement (per Lord Justice Bingham in *Ashville*, *post*, pp. 87–88). The third authority is *Ashville* itself. The decision there was

that the claim for rectification of a construction contract was within an arbitration clause which referred —

> . . . any dispute or difference . . . as to the construction of this contract or as to any matter or thing of whatsoever nature arising thereunder or in connection therewith . . . .

It is reasonable to infer from the judgments that the disputed claim for rectification was one arising "in connection with" the contract, but that it did not arise "thereunder".

The other disputed claim in the present case is for damages for breach of a collateral contract. This claim arises only if the alleged oral agreement did not give rise to an implied term of the reinsurance agreement, but the relevant facts are the same, whichever legal analysis may be employed. These facts include the question whether the written agreement was intended to contain the whole of the agreed terms, or not. The parties could be forgiven if they were to express surprise that the correct legal analysis of the same factual situation could determine not merely whether both or only one of the two alternative claims should be referred to arbitration but also whether that was what they themselves intended when they made the agreement. Assuming, however, that on one view of the facts there was a collateral contract, separate from the written agreement, then five further authorities which were cited before me became relevant. None of them was concerned with a collateral contract of this kind. I will consider them in date order because none of them, in my judgment, establishes any rule of law to the effect that disputes arising under separate contracts do or do not fall within the scope of an arbitration clause, nor is there any decision on the precise form of words used in the present case. In *Lawson* v. *Wallasey Local Board*, (1883) 11 Q.B.D. 229 there was a contract under seal for certain dredging works in the River Mersey. The contract referred to the engineer —

> . . . any difference . . . concerning the work hereby contracted for . . . or concerning anything in connection with this contract [p. 232].

The works were delayed by the non-removal of certain staging, and the Queen's Bench Divisional Court (Mr. Justice Denman and Mr. Justice Manisty) held that the defendants undertook by an —

> . . . implied contract . . . that the removal of the staging should not be unreasonably delayed [p. 239].

The Court further held that the contractor's claim for damages for breach of this implied contract did not give rise to a difference within the reference clause.

> The dispute is one arising from a breach of an implied contract which is not part of or *necessarily* connected with *the* contract under seal [p. 239 emphasis as quoted].

This decision, in my judgment, rests as much upon the reference to "the" contract, which was under seal, as it does upon "in connection with". This underlines the importance of considering the whole of the words used, not merely the individual words or phrases, one by one.

In *The Evje*, [1974] 2 Lloyd's Rep. 57; [1975] A.C. 797 shipowners claimed a general average contribution from charterers but they agreed not to exercise their lien on the cargo in return for an undertaking by the charterers to pay any contribution "which may be legally due". The House of Lords held that this was a fresh contract which was not subject to the arbitration clause in the charter-party. That was the Centrocon clause, which refers to —

> . . . all disputes from time to time arising out of this contract.

Lord Salmon was inclined to think that the only respect in which the fresh contract altered the parties' rights and obligations under the charter was by removing the requirements of the arbitration clause (pp. 69 and 819B). The parties' intention that claims under the new contract should not be subject to the clause or, more particularly, to the time limit in the arbitration clause, was therefore established.

Two subsequent decisions in the Commercial Court have also been concerned with agreements made later than the contract which contains the arbitration clause. In *Faghirzadeh* v. *Rudolf Wolff (S.A.) (Pty.) Ltd.*, [1977] 1 Lloyd's Rep. 630 the arbitrators appointed under the c. & f. sale contract decided that the parties had made a subsequent agreement which abrogated the contract. Although this was a fundamental alteration, the parties had not intended to jettison the arbitration provisions in the sale contract (per Mr. Justice Mocatta at p. 643) and the arbitrators had jurisdiction under the clause, which covered "any dispute arising out of this contract". Similarly, in The *Marques de Bolarque*, [1980] 2 Lloyd's Rep. 186 the charter-party arbitration clause covered —

> . . . any dispute arising between owners and charterers [p. 190]

but the arbitrator in fact was authorized only to decide "disputes arising under the charter"

Q.B. (Com. Ct.)]          **Overseas Union Insce. v. AA Mutual**          [EVANS, J.

(p. 191). The owners claimed hire due under the charter and, in reply to an off-hire defence, they relied upon a separate agreement made in Paris by which the charterers had agreed that time spent waiting for dry docking, which in the event was eight days, should be for their account, "so that vessel will remain on hire during such time". Mr. Justice Parker held that this was merely an additional ground for saying that the existing dispute, which arose out of the claim for hire under the charter, should be resolved in their favour (p. 192).

It is clear, therefore, that disputes as to the making or the terms of a subsequent agreement, which, if established, has the effect of varying or even abrogating the first, may in certain circumstances be regarded as arising "under" or "out of" the first agreement. Conversely, a dispute as to the terms or effect of such an agreement is not necessarily outside the scope of such an arbitration clause in the first.

Finally, *The Damianos*, [1971] 1 Lloyd's Rep. 502; [1971] 2 Q.B. 588 was not concerned with rectification, nor with a separate agreement. The vessel was twice arrested by charterers pursuant to a charter-party dispute, once during the performance of the charter-party voyage and again during a subsequent voyage. The shipowners claimed damages for wrongful arrest on both occasions. These were claims in tort and as such they raised the issue, not relevant to the charter-party dispute, whether the charterers had acted wrongfully and with "malice". The charter-party arbitration clause covered —

> . . . any dispute arising during execution of this charter-party.

The Court of Appeal held that the arbitrators' jurisdiction was not limited to contractual claims and that it included the tort claim, which was so closely connected with the contractual dispute (per Lord Denning, M.R. at pp. 504 and 595D). The dispute in respect of the second arrest arose after the period covered by the clause, but the Court held, more hesitantly, that it was "part and parcel" of the original dispute (pp. 505 and 595H) and also therefore covered by the clause.

*This case*

The material words are —

> . . . all disputes and differences . . . in respect of this Reinsurance . . . .

It is as important, in my judgment, to consider the meaning of "this Reinsurance" as of the phrase "in respect of". If "this Reinsurance" means "this written Agreement", then both are

a matter of language and, by analogy with *Printing Machinery v. Linotype* (sup. — "in relation to these Presents"), it is more difficult to say that the arbitrators have jurisdiction over a rectification dispute or over one concerning a collateral and therefore different contract. If on the other hand "this Reinsurance" means the reinsurance arrangement which was intended to be recorded either wholly or in part in the agreement (depending on whether the written agreement was intended to embody the whole agreement, or not), then the reference is wide enough to include disputes concerning the existence of what has to be called a collateral contract.

As to the intended meaning of "this Reinsurance", there are indications both ways in the wording of the agreement. It is described as a "Memorandum of Agreement", suggesting, the defendants submit, that the written terms were not necessarily comprehensive. But, in art. 9 itself, "this Reinsurance" is also described as a submission to arbitration for the purposes of the Arbitration Acts. Such a submission must be in writing. This suggests, according to the plaintiffs, that the reference is to the written agreement, and no more.

Both parties relied upon the third paragraph of art. 9, which may be called an "equity" clause. The precise legal effect of such clauses, notwithstanding their frequent appearance in insurance contracts, is a matter of doubt which I shall mention again later. For present purposes, Mr. Gaisman submits that its inclusion points to a wide interpretation of the arbitration provision as a whole. Mr. Flaux disputes this, and in my judgment he is correct in saying that it does not affect the scope of the arbitrator's jurisdiction, as distinct from the manner in which the jurisdiction may be exercised. It may be said that the clause, if relevant at all, points towards the arbitrators being concerned with the written agreement only, and that it directs them not to be tied to any artificial or narrow interpretation of the language used.

The parties understandably place different emphasis on the words "in respect of". Mr. Flaux submits that they are equivalent to "under" or "arising out of", so that in effect the clause is concerned only with the written agreement and with contractual disputes. Mr. Gaisman submits that "in respect of" is equivalent to "in relation to" or "in connection with" and that the words are used in order to widen the scope of the clause in both respects. If it is necessary to decide the meaning of these words in isolation, then I prefer the wider meaning. This conclusion has some support from the

decision in *Tatem v. Reeve*, [1893] 1 Q.B. 44 where the words of the Gaming Act 1892, "under or in respect of" the gaming contract, were construed disjunctively and "in respect of" was held to be wider than "under". Such support, however, is of limited weight in the present case, not only because of the different context but also because here "in respect of" appears alone.

"Disputes or differences" in clauses such as these means disputed claims or contentions, together with any wider meaning which may be derived from the use of "differences" as well as "disputes". The context is a reinsurance transaction which the parties have agreed to record in writing at least in part. There is no clear indication that they intended the arbitrators to have no jurisdiction outside the written terms and there are good commercial reasons, in my judgment, why they should envisage that all disputes concerning the transaction generally would be regarded as coming within the words "in respect of this Reinsurance". This commercial consideration is strongest in a situation where the same factual dispute viz. whether there was or was not an oral agreement, not recorded in the written agreement, which either was or was not intended to be included therein, may give rise to different classifications of their legal rights. In my judgment, this clause in this context does include the plaintiffs' disputed claims, not only that there was an implied term of the reinsurance agreement, but also, alternatively, that there was a collateral contract or that the agreement should be rectified by the addition of an express term.

### (2) *Illegality*

I propose to deal more briefly with the second issue which arises on the present application. It has two aspects. The first concerns the interpretation of s. 1 of the Arbitration Act, 1975, under which the application is made. Section 1 provides that where there is a relevant arbitration agreement, the Court shall order a stay —

. . . unless satisfied that the arbitration agreement is null and void. inoperative or incapable of being performed or that there is not in fact any dispute between the parties with regard to the matter agreed to be referred . . .

The first question is to the burden of proof where the party opposing the stay contends, as here, that the statutory exception applies. I respectfully agree with the learned authors of Commercial Arbitration by Mustill & Boyd that once the applicant has proved the existence of

what appears to be a relevant arbitration agreement, then the burden shifts to the opposing party to prove that the agreement is in fact null and void, etc. (p. 414). This approach has been adopted, I believe, in decided cases where it has been alleged that there is not, in fact, any dispute, but it may be that in those cases the nature of the inquiry is such that no burden of proof, save that of adducing evidence, exists.

The burden of proof being on the plaintiffs, the statute requires them to satisfy the Court that the agreement to arbitrate was null and void, etc. (I need not repeat the subsequent words in full). Both parties agreed before me that a ruling on this issue at the interlocutory stage is not finally binding on the parties, who will remain free to raise and argue the issue in the substantive proceedings, whether before arbitrators or before the Court. I am not sure that without this agreement I would have reached the same conclusion, if only because for the Court to be "satisfied" it would appear to be necessary for a decision to be reached on the evidence at this stage, and, if the decision is provisional only, it could result in a situation where the Court referred to arbitration a matter which the arbitrators certainly cannot decide, that is, whether the agreement to arbitrate is wholly null and void or wholly "inoperative or incapable of being enforced".

Mr. Flaux, for the plaintiffs, does not seek a decision in his client's favour, save on the provisional basis that I have described. He contended that the evidence shows a good arguable case that the plaintiffs are correct, from which it would follow that the defendants have not discharged the burden of proof which, he also contends, is upon them. If he is wrong about the burden of proof, he submits that the Court could and should direct an issue to be tried so that oral evidence, if necessary, may be heard before the issue is decided, even at this interlocutory stage.

I would be inclined at least to give the plaintiffs a further opportunity to ventilate this issue, either separately or at an adjourned hearing of the defendants' application, were it not for the fact that, on the evidence which has been produced, and in the absence of any application for an adjournment of this summons, I am satisfied not only that the agreement is not null and void, etc., as the plaintiffs contend, but also that the plaintiffs' contention is certainly wrong.

The plaintiffs' evidence is primarily that of Mr. Burbridge which, as I have indicated, I am prepared to accept in full for the purposes of this application. They rely also on the views expressed by South African lawyers to the

[1988] Vol. 2    LLOYD'S LAW REPORTS    71

Q.B. (Com. Ct.)]    Overseas Union Insce. v. AA Mutual    [EVANS, J.

effect set out in Mr. Ghirardarni's affidavit, par. 8 and following. The text of the South African Exchange Control Regulations has been produced, and Miss Davis's second affidavit on behalf of the defendants contains some further evidence with regard to South African law. I refer to Mr. Plummer's affidavit only for the unsurprising fact that from time to time exchange control permission for the transfer of capital or equivalent funds from AAMIA to the defendants, their English subsidiary, was applied for and obtained.

The plaintiffs say that the two reinsurance agreements were together a device aimed at misleading the South African authorities and concealing what was in essence a payment of money, or "funds", by AAMIA to the defendants which required government permission, which was not authorized, and which was therefore illegal by South African law. Furthermore, they rely upon art. 8(2) of the Bretton Woods Agreement and they contend that this was an exchange contract which, being unauthorized, was wholly unenforceable under English law, which is expressly made the proper law of the agreement (art. 10).

Neither in their evidence nor in their contentions, however, do the plaintiffs take account of the fact that the South African regulations expressly authorize payments made by a South African reinsurer under a reinsurance treaty (the same does not apply to facultative reinsurance, but that is not relevant here). The reason why the reinsurance agreements, if a device, would be successful as such, was the fact that, for such agreements, permission is not required. There is no evidence, and no assertion, that the reinsurance agreements were not valid, or that they were a sham or device or were inoperable in accordance with their terms, save by reference to the exchange control regulations in question. They were apparently valid agreements which were intended to achieve a result which was lawful under South African as well as English law, viz., the retrocession to AAMIA of certain risks which the defendants lawfully reinsured. The fact that payments made under the reinsurance agreements would or might avoid the need for the defendants to reduce their capital below what are, presumably, statutory requirements in this country, and so might achieve the same result as an agreement to provide further capital, if required, seems to me to be irrelevant in considering whether these agreements were lawful or not. It was a lawful method of achieving a lawful result i.e. the payment, if need be, of reinsurance moneys without exchange control

permission, which they did not require. There is no evidence to support the plaintiffs' assertions that the exchange control regulations required express consent for any payment to a subsidiary, whether under a reinsurance treaty or not. This may have been Mr. Burbridge's and Mr. Plummer's understanding of the position, but it is not borne out by the regulations themselves.

For these reasons, I reject the plaintiffs' contentions that the reinsurance agreement was null and void, etc., or that it was arguably so. I would be prepared to infer, if it was relevant to do so, that the payments in question were to be made out of South African currency and in sterling, so that an exchange transfer would take place. I would also accept, for the purposes of argument, that a direct reinsurance agreement between the defendants and AAMIA would have required exchange control permission, though on what basis I do not known. The plain fact is that payments under a valid reinsurance treaty did not require permission, and the two reinsurance agreements which the plaintiffs entered into were such.

The effect of the Bretton Woods Agreement as part of English law is to render unenforceable any "exchange contract" for which exchange control permission has not been given, so far as it extends to the unauthorized transaction: *United City Merchants Ltd. v. Royal Bank of Canada*, [1982] 2 Lloyd's Rep. 1 at pp. 9–11; [1983] 1 A.C. 168 at pp. 188–190 (Lord Diplock). The distinction between void and unenforceable is analysed, also by Lord Diplock, in *Mackender v. Feldia A. G.*, [1966] 2 Lloyd's Rep. 449 at p. 457; [1967] 2 Q.B. 590 at p. 601. The plaintiffs say that in the present case the whole contract would be unenforceable, and therefore a nullity, just as if it was legally void. The defendants respond that, even if that was correct, the arbitration agreement would survive as an independent or collateral contract (*Heyman v. Darwins*, (1942) 72 Ll.L.Rep. 65; [1942] A.C. 356) and that arbitrators would therefore have jurisdiction to decide the illegality issue. I observe merely that, if the Court was satisfied that the primary contractual obligations were all unenforceable, then it would be unlikely to order a stay, and so that extent of the arbitrator's jurisdiction would not have to be considered for the purposes of the application under s. 1.

*Conclusion*

In my judgment, therefore, the defendants succeed in showing the existence of an agreement to arbitrate the claims made by the plaintiffs in this action, and the plaintiffs fail to

## LLOYD'S LAW REPORTS

EVANS, J.]                  **Overseas Union Insce. v. AA Mutual**                  [Q.B. (Com. Ct.)

satisfy me that the statutory exceptions apply, or that I should direct an issue to be tried before reaching a final conclusion on the application under s. 1. The application therefore succeeds.

### The equity clause

As already stated, the effect of such provisions is not clearly settled as a matter of law. The former view that they cannot displace the need for arbitrators to apply the law (*Czarnikow v. Roth, Schmidt*, (1922) 12 Ll.L.Rep. 195; [1922] 2 K.B. 478; *Belfort v. Orion*, [1962] 2 Lloyd's Rep. 32) has been supplanted to some extent at least by more recent judgments: *Eagle Star Insurance Co. v. Yuval Insurance Co. Ltd.*, [1978] 1 Lloyd's Rep. 357 per Lord Denning M.R. at p. 362 and Lord Justice Robert Goff at p. 363, and *Home Insurance Co. v. Administratia Asigurilor de Stat*, [1983] 2 Lloyd's Rep. 674. To what extent the clause has this effect is, in my respectful view, unclear from the later authorities. Although the clause may entitle the arbitrators "to view the matter more leniently" ([1978] 1 Lloyd's Rep. at p. 363), sc. than a Court would do, I am doubtful whether they can embark on any other inquiry than what the law requires, namely, finding the natural and proper meaning of the words used, in the particular context. The Court's approach is described by Lord Justice May in *Ashville* (post, p. 75). The equity clause does however emphasise that commercial arbitrators may draw upon their own experience and knowledge of commercial matters without formal proof.

I wondered during the present hearing whether it would be right to order a stay of the action and therefore require that the disputes be referred to arbitration, without first hearing argument on and seeking to define the scope and effect of the clause. But having regard to the authorities which I have mentioned, I do not think that it is necessary for me to say more.

### Order 14

The plaintiffs' summons was issued after the defendants' application to stay and when the plaintiffs' evidence was unchallenged by the defendants. When that challenge came, at a very later stage, in Mr. Plummer's affidavit, the plaintiffs properly conceded that a factual issue does arise. The only remaining question is what order, if any, to make with regard to the costs of the plaintiffs' summons. Even if the facts were unchallenged, the application was somewhat optimistic, though not improper. True, there was a logical difficulty about seeking judgment as to the effect of a contract which the plaintiffs themselves alleged was illegal, but the summons could have become effective if the defendants failed on the construction issues although successful, as they have been, as regards illegality. I propose to make no order on the plaintiffs' summons, and this includes no order as to its costs.

---

# EXHIBIT 7

# The Law and Practice of Commercial Arbitration in England

## Second Edition

SIR MICHAEL J. MUSTILL
*One of Her Majesty's Lords Justices of Appeal*
*of St. John's College Cambridge*
*and Gray's Inn*

STEWART C. BOYD
*of Trinity College, Cambridge*
*and of the Middle Temple*
*One of Her Majesty's Counsel*

**Butterworths**
London and Edinburgh
1989

CHAPTER 6

# Agreements to refer future disputes

## A. EXISTENCE OF AGREEMENT

It is unusual to find an agreement to refer future disputes to arbitration completely isolated from any other contractual relationship. The agreement almost always forms part of, or is at least ancillary to, some underlying contract.

If the agreement takes this form, three questions must be considered when determining whether there is in existence a binding agreement to arbitrate[1] –

1 Did the underlying contract itself come into existence?

2 If so, does it incorporate an agreement to submit future disputes to arbitration?

3 If so, are the terms of that agreement sufficiently certain to be enforceable? These questions are discussed below.

### 1 Existence of underlying contract

Unless the underlying contract itself came into existence as a legally enforceable agreement it cannot contain an effective submission to arbitration. This principle is discussed in more detail later in this chapter[2].

### 2 Incorporation of agreement to arbitrate

As to the second question, it is well established that the parties need not set out the terms of their arbitration agreement in the contract itself. It is sufficient for the clause to be incorporated by reference either to a standard form of clause or to a set of trade terms which themselves include provisions requiring disputes to be submitted to arbitration[3]. Nor need the contract itself be contained in a single

---

[1] If the court is asked to stay proceedings on the ground that they are covered by an agreement to arbitrate, the question whether such an agreement exists should be decided by the Court at the outset: see p. 108, post.

[2] See p. 108, post.

[3] There are many examples in the reports relating to the rules of trade associations. Reference may also be made to *Wyndham Rather Ltd v Eagle Star* and *British Dominions Insurance Co Ltd* (1925) 21 Ll L Rep 214 (action on insurance slip, which was stated to be subject to proposal form, which in turn was subject to the usual conditions of the company policy, which contained an arbitration clause); *Beattie v E and F Beattie Ltd* [1938] Ch 708 (article of association of private company was not a written agreement to arbitrate within s. 4); *London Sack and Bag Co Ltd v Dixon and Lugton Ltd* [1943] 2 All E R 763; *Hickman v Kent and Romney Marsh Sheep-Breeders' Association* [1915] 1 Ch 881; *Excomm Ltd v Bamaodah, The St. Raphael* [1985] 1 Lloyd's Rep 403. It is not necessary to prove that the parties knew of the arbitration provisions thus incorporated: *Golodetz v Schrier* (1947) 80 Ll L Rep 647, explaining *McConnell and Reid v Smith* 1911 SC 635.

105

caused by one to the other, or over allegations of libel. Nor would a clause in a partnership agreement referring 'differences or disputes' to arbitration cover a quarrel about a horse race[20]. But it would, for example, if included in a contract of carriage, embrace claims for damage to the goods, even if framed in tort. It would also embrace all contractual remedies, apart from those which sought to impeach the initial existence of the contract, so that it would cover claims for damages arising from a repudiation or a deviation, claims for rectification, or avoidance on the ground of misrepresentation. It would, of course, include issues of law as well as fact[1].

### (b) 'In connection with'; 'in relation to'

On the face of them, expressions of this sort would appear to be of considerable width and the current tendency is to enlarge rather than to diminish their scope where the context allows[2]. The courts have, however, in the past given them a surprisingly restricted interpretation. Thus, they have been held not to cover claims for damages based on the fraudulent inducement of the contract[3], or claims for payment on a quantum meruit in respect of work done under a contract which the claimant sought to declare void[4], or a claim for breach of an implied contract not to impede building works which were being carried out under the contract in question[5]. These earlier cases do not, however, decide that expressions of this type must always bear the same limited meaning. In the context of different transactions and differently worded contracts such expressions are capable of bearing, and prima facie do bear, a meaning which embraces any dispute other than one which is entirely unrelated to the transaction covered by the contract[6].

The words 'relating thereto', and 'relative to', have been treated as apt to cover cases where it is alleged that the contract has terminated through failure of a condition, or non-disclosure[7].

### (c) 'In respect of '; 'with regard to'

It has been stated on high authority that these words cover disputes about whether there has been a breach by one side or the other, or whether circumstances have arisen which have discharged one or both parties from future performance[8]. 'In respect of this reinsurance' has been held to cover

---

[20] *Piercy v Young* (1879) 14 Ch D 200, per Jessel MR at 205.
[1] *Selby v Whitbread & Co* [1917] 1 KB 736 at 744 and see, for example, *Farr v Ministry of Transport* [1960] 1 WLR 956. The proposition could not now be doubted.
[2] See *A & B v C & D* [1982] 1 Lloyd's Rep 166, and *Ashville Investments Ltd v Elmer Contractors Ltd*, supra, in which the words 'in connection with' were held wide enough to cover claims for rectification and damages for innocent misrepresentation inducing the contract.
[3] *Monro v Bognor UDC* [1915] 3 KB 167; see the discussion of this case in notes 5 and 7 on pp. 112–113, ante.
[4] Ibid., per Pickford LJ at 170–171.
[5] *Lawson v Wallasey Local Board* (1883) 11 QBD 229.
[6] *Ashville Investments Ltd v Elmer Contractors Ltd*, supra; *Woolf v Collis Removal Services* [1948] 1 KB 11 at 18, per Asquith LJ.
[7] *De la Garde v Worsnop & Co* [1928] Ch 17; *Stevens & Sons v Timber and General Mutual Accident Insurance Association Ltd* (1933) 102 LJ KB 337.
[8] Per Viscount Simon LC in *Heyman v Darwins Ltd* [1942] AC 356 at 366.

# EXHIBIT 8

由此:

HCA 1109/2005

# IN THE HIGH COURT OF THE

# HONG KONG SPECIAL ADMINISTRATIVE REGION

# COURT OF FIRST INSTANCE

ACTION NO. 1109 OF 2005

————————

BETWEEN

| | |
|---|---|
| XU YI HONG (許毅紅) | Plaintiff |

and

| | |
|---|---|
| CHEN MING HAN (陳明翰) | 1st Defendant |
| LIU HONG WEI (劉宏偉) | 2nd Defendant |
| ZHAN KING | 3rd Defendant |
| LIN JIAN YUAN (林建元) | 4th Defendant |

————————

Before: Deputy High Court Judge To in Chambers (Open to Public)

Dates of Hearing: 4 May 2006 and 15 August 2006

Date of Decision: 3 October 2006

————————

# D E C I S I O N

————————

*Background*

1.        This is the Defendants' application to have the proceedings against them stayed pursuant to section 6 of the Arbitration Ordinance and to have their dispute with the Plaintiff referred to arbitration.  As a fallback, the Defendants apply to have the Plaintiff's Amended Writ of Summons set aside on the ground of *forum non conveniens* because Xiamen in the People's Republic of China (the "PRC") is the *forum conveniens* and not Hong Kong.

2.        The Plaintiff is a Hong Kong businesswoman with substantial business holdings in Xiamen where she is a public figure.  Her husband and business partner, Mr Xie Hongbin, had a company called Xiamen Hsin Zhong Hsia Property Development Company Limited ("Xie's Company") in the PRC.

3.        The late Mr Lim Por Yen of the Lai Sun Group and his wife, Ms U Po Chu (collectively the "Lims"), were the sole shareholders of Zenbo Limited（精寶有限公司）("Zenbo") which is a company registered in Hong Kong.  Zenbo is the sole shareholder of a PRC company called Lai Sun (Xiamen) Real Estate Development Company Limited ("Lai Sun Xiamen"). The sole asset of Lai Sun Xiamen is a piece of land in Xiamen for a development project known as Hong Kong Square Project (the "Project").

4.        By a provisional agreement dated 21 January 2004, the Lims agreed to sell their shares in Zenbo to Xie's Company for RMB 180 million. Then by a supplemental provisional agreement dated 10 March 2004, the Plaintiff and her husband (the "Partners") substituted Xie's Company as the

- 3 -

purchaser of the Zenbo shares with the share transfer agreement to be signed on or before 9 May 2004 when the balance of the purchase price would be paid (the "Partners/Lims Agreement").  For reasons which need not concern me, despite repeated extensions of time granted by the Lims, the Partners/Lims Agreement was not signed and the Partners never paid.  Eventually, on 18 June 2004, it was agreed that the Partners had to make a further part payment of RMB 52 million on or before 5 July 2004.

5.        It was at this stage that the Defendants came into the scene.  They contacted the Plaintiff in July 2004 to discuss the possibility of their acquiring the Zenbo shares jointly with her.   They entered into two agreements with the Plaintiff on 7 August 2004.  The first one is a rights transfer agreement made between the Plaintiff as Party A on the one part and the Plaintiff jointly with the 1st to 3rd Defendants as Party B on the other part (the "Rights Transfer Agreement").  Under that agreement, the Plaintiff as Party A would sell all the Zenbo shares which she would acquire from the Lims to herself, the 1st Defendant, the 2nd Defendant and the 3rd Defendant in the proportions of 20%, 40%, 20% and 20% respectively.  Clause 9 of that agreement is an arbitration clause which provided that the parties unanimously agreed to refer any dispute arising from the agreement to arbitration by the Xiamen Arbitration Commission and that the decision of the Xiamen Arbitration Commission shall be binding on the parties.  Clause 9 is in the following terms:

> 「若因本協議發生糾紛，各方一致同意提交廈門仲裁委員會裁決，該裁決對任何一方均具約束力。」

> "If a dispute arises because of this agreement, the parties unanimously agree to refer the dispute to the Xiamen Arbitration Commission for adjudication, whose adjudication shall be binding on any of the parties."  (English translation)

由此:

- 4 -

6.        The second agreement is a joint venture agreement made between the Plaintiff as Party A, the 1st Defendant as Party B and the 2nd and 3rd Defendants jointly as Party C (the "Joint Venture Agreement"). The agreement referred to the Rights Transfer Agreement, Zenbo and its shares.  It provided for the parties rights and obligations in relation to their joint venture in the Project.

7.        Then on 18 August 2004, the parties together with the 4th Defendant as an additional party entered into a Supplemental Agreement with the Plaintiff as Party A, the 1st to 3rd Defendants jointly as Party B and the 4th Defendant as Party C (the "Supplemental Agreement").   The preamble stated that the Supplemental Agreement was to set out the procedures for implementing the Rights Transfer Agreement and the Joint Venture Agreement.   In particular, Clause 2 of the Supplemental Agreement provided that upon fulfilment of certain conditions by the Plaintiff, the Defendants shall pay part of the purchase price for the Zenbo shares to the Lims.

8.        The four Defendants also signed a letter dated 18 August 2004 to the Plaintiff undertaking that upon fulfilment of the conditions in Clause 2 of the Supplemental Agreement by the Plaintiff, they will transfer RMB 90 million to the bank account specified by the Lims and failing which they would indemnify the Plaintiff of her loss (the "Undertaking Letter").

9.        The Partners did not complete their sale and purchase with the Lims on 18 August 2004.  The Plaintiff's case is that the Partners' failure to complete the sale and purchase was due to the Defendants' failure to pay the Lims pursuant to Clause 3 of the Supplemental Agreement.   The Defendants' case is that they did not pay because the Plaintiff had failed to

- 5 -

fulfil the conditions precedent under Clause 2 of the Supplemental Agreement.

10.        On 18 August 2004, the Lims' solicitors wrote to the Plaintiff's solicitors complaining about her breach of the Partners/Lims Agreement and asked for proof of the Partners' ability to pay on or before 19 August 2004.  The sale and purchase between the Partners and the Lims was aborted.  On 20 August 2004, the Lims' solicitors wrote to the Plaintiff's solicitors and alleged that the Partners were in breach of the Partners/Lims Agreement and reserved the Lims' right to sell the shares to others.  On 27 August 2004, the Lims' solicitors wrote to the Plaintiff's solicitors to place on record that the Partners had given up the purchase and that the Lims would sell the Zenbo shares to others.  In another letter, the Lims' solicitors informed the Plaintiff's solicitors that the Plaintiff's deposit of RMB 38 million would be forfeited and the agreement with the Lims rescinded.  Then on 18 October 2004, the Defendants reached agreement with the Lims to purchase their shares in Zenbo.  In a letter dated 4 March 2005 from the Lims' solicitors to the Plaintiff's solicitors, they recorded the agreement between the Lims and the Partners that RMB 15 million be forfeited for the Partners' breach of contract in completing the sale and purchase of the Zenbo shares under the Partners/Lims Agreement.

11.        On 13 June 2005, the Plaintiff commenced the present action against the Defendants.   The Plaintiff relied on two causes of action. Firstly, she claimed that the Defendants had wrongfully and in breach of the Rights Transfer Agreement, the Joint Venture Agreement and the Supplemental Agreement bypassed her and acquired the Zenbo shares from the Lims.   Her second cause of action is in tort in that the Defendants

- 6 -

procured breach by the Lims of the Partners/Lims Agreement.   The Defendants' defence in respect of the first cause of action is that the Plaintiff had failed to satisfy the conditions precedent under Clause 2 of the Supplemental Agreement and in respect of the second cause of action is that it was after the transaction under the Partners/Lims Agreement had been aborted that they reached agreement with the Lims to purchase the Zenbo shares.

*Stay of proceedings, the law and the issues*

12.       The primary application of the Defendants is that the proceedings should be stayed and the parties' dispute referred to arbitration. The Defendants' case is that all the three agreements and the Undertaking Letter should be read as one composite agreement and Clause 9 of the Rights Transfer Agreement is an arbitration agreement which is applicable to all the three agreements and not just the Rights Transfer Agreement itself.   Hence Mr Li, counsel for the Defendants, submits that the proceedings in respect of both the contractual claim and the tortious claim should be stayed and the parties' dispute referred to arbitration.

13.       On the other hand, Mr Cheung, counsel for the Plaintiff, does not dispute that Clause 9 of the Rights Transfer Agreement is an arbitration agreement but submits that that clause was only applicable to the Rights Transfer Agreement and in any event that clause in its entirety had been rescinded by the Joint Venture Agreement and/or the Supplemental Agreement.   He submits in the alternative that even if Clause 9 is applicable to all the three agreements and hence to the Plaintiff's contractual claim, but not the tortious claim.

- 7 -

14.      The court's approach to such an application for stay has been correctly set out by Ma J (as he then was) in *Tommy CP Sze & Co v Li & Fung (Trading) Ltd* Ors [2003] 1 HKC 418 at 425D - 426C.  The court shall ask itself the following four questions:

> (1)   have the parties entered into an arbitration agreement?
>
> (2)   is the arbitration agreement null and void, inoperative or incapable of being performed?
>
> (3)   is there in reality a dispute or difference between the parties?
>
> (4)   is that dispute or difference within the ambit of the arbitration agreement?

A stay of proceedings will be granted and the dispute referred to arbitration if the answers to questions (1), (3) and (4) are in the affirmative and the answer to question (2) is in the negative.

15.      There is no dispute that Clause 9 of the Rights Transfer Agreement contained an arbitration agreement and that there is in reality a dispute between the parties.  Thus, the issues raised by this application are:

> (1)   whether the Rights Transfer Agreement; Joint Venture Agreement; Supplemental Agreement and the Undertaking Letter together formed one composite agreement;
>
> (2)   if yes, whether Clause 9 of the Rights Transfer Agreement had been rescinded by the Joint Venture Agreement and/or the Supplemental Agreement;

由此:

- 8 -

> (3)  if it had not been rescinded, whether that clause is null and void, inoperative or incapable of being performed;
>
> (4)  if it is not, whether the dispute in respect of the tortious claim is within the ambit of Clause 9 of the Rights Transfer Agreement.

16.        As for the standard of proof in an application for stay, it is well settled that the applicant only needs to demonstrate a good prima facie case or a plainly arguable case that the arbitration agreement is in existence and binding on the parties and it is for the arbitrator and not the court to determine the existence or otherwise of the arbitration agreement: see *New Sound Industries Ltd v Meliga (HK) Ltd* [2005] 1 HKC 41 at 47C - D and *Pacific Crown Engineering Ltd v Hyundai Engineering & Construction Co Ltd* [2003] 3 HKC at 662C - 663B.

*Whether the three agreements and the Undertaking Letter together formed one composite agreement*

17.        The Rights Transfer Agreement and the Joint Venture Agreement were entered into on the same day.  The former referred to the Partners/Lims Agreement in the preamble.  The Joint Venture Agreement expressly referred to the Rights Transfer Agreement.  The opening words of that agreement read as follows:

> 「… 就進一步明確各方的權利義務，務實解決目前的實際問題，以利轉讓順利進行的基礎上，達成以下協議：」

The expressed purpose of the Joint Venture Agreement was to further clarify and identify the respective rights and obligations of the parties under the Rights Transfer Agreement and to resolve practical problems in a

- 9 -

pragmatic manner so as to facilitate the implementation of the Rights Transfer Agreement. Clause 1 expressly referred to the Rights Transfer Agreement and provided that upon acquisition of the Zenbo shares pursuant to that agreement, the parties shall jointly possess Zenbo and the Project. Under Clause 2, the parties revised the purchase price of the Zenbo shares under the Rights Transfer Agreement to RMB 190 million, the Plaintiff shall invest RMB 10 million for 20% of the Zenbo shares and in the Project, the 1st Defendant and the 2nd and 3rd Defendants jointly shall each invest RMB 90 million for 40% of the Zenbo shares and in the Project in line with the Rights Transfer Agreement. The effect of the revision was that the Plaintiff only had to pay RMB 10 million for 20% of the Zenbo shares in recognition of her contribution in bringing about the arrangement. Clause 3 provided for distribution of profits and repayment of capital, i.e. capital would be repaid in accordance with the amount of capital injected while profit would be shared in accordance with the parties' shareholding in the Zenbo shares. Clause 4 provided for the obligations of the Plaintiff, which were to bring about the sale of the Zenbo shares and thereafter to liaise with banks and financial institutions in connection with the Project.

18.        From the opening words and Clause 1 of the Joint Venture Agreement, it is beyond dispute that the Joint Venture Agreement was to supplement the Rights Transfer Agreement. The revision of the purchase price of the Zenbo shares under Clause 2, the provision for distribution of profits and repayment of capital under Clause 3 and the provision in respect of the Plaintiff's obligations under Clause 4 were all meaningless without the Rights Transfer Agreement or without that agreement being carried out into effect. Thus the Joint Venture Agreement could not stand on its own without the Rights Transfer Agreement. It did not substitute but supplement the Rights Transfer Agreement.

由此.

19.     The preamble to the Supplemental Agreement expressly referred to the Rights Transfer Agreement and the Joint Venture Agreement. It stated that the Supplemental Agreement was made for the purpose of implementing the other two agreements.  The opening words reads:

> 「甲、乙雙方于 2004 年 8 月 7 日曾簽訂兩份與有關精實有限公司股份買賣的協議(權益轉讓協議、協議書)。為落實有關協議，雙方同意如下：」

20.     Clause 1 of the Supplemental Agreement provided that the Plaintiff and the 1st to 3rd Defendants would form a company called 藝和投資有限公司 ("Yi He") to take up the Zenbo shares and the parties' shareholdings in Yi He would be in the same proportion as agreed in respect of their holding of the Zenbo shares under the Rights Transfer Agreement.

21.     Under Clause 2 of the Supplemental Agreement, the Plaintiff and the 1st to 3rd Defendants agreed to further revise the purchase price for the Zenbo shares to be paid by Yi He to RMB 192.5 million plus HK$180,000.  According to the Plaintiff, the increase in RMB 2.5 million was to compensate the Lims for the loss in interest caused by further extension of time in paying the Lims for the Zenbo shares under the Partners/Lims Agreement, while the sum of HK$180,000 was to cover stamp duty payment in connection with the transfer of the Zenbo shares. Under this clause, the Plaintiff undertook to provide the following confirmation to the 1st to 3rd Defendants on or before 18 August 2004:

> (1)   the Plaintiff's solicitors' undertaking that the Plaintiff had authority to transfer the Zenbo shares;
>
> (2)   the Plaintiff's solicitors' confirmation that the Lims' solicitors had agreed to the share transfer

- 11 -

agreement entered into between the Plaintiff and the Lims and had agreed to transfer the Zenbo shares to Yi He; the Plaintiff's solicitors' confirmation that the 1st Defendant shall hold 40% of the shares in Yi He while the Plaintiff, the 2nd Defendant and the 3rd Defendant each shall hold 20% of the shares in Yi He; and

(3) the Lims' solicitors' confirmation that the balance due and payable on 19 August 2004 by the Plaintiff in respect of her purchase of the Zenbo shares from the Lims did not exceed RMB 132.5 million.

22.      Clause 3 provided that upon fulfilment of the conditions in Clause 2, the 1st to 3rd Defendants shall transfer RMB 132.5 million to an account of the Bank of China in Guangzhou specified by the Lims.

23.      Clause 4 provided that upon completion of the transfer of the Zenbo shares to Yi He, the 1st to 3rd Defendants shall transfer RMB 20 million and HK$180,000 to the Plaintiff's bank account with Hang Seng Bank in Hong Kong and RMB 5 million to the bank account of a Xiamen company with the Commercial Bank nominated by the Plaintiff.   The balance of RMB 25 million shall be paid directly to the Plaintiff by the 4th Defendant on behalf of the 1st Defendant.

24.      Clause 6 provided that in the event of inconsistency or conflict between the terms of the Rights Transfer Agreement and those of the Supplemental Agreement, the terms of the Supplemental Agreement shall prevail, but all other terms of the Rights Transfer Agreement shall be

由此:

- 12 -

A

B

unaffected by the terms of the Supplemental Agreement.   Clause 7 provided that the applicable law of the Supplemental Agreement is Hong Kong law.  Clauses 6 and 7 were read as follows:

「6.　如果甲、乙雙方前述的權益轉讓協議書與本補充協議書的條款有任何不符或抵觸，一概以本補充協議書的條款為準，其餘條款則不受本補充協議書影響。

7.　本補充協議書適用于香港法律。」

"6.　If the aforesaid Rights Transfer Agreement between Party A and Party B is inconsistent or conflicts with the terms of this Supplemental Agreement, the terms of this Supplemental Agreement shall prevail, but all other terms [of the Rights Transfer Agreement] shall not be affected by this Supplemental Agreement.

7.　The law of Hong Kong is applicable to this Supplemental Agreement." (English translation)

25.　　　The Undertaking Letter was signed by the four Defendants on the same date as the Supplemental Agreement.   By that letter, the four Defendants undertook to remit RMB 90 million to the account specified by the Lims before 8 pm on 18 August 2004 upon fulfilment by the Plaintiff of the conditions in Clause 2 of the Supplemental Agreement.

26.　　　The provisions in the Supplemental Agreement were detailed provisions made for the purpose of implementing the Rights Transfer Agreement.   The Undertaking Letter was an undertaking to that effect. Except for Clause 2 of the Supplemental Agreement which provided for a revision of the purchase price of the Zenbo shares, all the provisions in the Supplemental Agreement were new provisions in which there were no equivalent in either the Rights Transfer Agreement or the Joint Venture Agreement.   Even in respect of the revision in the purchase price of the Zenbo shares, there was a reason for the revision, namely to make financial provision for payment of interest charged by the Lims as a result of the

- 13 -

delayed completion and for stamp duty.  I find that the Supplemental Agreement and the Undertaking Letter were consistent with the Rights Transfer Agreement and the Joint Venture Agreement and should be read as one composite agreement.  The Supplemental Agreement should not be treated as having replaced the other two agreements.  Indeed, even in the Plaintiff's statement of claim, she based her claim on all the three agreements.

*Whether Clause 9 of the Rights Transfer Agreement had been rescinded*

27.       Mr Cheung submits that the arbitration agreement contained in Clause 9 of the Rights Transfer Agreement had been rescinded by Clauses 6 and 7 of the Supplemental Agreement.  His argument is as follows.  As the Supplemental Agreement is silent on arbitration, the natural recourse of the parties in the event of a dispute would be to litigate their differences in the court unless they agree to resort to other modes of dispute resolution.  In this respect, Clause 9 of the Rights Transfer Agreement is in conflict with and repugnant to the Supplemental Agreement.   He argues that there is no choice of law provision under the Rights Transfer Agreement providing for arbitration in Xiamen as the mode for resolving dispute under that agreement.  Hence he submits that by inserting the choice of law provision in Clause 7 of the Supplemental Agreement but without providing for arbitration, the parties must have given careful consideration to the forum and jurisdictional issues when drafting the Supplemental Agreement and must have intended to eliminate their previous choice of utilizing arbitration in Xiamen as a venue for adjudicating their dispute.  He further argues that it is particularly significant that the Supplemental Agreement was executed in the presence of the parties' Hong Kong lawyers.  He submits that in the circumstances it is not sensible or probable

- 14 -

that the parties, considering their experience in business and the magnitude and subject matter of the transaction had intended to choose Hong Kong substantive law but the PRC procedural law to resolve their disputes.

28.      Mr Li disputes that the Supplemental Agreement was executed in Hong Kong in the presence of the parties' solicitors.  He argues that the Supplemental Agreement was executed in China by the 1st to 3rd Defendants and in Hong Kong by the Plaintiff and the 4th Defendant; and that only the execution by the Plaintiff and the 4th Defendant was witnessed by their solicitors.  I do not think it appropriate to resolve disputes of fact here, nor is it necessary.

29.      I accept it is unusual and it lacks business sense to opt for Hong Kong substantive law but the PRC procedural law to resolve disputes.  However, to be inconsistent a term must contradict another term or be in conflict with it such that effect cannot fairly be given to both clauses: see *Pagnan SpA v Tradax Ocean Transportation SA* [1987] 2 Lloyd's Rep 342 at 350.  If a supplemental agreement is expressly made to implement an earlier or a principal agreement, the two agreements should be construed so far as possible consistently with each other so that they can co-exist together.  Every effort must be made to give effect to both agreements and no provisions in either of the agreements should be rejected unless it is manifestly inconsistent with or repugnant to the two agreements read together as a whole.  It needs unequivocal language for any provision in the supplemental agreement to override a provision in the principal agreement.

30.      Mr Cheung cannot refer to any express provision abrogating Clause 9 of the Rights Transfer Agreement.  He says that it was the intention of the parties that the arbitration agreement be rescinded.

由此:

- 15 -

However, that is only a bare assertion which is disputed by the Defendants. More fatally for that argument, it is trite law that construction of a contract is the ascertainment of the meaning of the agreement as would be understood by a reasonable reader having knowledge of the factual matrix surrounding the making of the agreement: per Lord Hoffmann, NPJ, in *Jumbo King Ltd and Faithful Properties Ltd & Others* [1999] 2 HKCFAR 279 at 296 and *Investors Compensation Scheme Ltd and West Bromwich Building Society* [1998] 1 WLR 897 at 912F - 913F.   Evidence of any expressed intention of the parties to a contract is not evidence admissible for the purpose of construing the contract.

31.        Mr Cheung seeks to rely on the absence of arbitration provision in the Supplemental Agreement and the introduction of a choice of law clause to raise the inference that Clause 9 was rescinded.  Even with the introduction of a choice of law clause in the Supplemental Agreement, I find it impossible for Mr Cheung to make the quantum leap from the absence of provision on arbitration in the Supplemental Agreement to the conclusion that an express provision in the Rights Transfer Agreement was thereby impliedly rescinded.  It is almost impossible to rely on inference to be drawn from mere silence in the supplemental agreement to override an express provision in the principal agreement.   There must exist some overwhelming and strong circumstances in order to raise such inference which has the effect of overriding an earlier express provision.  There are no such circumstances here.  In my view, the choice of law provision is not strong enough to displace the express arbitration agreement.   On the contrary, the Project is in Xiamen in the PRC and payment for the shares was substantially effected in the PRC.  There is nothing wrong or unusual for the parties to agree to resolve their disputes in the place where the dispute would occur with the procedural law of that place but using the

substantive law of another place which the parties are more comfortable with.  There is nothing to suggest that the Xiamen Arbitration Commission would not be competent in applying Hong Kong law if properly advised by legal experts just as our own courts would be competent in applying foreign law if properly advised by experts on foreign law.

32.        Accordingly, I find that the arbitration agreement contained in Clause 9 of the Rights Transfer Agreement had not been rescinded by the Joint Venture Agreement or Supplemental Agreement.

*Whether the arbitration agreement was null and void, inoperative or incapable of being performed*

33.        There is nothing to suggest that the arbitration agreement contained in Clause 9 of the Rights Transfer Agreement was null and void, inoperative or incapable of being performed.  The arbitration agreement is in writing and signed by the parties.  The Xiamen Arbitration Commission is a proper arbitration body.  There is nothing to suggest that an award properly obtained from the Xiamen Arbitration Commission will not meet with the requirements under Order 73 of the Rules of the High Court and be incapable of enforcement.

34.        The only argument raised by Mr Cheung under this head is that the 4th Defendant is not a party to the Rights Transfer Agreement which contained the arbitration agreement.  The 4th Defendant is a party to the Supplemental Agreement which expressly referred to the Rights Transfer Agreement and the Joint Venture Agreement.  I have found that all the three agreements are to be read as one composite agreement.  By entering into the Supplemental Agreement, the 4th Defendant joined in the scheme

- 17 -

under the Rights Transfer Agreements, including the arbitration agreement. He is therefore also a party to the Rights Transfer Agreement and is bound by the arbitration agreement.   Furthermore, under Clause 4(3), the 4th Defendant had assumed the primary obligation of the 1st Defendant to pay the Plaintiff RMB 25 million and the joint obligation with all the Defendants in respect of all damage suffered by the Plaintiff in the event of their breach of the three agreements.   He had assumed liability as guarantor for the performance by the 1st to 3rd Defendants of their obligations under the three agreements.   If the Plaintiff's dispute with the 1st to 3rd Defendants in respect of their liability under the three agreements is to be resolved by arbitration, there is all the more reason that her dispute with the 4th Defendant in respect of his liability arising from the liability of the 1st to 3rd Defendants should also be resolved in the same proceedings as well.   I am therefore satisfied that the arbitration agreement contained in Clause 9 of the Rights Transfer Agreement is valid and operative for and against all the Defendants and that the arbitration agreement is capable of being performed.

*Whether the dispute is within the ambit of the arbitration agreement - the close connection test*

35.        There is no dispute that the contractual claim is within the ambit of the arbitration agreement.   The Plaintiff's contention is that the dispute in respect of the tortious claim, i.e. inducing the Lims to breach the Partners/Lims Agreement, is outside the ambit of the arbitration agreement. Mr Cheung referred me to the Court of Appeal decision in *New Sound Industries Ltd v Meliga (HK) Ltd* [2005] 1 HKC 41 at 47.   In that case, Deputy High Court Judge Muttrie held at first instance that reference to 'all disputes' in an arbitration agreement is equivalent to a clause containing

- 18 -

such words as 'all disputes in relation' or 'in connection with' the contract. This definition was accepted and not argued by the parties on appeal.  On this basis, Mr Cheung submits that the arbitration agreement only encompasses disputes giving rise to a cause of action in contract and hence the dispute in respect of the tortious claim is not within the ambit of Clause 9 of the Rights Transfer Agreement.

36.        With respect, I think that submission is an over-simplification of the legal and factual issue involved and it failed to address the question of what disputes are in connection or in relation with the contract.  I think in that case neither Deputy High Court Judge Muttrie nor the Court of Appeal took the very over-sweeping view as suggested by counsel, namely that a tortious claim must be un-related to or unconnected with the contract. Indeed in *Getwick Engineers Ltd v Pilecon Engineering Bhd* HCA 558/2002 (unreported) which was quoted by Deputy High Court Judge Muttrie, Ma J (as he then was) said at para 23(2):

> "Where the words 'in connection with' are used, while every contract must of course be construed in accordance with its ordinary and natural meaning (and arbitration agreements are no exception), it seems to me that they are wide in nature. They would in general cover all disputes other than one entirely unrelated to the transaction covered by the contract in question: see *Mustill & Boyd: Commercial Arbitration*, 2nd Edition, at 119."

I think this must be correct.  Those words are very wide in their nature and scope.  It is wrong to limit them to disputes giving rise to a cause of action in contract and ignore the wide meaning conveyed by the words 'in connection with' or 'in relation to'.  I think the words 'if a dispute arises because of this agreement' as used in the Rights Transfer Agreement have the same effect.  Whether a dispute is in connection with or arises because of a contract is a question of fact which has to be answered by examining all the circumstances of the case and is not to be determined solely on the

由此

- 19 -

basis whether it is a claim in contract or otherwise.  Indeed, in *Halsbury's Laws of Hong Kong,* Vol 1(2) para 25.022, the learned authors referred to a claim in tort which has a sufficiently close connection with the contractual claim as an example of the type of dispute that may be covered by an arbitration agreement in which the parties agreed to submit all disputes in connection with the contract to arbitration.

37.        These words in the context of jurisdiction in arbitration proceedings have been considered by the English Court of Appeal on a number of occasions.  The English Court of Appeal adopted the close connection test formulated by Mocatta J in *Astro Vencedor Compania Naviera SA of Panama v Mabanaft G.m.b.H. ("The Damianos")* [1971] QB 588 at 595B-G as the test for determining whether a tortious claim is within the ambit of an arbitration clause.  The test is whether the tortious claim has a sufficiently close connection with the contractual claim.  In *Astro Vencedor*, the parties entered into an agreement containing a clause that any dispute arising during the execution of the charter-party shall be resolved by arbitration.  The owners referred their disputes which included the owners' claim for damages for two arrests of the vessel to arbitration. The charterers' application by motion for a declaration that the claim for damages for the tort of wrongful arrest did not fall within the arbitration clause was dismissed by Mocatta J.  On appeal, Lord Denning MR held that although the claim for wrongful arrest was a claim in tort, it was within the scope of arbitration as that claim was simply a follow-up to the claim that the shipowners had wrongfully stopped the discharge of the vessel which was a claim which arose out of the contract and during the execution of the contract.  Lord Denning MR held at 595D:

> "The arrest of the ship was the direct consequence of the
> charterers' claim for damages against the shipowners.  The
> charterers arrested the ship so as to enforce their claim. Their

- 20 -

> claim - that the shipowners had wrongfully stopped discharging the oil - was certainly a claim which arose out of the contract during the execution of it. It was plainly within the arbitration clause. It had necessarily to be decided by the arbitrators. The arrest was simply the follow-up to that claim. It was so closely connected with it that the rightness or wrongness of the arrest is also within the scope of the arbitration. …
>
> In this case the umpire found that the claim of the charterers was bad. He dismissed it out of hand. At once the question arises: Was not then the arrest unlawful? It seems to me that the arrests were so much part and parcel of the inquiry that they come within the broad scope of the arbitration clause. I agree with the way Mocatta J put it: If the claim or the issue has a sufficiently close connection with the claim under the contract, then it comes within the arbitration clause."

Lord Denning MR approved the close connection test formulated by Mocatta J. But it should be noted that the degree of closeness established in that case was a very high one. To be within the scope of the arbitration clause, the tortious claim has to be part and parcel of the inquiry that the arbitrator had to undertake in relation to the contractual claim, i.e. the resolution of the contractual claim was necessary for a decision on the tortious claim.

38.       However, the English Court of Appeal adopted a more relaxed approach in its later decision in *Empresa Exportadora de Azucar v Industria Azucarera Nacional SA (The "Playa Larga" and "Marble Islands")* [1983] 2 Lloyd's Rep 171. In that case, the parties entered into a contract for sale and delivery of Cuban raw sugar to a Chilean port and agreed to submit to arbitration by the Sugar Association of London in respect of any controversy that might arise from this contract. The buyers, Iansa, had paid for the sugar and claimed in arbitration for damages in respect of undelivered sugar in contract and in tort for detinue or conversion. The arbitrators found the vendor, Cubazucar liable for damages for breach of contract and for tort of conversion in respect of the cargo on board the *Playa Larga* but not in respect of the cargo on board the

- 21 -

*Marble Island*.  The arbitrators stated their award in the form of a special case for the opinion of the court.  Mustill J upheld the arbitrators' award.  Cubazucar appealed and Iansa cross-appealed.   On appeal, Ackner LJ accepted as correct the two-limb test as stated by Mustill J in the court below.  According to Mustill J, the close connection test is satisfied if it can be shown either the resolution of a contractual issue is necessary for a decision on the tortious claim as in *Astro Vencedor* or in the alternative that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other as in *Wolf v Collis Removal Services* [1948] 1 KB 11.  I shall quote extensively from the judgment of Ackner LJ as both counsel took different views on the interpretation of the judgment as approved by the English Court of Appeal.

39.        In *Playa Larga,* one of the arguments raised by counsel for Cubazucar, Mr Hallgarten QC, was that 'dispute arising out of this contract' meant and only meant, a dispute giving rise to a contractual cause of action.  This is exactly what Mr Cheung sought to argue on behalf of the Plaintiff in the present case.  Mr Hallgarten QC's argument was rejected by the arbitrators.  Mustill J, having held there was a breach of contract by Cubazucar, found it unnecessary to express a firm conclusion on this issue.  But then he went on to consider the authorities, including *Astro Vencedor*, set out the two-limb close connection test and seemingly rejected the submission of Mr Hallgarten QC.  In the English Court of Appeal, Ackner LJ agreed with that view.  He explained at 182, quoting the judgment of Mustill J:

> "… Mr Justice Mustill, having held that there was a breach of the warranty implied by s 12(2) of the Act, accordingly found it unnecessary to express a firm conclusion on this point.  Having referred to a number of the cases cited to him, he did say this:

- 22 -

> It seems to me that the claimant must show either that the resolution of a contractual issue is necessary for a decision on the tortious claim (as in *Astro Vencedor v Mabanaft,* [1971] 1 QB 588) or, that the contractual and tortious disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other: as in *Wolf v Collis Removal Services*, [1948] 2 KB 11, and the "Merita" (unreported).   ***In the present instance, however, there is no need to examine the contract in order to ascertain the merits of the claim in conversion. The fact that Iansa had both title and constructive possession at the material time is indisputable; this is all they need show to establish their claim in conversion. The contract does, no doubt, form part of a narrative of the events leading up to the claim, but it need not be asserted when the cause of action comes to be pleaded.***   Moreover, although the claims in contract and conversion are closely associated, it is hard to see how the assertion of a contractual claim which was (ex hypothesi) invalid could generate a jurisdiction in tort which would not otherwise have existed.

That part of his judgment would appear to support Mr Hallgarten's submissions.  However, he continued as follows: -

> The wrongful acts relied upon as a breach of s 12(2) were the same as those which founded the claim in conversion.  The dispute is whether these acts entitled Iansa to a remedy, and, if so, for how much.  This was a single dispute, even though the argument upon it was put forward in different alternative ways; and in my judgment the whole of the dispute in all its aspects can properly be regarded as falling within the scope of the agreement to arbitrate.

Mr Hallgarten submits that the two propositions are not reconcilable.  We do not agree.  To our minds the learned Judge having concluded that Iansa had failed to show that the resolution of a contractual issue was necessary for a decision on the tortious claim, was nevertheless satisfied that they had passed the alternative test, namely that they had established that the contractual and tortious disputes were so closely knitted together on the facts, that an agreement to arbitrate on one can properly be construed as covering the other.  If that was his view, we agree with it."

40.       In the first sentence of Mustill J's judgment quoted above, the learned judge stated that the close connection test may be met by showing

由此:

- 23 -

A

B

C

D

E

F

G

H

I

J

K

L

M

N

O

P

Q

R

S

T

U

V

that the resolution of a contractual issue is necessary for a decision on the tortious claim or failing that by showing that the two disputes are so closely knitted together on the facts that an agreement to arbitrate on one can properly be construed as covering the other.   In the last paragraph of the judgment quoted above, Ackner LJ approved that statement as correct.  In the later part of his judgment, Ackner LJ indeed applied the second limb of the test and held that the tortious claim was within the scope of the arbitration agreement.

41.        However, Mr Cheung seizes upon the part of Mustill J's judgment which immediately followed the first sentence of the judgment quoted above (which I have high-lighted) and argues that that is the test for deciding whether a tortious dispute is outside the arbitration clause.  He submits that the tortious claim is outside the ambit of the arbitration clause if it can be shown that the tortious claim is free standing on its own without having to plead or to examine the contract which was just part of the background, i.e. the claimant only needs to show he has a right that has been infringed.  With respect, that is a blatant distortion of the judgment of Mustill J.  Mustill J set out the two-limb test of close connection in the first sentence of the judgment quoted above.  Then he went on the deal with the facts of the case before him.  It was in relation to the facts of that case that he held it was not necessary to determine the contractual claim in order to determine the tortious claim.  In other words, Mustill J found Iansa failed under the first limb.  Then Mustill J continued, as observed by Ackner LJ, to hold that the wrongful acts relied on in the contractual claim and tortious claim were the same acts such that the dispute was just one dispute and the agreement to submit to arbitration in respect of the contractual claim covered the tortious claim as well.  This view was clearly expressed by Mustill J and if that is not clear enough, Ackner LJ's further explanation

- 24 -

must have put the matter beyond doubt.  Mr Cheung was advancing the same argument of Mr Hallgarten QC which was rejected by Mustill J and on appeal by Ackner LJ.  That argument is doomed to fail before me.

42.        The two-limb test is further affirmed in the following dicta of Ackner LJ at 183:

> "We do find, however, that the approach of Mr Justice Mocatta, as approved by this Court in *Astro Vencedor Compania Naviera SA v Mabanaft G.m.b.H.,* [1971] 1 Lloyd's Rep 331, to be most helpful.  The claim in conversion had a sufficiently close connection with the claims under the contract that it came within the arbitration clause.  Adopting the words of Mr Justice Mustill, the contractual and tortious disputes were so closely knitted together on the facts, that the agreement to arbitrate on one can properly be construed as covering the other. Accordingly, we would have held, had the matter required a decision, that the whole of the dispute as reflected in the pleadings could be properly regarded as falling within the scope of the agreement to arbitrate."

43.        The above dicta of Ackner LJ is clearly obiter.  The present case is one in which a decision is required as to what is the applicable test.  In his last attempt to argue for the free standing test, Mr Cheung sought to distinguish *Astro Vencedor, Playa Larga* and *Wolf v Collis Removal Services* from the present case on the basis that the parties to the tortious act in those cases were the same parties to the contract and to the arbitration agreement whereas in the present case the party who was procured to breach the contract, namely the Lims, was an outside party.  However, as the Lims are not a party to this action, I think the distinction is one of no difference.  The two-limb close connection test as stated by Mustill J in *Playa Larga* has stood for almost sixty years and has been approved by the English Court of Appeal.  I respectfully adopt that test as the proper test to determine whether a tortious dispute is within the ambit of an arbitration

- 25 -

clause.   The burden of proof rests on the party seeking to rely on the arbitration clause, i.e. the Defendants in this case.

*Whether the dispute is within the ambit of the arbitration agreement - the fact*

44.        Mr Cheung submits that there is no close connection between the contractual claim and tortious claim as the tortious claim is free standing even without the contractual claim.   Again, with respect, that is not the proper test.   The test is whether resolution of the contractual claim is necessary for disposing of the tortious claim or whether the facts of the two disputes are so closely knitted together that the agreement to arbitrate on one can properly be construed as covering the other.   On the Plaintiff's pleading, the contractual claim is based on the Defendants' failure to pay the Lims on or before 19 August 2004 in accordance with Clause 3 of the Supplemental Agreement which resulted in the Lims rescinding the Partners/Lims Agreement and forfeiting part of the deposit.   The tortious claim is based on the Defendants' knowingly offering a higher price to the Lims for their Zenbo shares which procured the Lims to breach the Partners/Lims Agreement.   On the Plaintiff's pleaded case, the tortious claim is separate and distinct from the contractual claim.   But, as I shall demonstrate below, the Plaintiff's pleaded claim in tort is problematic.

45.        Whether there is close connection is not to be determined solely on the basis of the pleading of one party.   Skilled draftsmanship can turn a positive averment negative and vice versa.   To determine whether the two claims are closely connected, the court must consider the substance and nature of the two disputes.   This, the court cannot do without also looking at the pleading of the other party.   The Defendants' defence to the

- 26 -

contractual claim is that they did not honour their payment obligation because the Plaintiff had failed to meet the conditions precedent under Clause 2 of the Supplemental Agreement by providing the necessary confirmations.  On these pleadings, the dispute under the contractual claim is clearly a matter within the ambit of the arbitration clause.  Counsel have no dispute about this.

46.        As for the defence to the tortious claim, the Defendants pleaded that they were approached by the Lims after the Partners/Lims Agreement was rescinded in August 2004 and they entered into the agreement with the Lims to purchase their Zenbo shares at the same price on 18 October 2004.  The Plaintiff was unable to say what was the price that the Defendants offered to procure the Lims to breach the Partners/Lims Agreement and averred that that will be pleaded upon completion of discovery.  But even assuming, in favour of the Plaintiff, that she can show that the price offered by the Defendants to the Lims for their Zenbo shares was higher than that under the Partners/Lims Agreement and that the Defendants had begun negotiation with the Lims for the purchase of the Zenbo shares prior to 18 October 2004, the central dispute in respect of both the contractual claim and tortious claim remains whether the Plaintiff had failed to meet the conditions precedent under Clause 2 of the Supplemental Agreement.

47.        If the Plaintiff had failed to meet the conditions precedent, the Defendants had no obligation to pay.  The rescission of the Partners/Lims Agreement by the Lims was a matter of course and matter of right for the Lims.  The Plaintiff was responsible for that breach. There was no breach of the Partners/Lims Agreement on the part of the Lims.  The Plaintiff could not complain that the breach was procured by the Defendants.  The

- 27 -

Defendants have a complete defence to both the contractual and tortious claims. If, on the other hand, the Plaintiff had met the conditions precedent, the Defendants were in breach of their payment obligation. Their breach clearly resulted in rescission of the Partners/Lims Agreement by the Lims. They would be liable to the Plaintiff for breach of the Supplemental Agreement. But even then, the Defendants could not have committed the tort of procuring the breach of the Partners/Lims Agreement by the Lims because the party who was in breach of that agreement was the Plaintiff for not being able to pay and not the Lims for having agreed to sell at a higher price to the Defendants. The Defendants would have no defence to the contractual claim but would have a complete defence to the tortious claim. That is why I indicated earlier that the Plaintiff's pleaded case in respect of the tortious claim is problematic. Immediately, it could be seen that this is a case falling within both limbs of the close connection test. The single and common issue for the two claims is whether the Plaintiff had failed to satisfy the conditions precedent under Clause 2 of the Supplemental Agreement. The resolution of the contractual claim is necessary for a decision on the tortious claim and the factual dispute in respect of both claims involved the same fact.

48.       In the circumstances, I am satisfied that there is a sufficiently close connection between the contractual claim and the tortious claim that the tortious claim also comes within the ambit of the arbitration clause. I find that the Defendants have demonstrated a good prima facie case or a plainly arguable case that the arbitration agreement is in existence and binding on the parties. Accordingly, I shall allow the application to have these proceedings stayed pursuant to section 6 of the Arbitration Ordinance for the dispute to be referred to arbitration by the Xiamen Arbitration Commission in accordance with Clause 9 of the Rights Transfer Agreement.

- 28 -

*Setting aside the writ on the ground of forum non conveniens - the law*

49.       Having reached the above conclusion, it is unnecessary for me to consider the Defendants' fallback application.  But I shall nevertheless deal with that briefly.

50.       The law on this matter is very well established: see *Hong Kong Civil Procedure 2006* Vol 1 para at 11/1/10, *The Lanka Muditha* [1991] 1 HKLR 741 at 744 and *New Link Consultants Ltd v Air China & Others* [2005] 2 HKC 260 at paras 52 and 53.  In considering an application to set aside a writ on the ground of *forum non conveniens*, the court asks itself the following three questions: -

(a)    is it shown that Hong Kong is not only not the natural and appropriate forum for the trial, but that there is another forum which is clearly and distinctly more appropriate than Hong Kong?

(b)    if the answer to question (a) is yes, will a trial at the other forum deprive the plaintiff of any legitimate personal and juridical advantages?

(c)    if the answer to question (b) is yes, the court has to balance the advantages in question (a) against the disadvantages in question (b).  Deprivation of one or more personal or juridical advantages will not necessarily be fatal to the applicant provided that the court is satisfied that notwithstanding such loss substantial justice will be done in the available forum.

- 29 -

It is the plaintiff's prerogative to choose the forum in which he wishes to institute proceedings.  If the defendant wishes to set aside the proceedings on the ground of *forum non conveniens*, he bears the burden of proof, save in respect of question (b) which is a matter solely within the knowledge of the plaintiff who should therefore bear the burden of proof in respect of that issue.

*Question (a) - Whether another forum is more appropriate*

51.        In considering this question, the court must bear in mind all matters pertaining to the trial of the action, including the place of residence of the parties and their witnesses, the nature of the claim, the defence, the evidence and the remedy sought and the law applicable to the dispute.

52.        The 1st, 2nd and 4th Defendants are citizens of the PRC.  Not only that they are businessmen in Xiamen, they are also international businessmen.  There is nothing to suggest that any of them have difficulties coming to Hong Kong to conduct their litigation.  The large number of PRC litigants in our courts these days shows that travelling to Hong Kong or obtaining two way permits to come Hong Kong is no longer a consideration against Hong Kong as a *forum conveniens*.  The 3rd Defendant is an Australian citizen.  The Plaintiff is a Hong Kong citizen, but she is also a businesswoman in Xiamen and a public figure there.  Her husband is also a PRC citizen in Xiamen.  Whether the trial is conducted in Hong Kong or Xiamen is of no difference to the 3rd Defendant and the Plaintiff.  It is argued by Mr Cheung that the Defendants' company, Excel Pearl (Hong Kong) Limited is a company incorporated in Hong Kong under the Company Ordinance and is indicative of the Defendants' connection with Hong Kong.  However, the company is only an investment

- 30 -

vehicle for the Defendants' investment in the PRC.  I consider there is little significance to be attached to this company or its place of incorporation.

53.        On witnesses, the 1st, 2nd and 4th Defendants, the Lims' representative in Xiamen who negotiated the sale of the Zenbo shares to the Defendants and the Plaintiff's husband are all residents in the PRC.  The Plaintiff, her solicitors and those of the Lims' solicitors are resident in Hong Kong.  Though travelling to Xiamen by the Hong Kong witnesses or travelling to Hong Kong by the PRC witnesses is not a major consideration, having regard to the nature of the dispute and the nature of the evidence, it appears that the Plaintiff's solicitors and the Lims' solicitors will most likely be the most important witnesses in the trial.  The documents they will likely produce will most likely originate from Hong Kong and be more intelligible to the Hong Kong court than to the forum in Xiamen.  This consideration favours Hong Kong as the more convenient forum.

54.        As for the agreements, they were executed by the Plaintiff and the 4th Defendants in Hong Kong and by the other Defendants in the PRC.  The execution of the agreements is not in dispute.  I do not think there is any significance to be attached to this fact as the parties have agreed that the proper law of the contract is Hong Kong law.

55.        As for the place of performance of the agreements, Mr Li submits that the place of performance is the PRC as payment of monies which is the crucial part of the performance of the agreements was to be substantially performed in the PRC.  He also argues that although the subject matter of the agreements was the Zenbo shares, in reality the subject matter was the shares of Lai Sun Xiamen, a PRC company holding the Project in Xiamen.  Be that as it may, I think Mr Li's submission is

only of superficial attraction. Though the majority of the payment was to be remitted to the PRC, the payment obligations were never discharged and this is not in dispute. Insofar as the dispute between the Plaintiff and the Defendants is concerned, nothing turned on the Zenbo shares or the Project. The Plaintiff is not seeking delivery up of the Zenbo shares or of the Project. There are no disputes about any breach of warranty in respect of the Project or of Lai Sun Xiamen. There are no claims over the assets of the Project or of Lai Sun Xiamen. The remedy sought by the Plaintiff is purely monetary. Thus, the place where the contract was to be performed or where the subject matter was situated has no significance so far as issues pertaining to the trial in Xiamen or Hong Kong are concerned.

56. In the ultimate analysis, the most important issues to be considered under this question are the place of residence of the crucial witnesses, the nature of the evidence and the choice of law clause. The crucial witnesses are resident in Hong Kong. The documentary evidence are likely to be more familiar to the Hong Kong court than to any forum in Xiamen. The law to be applied to the contract is Hong Kong law. Though there is nothing to suggest that the Xiamen forum would not be competent in Hong Kong law if properly advised by legal experts, there is nothing to suggest that forum is more appropriate than Hong Kong. I find that the Defendants have failed to show that Hong Kong is not the natural and appropriate forum for the trial and that the forum in Xiamen is clearly and distinctly more appropriate than Hong Kong. In view of this conclusion, there is no need to consider the question (b) and question (c). If it becomes necessary for me to determine this application, for the reasons as stated above, I would dismiss it.

由此:

- 32 -

*Conclusion*

57.        Accordingly, I grant the Defendants' application to have these proceedings stayed pursuant to section 6 of the Arbitration Ordinance for the dispute to be referred to arbitration by the Xiamen Arbitration Commission in accordance with Clause 9 of the Rights Transfer Agreement. I also make a costs order nisi that the Plaintiff shall pay the costs of the Defendants, to be taxed if not agreed.

(Anthony To)
Deputy High Court Judge

Mr. Lawrence L.K. Cheung, instructed by Messrs Leung, Chan & Pang, for the Plaintiff

Mr. LI Chau Yuen, instructed by Messrs Li, Wong & Lam, for the Defendants

# EXHIBIT 9

A

B                                                          HCMP 1954/2018

C                                                        [2019] HKCFI 482

## IN THE HIGH COURT OF THE

D

## HONG KONG SPECIAL ADMINISTRATIVE REGION

E

## COURT OF FIRST INSTANCE

F       MISCELLANEOUS PROCEEDINGS NO 1954 OF 2018

G                          _____

H                                   IN THE MATTER OF an application
                                    for injunctive relief under Section 21L
I                                   of the High Court Ordinance (Cap 4)

J                          _____

        BETWEEN

K       DICKSON VALORA GROUP (HOLDINGS)              1st Plaintiff
        COMPANY LIMITED (迪維集團(控股)有限公司)
L
        DICKSON VALORA (LIANYUNGANG)                 2nd Plaintiff
M       PROPERTY CO LIMITED (迪維(連雲港)置業有限公司)

N                                   and

O       FAN JI QIAN (樊紀乾)                          Defendant

                           _____
P

Q       Before:  Hon G Lam J in Court

R       Date of Hearing:  31 January 2019

        Date of Judgment:  20 February 2019
S
                              _____

T                            J U D G M E N T
                              _____
U

V

- 2 -

*A.*    *Introduction*

1.          This is an application by the plaintiffs for an anti-suit injunction restraining the defendant from taking steps in the legal proceedings he had commenced in the Mainland against the plaintiffs on the ground that the dispute should be referred to arbitration.  The issues include whether there is an arbitration clause in the contract being sued upon by the defendant, what the court's approach should be in the absence of privity to the arbitration agreement, whether the application is precluded by issue estoppel arising from a Mainland judgment, and whether there are other reasons why the injunction should be refused.

*B.*    *The background facts*

2.          In around 2010 a few investors based in Mexico, including Mr Domingo Rodriguez, agreed with a Mainland Chinese resident, Mr Fan Jiqian ("**Fan**"), to pursue the business opportunity of developing a commercial and residential real estate project in the Gangyu district of Jiangsu Province in Mainland China in cooperation with Walmart.  Through their respective corporate vehicles, namely, Moravia CV ("**Moravia**"), a Netherlands company, owned by the Mexican investors, and Dickson Holdings Enterprise Co Ltd ("**DHE**"), a Hong Kong company, owned by Fan, they agreed to set up a joint venture company in Hong Kong with the name of Dickson Valora Group (Holdings) Co Ltd ("**the Company**").

3.          Shortly after the incorporation of the Company, the three parties, namely, DHE, Moravia and the Company entered into a Shareholders Agreement on 24 December 2010.  The initial shareholdings

- 3 -

A

B

in the Company were equally split, with DHE and Moravia each holding 500,000 shares out of a total of 1 million shares in the Company.

4.        The Shareholders Agreement, written in both Chinese and English, makes provisions, *inter alia*, relating to the raising of funds for the project and the management and organisation of the Company.  In broad terms Moravia would advance loans of a total of US$3.5 million to the Company, to be transferred on to its wholly-owned subsidiary called Dickson Valora (Lianyungang) Property Co Ltd, ie the 2nd plaintiff herein ("**the Subsidiary**") to be applied towards acquisition of the land for the development.  DHE was to try to raise additional funds to complete the project.  At the end of the agreement there is a clause which lies at the heart of the present application:

" IX.      Governing law

This Agreement shall be governed by and construed in accordance with Hong Kong law.

Any dispute, controversy or claim arising out of or relating to this Agreement, or the breach, termination or invalidity thereof, shall be settled by arbitration under the Hong Kong International Centre Administered Arbitration Rules in force at the date of this Agreement (the "Arbitration Rules"):[1]

(i)      the place of arbitration shall be in Hong Kong at the Hong Kong International Arbitration Centre (HKIAC);

(ii)     there shall be three arbitrators, all of whom shall be appointed according to the Arbitration Rules;

(iii)    the arbitration proceedings shall be conducted in the English language;

(iv)    the decision of the arbitrators shall be final, binding and conclusive upon the parties to the dispute, their successors and permitted assigns, and they shall comply with such

---

[1]        The Chinese version of this paragraph reads: 「因本協議及其違約、終止、無效所生任何爭議、糾紛，各方同意根據本協議達成之日生效的香港國際仲裁規則的規定，提交仲裁裁決。」

- 4 -

decision in good faith; and

(v)    each party to the dispute to submit itself to the jurisdiction of the courts where the award by the arbitrators is sought to be enforced.  Notwithstanding the foregoing, judgment upon the award may be entered in Hong Kong, or any court having jurisdiction over the parties or their assets.

During the period when the dispute is being resolved, except for the matter being disputed, the parties shall in all other respects continued their implementation of the Contract."

5.      On 21 January 2011 the same three parties entered into a Supplementary Agreement adjusting the amount of the loan to be advanced by Moravia to US$3.25 million and providing for a "success fee" of US$3 million payable to DHE upon the fulfilment of certain conditions including the repayment of all the loans from Moravia and more than 50% of the saleable floor area in the project having been sold.  DHE is required to play a key role in achieving success.  The Supplementary Agreement states in its recital:

" Dickson, Moravia and the Company have agreed to enter into this Agreement for the purpose of governing their relationship as shareholders in relation to the Company, Dickson, Moravia and the Company for setting out the company's managing affairs had signed a Shareholder Agreement on the 24th Day of December 2010, for the articles of incorporation of the Company have a complete explanation, Dickson, Moravia and the Company have agreed to entered this supplementary agreement for a complement of the shareholder agreement and for managing the affairs of the upon the terms set out in this Agreement as a complement of the articles of incorporation of the Company" [*sic*][2]

6.      Clauses 1 and 2 provide:

" 1.      Subject    to    Moravia    will    advance    a    total

_____

[2]      The relevant sentence in the Chinese version reads: 「Dickson, Moravia 與合資公司一致同意為股東協議簽署本補充協議。」

- 5 -

USD$3,250,000 … To the Company (the "loan"); Provided that Dickson has duly fulfilled all of its obligations to the Company, Dickson shall be entitled to a success fee of up to USD$3,000,000 … (the "Success Fee"). The Success Fee is payable only after: The Company will not in any way impair financial conditions and operation of the Project Company or the PRC Subsidiary that the loan has been fully discharged and repaid to Moravia.

2.      Dickson, Moravia and the Company agreed: with rich sources in Wal-mart (China) group and local government, Dickson shall play key role in achievement for so-called "SUCCESS"; and also the preconditions or definitions for "SUCCESS" in above clause shall include the following issues well-prepared, such as: [6 conditions are then set out concerning the success of the project]" [*sic*]

7.      The amount of funds required for the land auction subsequently increased substantially.   In addition to the initial US$3.25 million, a second tranche of US$3 million was provided by a bank loan guaranteed by Moravia and a third tranche of US$4 million was to be provided by Moravia in December 2011.  In consequence, a document called "Addendum of Supplementary Agreement" was entered into between the same three parties to deal with, *inter alia*, the success fee. There were three executed versions of the Addendum dated 4, 8 and 16 December 2011 respectively, the last of which is the relevant one here ("**3rd Addendum**").  It starts with the recital:

" Dickson, Moravia and the Company have agreed to enter into this Addendum of Supplementary Agreement."

8.      It provides that DHE will transfer 22.5% shareholding in the Company to Moravia so that the former becomes a 27.5% minority shareholder and the latter a 72.5% majority shareholder.  It then provides:

" 4.      All parties agreed that after MORAVIA becomes the majority shareholder in the Company, or Moravia shall take

responsibility to charge the issues in project finance, and meanwhile, Dickson's duty shall focus on the local governmental matters.   Both parties has duty to participate in project management.   Dickson will have the right to appoint two representatives in the Project Company to participate in the project management matters.  The details will be decided by the Board of Directors later on.

5.1    All parties agree that Mr Rodolfo Padilla Cordero, Mr Marcos Edid Rayek (investors of Moravia) and Mr Fan Ji Qian (investor of Dickson) deserve 9 million USD success fee (These 9 Million USD Success Fee can be paid by the Project Company) (3 million for each person) as long as Joint Venture Company successfully completes the land development in LIANYUNGANG and the company has the capability of payment after the sales income, Mr Fan Ji Qian will receive the first partial payment of the sequences of payments (1 Million USD each partial payment).

5.2    After the payments have been made for the 9 million USD success fee, the company shall effect dividend distribution payments in accordance with the shareholder's share ratio of 72.5%/27.5%.

6.    This addendum cancels all other previous success fee agreements between the two parties."[3] [*sic*]

9.    It should be noted that despite that clause 5.1 states that the three named individuals deserve the success fees of US$3 million each, none of them is stated to be a party to or signed the 3rd Addendum in his own capacity.  Likewise, although clause 5.1 states that the success fees

---

[3]    The Chinese version reads as follows:

「4.    各方一致同意：在 MORAVIA 成為多數控股股東後，MORAVIA 將負責項目所需融資事務，同時，DICKSON 將負責所有當地政府事務。雙方共同參與項目管理。Dickson 公司有權利委派兩個代表至項目公司參與項目管理。具體管理參與細節將在董事局開會討論決定。
5.1    各方一致同意：如合資公司在該土地開發項目開始銷售後且有能力支付時，有銷售收入時即支付 Mr Rodolfo Padilla Cordero, Mr Marcos Edid Rayek（Moravia 的投資者）and 樊紀乾先生（Dickson 的投資者）將有權先行獲得總共 900 萬美金的成功費（其成功費可在項目公司支取）（他們每人各自有權獲得 300 萬美金）。樊紀乾先生將第一個先取成功費（每次 100 萬美元）。
5.2    在支付此筆 900 萬美元的成功費以後，合資公司會按照新的股權比例 72.5%/27.5%的比例支付股息。
6.    取消之前雙方約定的關於成功費的所有其他條款。」

A
B
C

may be paid by the "Project Company", ie the Subsidiary, it is not stated to be a party and did not execute the 3rd Addendum by any representative.

D

10.        For reasons that need not be gone into for present purposes, the relationship between the two sides subsequently broke down.  In late 2012 and early 2013, the Company, under the control of Moravia, forfeited and cancelled the shares held by DHE, and capitalised Moravia's loans by allotting to it 28,750,000 shares.  Mr Rodriguez subsequently became a holder of 01% of the shareholding.

E
F
G
H
I

11.        Five years later, in December 2017, DHE presented a petition to the High Court of Hong Kong (in proceedings numbered HCMP 2665/2017) against Moravia, Mr Rodriguez and the Company, in which it complains against the forfeiture of shares and the allotment of new shares to Moravia and seeks relief from unfairly prejudicial conduct under ss 724-725 of the Companies Ordinance (Cap 622).

J
K
L
M

12.        On 24 May 2018, DHE further took out a summons in the petition proceedings for interlocutory injunctive relief to restrain the disposal of (i) Moravia's and Mr Rodriguez's shares in the Company, (ii) the Company's shares in its direct or indirect subsidiaries (including the Subsidiary), and (iii) any business carried on or operated by the Company or its subsidiaries.  On 25 May 2018, Lisa Wong J made an interim order, pending the substantive hearing of the summons, requiring the respondents to give at least 10 days' notice to DHE prior to any intended disposition. On 13 June 2018, Moravia and Mr Rodriguez applied by summons for the petition to be struck out on the ground that DHE was no longer a member of the Company, alternatively for an order staying all further proceedings

N
O
P
Q
R
S
T
U
V

on the basis of the arbitration clause in the Shareholders Agreement.  This summons came to be heard on the same date as the application for anti-suit injunction herein and a separate decision on it will be handed down.

13.        Meanwhile, unknown to Moravia or the Company, on 6 June 2018 Fan had commenced an action in the Shenzhen Qianhai Cooperation Zone People's Court ("**Qianhai Court**") against the Company and the Subsidiary claiming the success fee of US$3 million pursuant to the 3rd Addendum.  For convenience I shall refer to them collectively as "**the Companies**".  Subsequently Fan obtained from the Qianhai Court a freezing order on 22 August 2018 and an execution order on 27 August 2018.  The effect of the execution order was that over 40 apartments held by the Subsidiary in the project were impounded for 3 years.  The freezing order meant that the assets of the Company and the Subsidiary (up to a limit of RMB19,168,200) were frozen.  It was only on 27 August 2018 that the Companies became aware of the Qianhai proceedings and the execution order when the relevant properties were sealed off by court officials.  The Companies also only became aware of the freezing order at around that time when a proposed lender refused to lend money to them after discovering the freezing order from public records.

14.        The Qianhai proceedings and the orders made therein had a serious and immediate effect on the fund-raising and marketing efforts of the project at a time when it was nearing completion.  As a consequence, the Companies swiftly engaged lawyers in the Mainland and lodged a challenge to the jurisdiction of the Qianhai Court on 30 August, contending that the matter was subject to the Hong Kong arbitration clause in the Shareholders Agreement.  On 10 September they in addition lodged an

- 9 -

A

B application to contest the freezing order on the ground that the amount

C frozen together with the properties affected by the execution order greatly exceeded US$3 million, the amount claimed by Fan.

D

E 15.       After a hearing on 18 September 2018, the Qianhai Court gave its decision on 8 October, releasing 16 of the apartments from the execution

F order and 30% of the Company's shares in the Subsidiary from the freezing

G order.  But it also rejected the Companies' jurisdictional challenge, in terms set out in §49 below.

H

I 16.       The Subsidiary and the Company lodged an appeal on 15 and

J 29 October respectively, which as I understand the position will be disposed of on paper.  As at the date of the hearing before me the appellate court has

K not yet rendered its decision.

L 17.       On 7 November 2018, the Companies instituted the

M proceedings herein by originating summons seeking an anti-suit injunction against Fan, ie an injunction to restrain him from pursuing the Qianhai

N proceedings and commencing any other similar proceedings in Mainland

O China.

P *C.    Issues*

Q 18.       Ms Rachel Lam who appeared on behalf of the Companies made clear that their application is based on the arbitration clause in the

R Shareholders Agreement and not simply on ordinary *forum non conveniens*

S considerations.  In particular, she relied on the court's approach in cases between parties to an arbitration agreement under which an anti-suit

T injunction will ordinarily be granted to restrain a party from suing in a

U

V

A

B    non-contractual forum unless there are strong reasons to the contrary.  The

C    fountain head of the principles underlying that approach is the decision of

D    the English Court of Appeal in *The Angelic Grace* [1995] 1 Lloyd's Rep 87,

E    which has been applied in Hong Kong in *Ever Judger Holding Co Ltd v*
     *Kroman Celik Sanayii Anonim Sirketi* [2015] 2 HKLRD 866 and *Sea*

F    *Powerful II Special Maritime Enterprises (ENE) v Bank of China Ltd* [2016]

G    1 HKLRD 1032; [2016] 3 HKLRD 352 (CA); see also *Compania Sud*
     *Americana de Vapores SA v Hin Pro International Logistics Ltd* (2016) 19

H    HKCFAR 586 at §57.

I    19.        On that basis the arguments before me fall into four main
     points, which are discussed below in turn:

J

K        (1)    whether the arbitration clause in the Shareholders Agreement
                is incorporated into the 3rd Addendum;

L        (2)    whether the principles established by cases starting from *The*
                *Angelic Grace* apply in the present case given that Fan is not a

M              party to the Shareholders Agreement or the 3rd Addendum;

N        (3)    whether the Qianhai Court's judgment rejecting the
                Companies' jurisdictional challenge has given rise to an issue

O              estoppel against the Companies; and

P        (4)    if the *Angelic Grace* principles apply, whether there are strong
                reasons not to grant the injunction.

Q

R    D.    *Arbitration agreement*

S    20.        The first issue is whether the 3rd Addendum is subject to the

T    arbitration agreement contained in the Shareholders Agreement.  This is a

U    question of contractual interpretation and incorporation.    Both sides'

V

- 11 -

arguments were based on the application of Hong Kong law to this issue (subject to the issue estoppel point raised on behalf of Fan which is separately dealt with below).

21.        Art 7 of UNCITRAL Model Law, made effective by s 19 of the Arbitration Ordinance (Cap 609), provides:

> " (6)      The reference in a contract to any document containing an arbitration clause constitutes an arbitration agreement in writing, provided that the reference is such as to make that clause part of the contract."

22.        As Kaplan J held in *Astel-Peiniger Joint Venture v Argos Engineering & Heavy Industries Co Ltd* [1995] 1 HKLR 300 at 306-307 and *Gay Constructions Pty Ltd and another v Caledonian Techmore (Building) Ltd* [1995] 2 HKLR 35 at 39, it is not necessary for there to be explicit reference to the arbitration clause; a reference to the document containing that clause may be sufficient.

23.        Ms Lam also relied on s 28 of the Conveyancing and Property Ordinance (Cap 219) which provides:

> " Any instrument (whether executed before or after the commencement of this section) expressed to be supplemental to a previous instrument shall be read and have effect as if the supplemental instrument contained the full recital of the previous instrument."

24.        If a document containing an arbitration clause is merely deemed repeated as a recital in a later agreement, I doubt it would suffice to incorporate the arbitration clause.  But there is more in the present case. The 3rd Addendum is an addendum, ie an appendix or a subsidiary addition, to the Supplementary Agreement.  Relevantly for present purposes, it

- 12 -

substitutes a provision on success fees in place of that in the Supplementary Agreement.  The Supplementary Agreement itself is expressly intended to be a "complement" — to form a complete whole — with the Shareholders Agreement.  All three documents were executed between and only between the same three parties, so that each party to the later documents was fully aware of the content of the previous documents.  There is no doubt in my mind that the documents are intended to be read and take effect together as a whole and that, in particular, the Supplementary Agreement and the 3rd Addendum are not standalone documents but are intended to be read as part and parcel of Shareholders Agreement.

25.        Neither the Supplementary Agreement nor the 3rd Addendum contains separate provisions on general matters such as choice of law or dispute resolution, which are of particular importance in a project such as this involving businessmen and entities from multiple jurisdictions.   It seems to me plain that the general provisions in the Shareholders Agreement are intended to govern these two later documents of a supplemental nature.  As Lord Hoffmann said in *Fiona Trust and Holding Corporation v Privalov* [2007] UKHL 40, at §6, albeit in the different context of deciding the scope of an arbitration clause:

> " In  approaching  the  question  of  construction,  it  is  therefore necessary to inquire into the purpose of the arbitration clause.  As to this, I think there can be no doubt.  The parties have entered into  a  relationship,  an  agreement  or  what  is  alleged  to  be  an agreement or what appears on its face to be an agreement, which may give rise to disputes.  They want those disputes decided by a tribunal  which  they  have  chosen,  commonly  on  the  grounds  of such  matters  as  its  neutrality,  expertise  and  privacy,  the availability of legal services at the seat of the arbitration and the unobtrusive efficiency of its supervisory law.  Particularly in the case  of  international  contracts,  they  want  a  quick  and  efficient adjudication and do not want to take the risks of delay and, in too many  cases,  partiality,  in  proceedings  before  a  national

- 13 -

jurisdiction."

26.          The same considerations inform the question at hand.  From a practical point of view, it would be wholly uncommercial to suggest that if there should be a dispute between Moravia and DHE, for example, about the success fees, the parties contemplated that it would not be regulated by the choice of law clause and the arbitration clause in the Shareholders Agreement.  It would be unrealistic to suppose that the parties intended that their disputes under the Shareholders Agreement and the 3rd Addendum respectively would be resolved in different fora by different modes of adjudication under different governing laws.

27.          I conclude therefore that the 3rd Addendum is subject to the arbitration clause in the Shareholders Agreement.

### E.      The principles on the grant of anti-suit injunction

28.          It is clear from his claim form in the Qianhai proceedings that Fan's claim is squarely based on the 3rd Addendum as a contract.  In his own affirmation in these proceedings he said the Companies are liable to pay him the success fee "pursuant to" the 3rd Addendum, giving rise to "contractual claims" and a "personal contractual dispute".  Although the Subsidiary is not explicitly a party to the contract, Fan claims against both Companies to enforce their promise or undertaking[4] to him as expressed in the 3rd Addendum.  No distinction is made by Fan between the Company and the Subsidiary so far as the obligation allegedly owed to him is concerned.  Nor should any distinction be made between them for present purposes because Fan clearly takes the position that both the Company and

---

[4]          In Chinese: "承諾"

A

B    the Subsidiary owe him contractual obligations under the 3rd Addendum:

C    see *Sea Premium Shipping Ltd v Sea Consortium Pte Ltd* [2001] EWHC

D    540 (Admiralty); *The MD Gemini* [2012] EWHC 2850 (Comm), §15; *Dell*

     *Emerging Markets (EMEA) Ltd v IB Maroc.com SA* [2017] EWHC 2397

E    (Comm), §§33-34; *ACE Seguradora SA v Fair Wind Navigation SA* [2017]

F    EWHC 3352 (Comm) §8; Raphael, *The Anti-suit Injunction*, §10.23.

G    29.        DHE    is    the    counterparty    to    the    3rd Addendum,    the

H    Supplementary Agreement and the Shareholders Agreement.  There is no

     dispute that it is bound by the arbitration clause assuming it is incorporated

I    into the 3rd Addendum.   If, instead of Fan, DHE had commenced

J    proceedings in the Mainland seeking an order for the success fee to be paid

K    to Fan (analogous to the order for specific performance in *Beswick v*

     *Beswick* [1968] AC 58), DHE would clearly be acting in breach of the

L    arbitration clause.

M    30.        In contrast, it is common ground that Fan is not a party to the

N    3rd Addendum, the Supplementary Agreement or the Shareholders

O    Agreement. As such, the precise juridical basis for his claim for the success

     fee is not clear and has not been explained.  Since the contract on which he

P    relies is, as I have found above, governed by Hong Kong law, the questions

Q    of what rights he has under that contract and whether in seeking to enforce

     those rights he is subject to the arbitration clause must, in my view, also be

R    governed by Hong Kong law.  In any event as neither party has adduced

S    evidence of Mainland law on these questions it seems to me I ought to apply

     Hong Kong law.

T

U

V

A          A

B          B
31.          As a matter of the common law of Hong Kong, in general only
a person who is a party to a contract can sue on it: *B + B Construction Ltd*
C          *v Sun Alliance and London Insurance Plc* [2000] 2 HKC 295 at 301B-F.          C
D          The doctrine of privity has been reformed by the Contracts (Rights of Third          D
Parties) Ordinance (Cap 623), but that statute has no application in this case
E          since all the agreements were entered into before it came into operation.[5]  It          E
F          should be noted that even under that statute the enforcement of the term by          F
a third party "is subject to any other term of the contract relevant to the term"
G          (s 4(4)).          G

H          H
32.          Outside of statute there exist various devices at common law
I          which are sometimes employed to temper the strictures of the doctrine of          I
J          privity.  One is to say that a promise by one contractual party to another to          J
pay a sum of money to a third party is held on trust by the promisee for the
K          benefit of the third party.  Another device is an assignment by the promisee          K
L          to the third party of the benefit of the promise.  A further technique is to          L
treat the promisee as having acted as an agent for the third party or for both
M          himself and the third party in receiving the promise (though this is not          M
N          strictly an exception since it renders the third party a party to the contract).          N

O          O
33.          It is not clear on what specific basis in Hong Kong law Fan
P          claims to be able to sue on the 3rd Addendum while insisting he is not a party          P
Q          to it, or whether he is relying on certain Mainland legislation similar in          Q
effect to the Contracts (Rights of Third Parties) Ordinance.  For present
R          purposes I am prepared to assume that Fan has a *prima facie* cause of action          R
S          under the 3rd Addendum against the Companies for the success fees.          S

T          _____          T

U          [5]          See s 3(1) of the Ordinance.          U

V          V

A

B   Whatever the precise basis may be, however, it is undeniable that his right

C   is derived from the contract in the 3rd Addendum.

D   34.      Let it further be assumed that, because Fan is not a party to the

E   contract, he cannot be said to be acting positively in breach of contract or
    promise by commencing and pursuing the Qianhai proceedings.  Does it

F   make a difference for present purposes that instead of procuring his

G   corporate vehicle (DHE), which is a party to the contract, to bring
    proceedings to enforce it, Fan has instituted proceedings in his own name

H   to enforce the contract as a third party?

I   35.      The Companies contend that it makes no difference and that

J   *The Angelia Grace* principles apply with equal force in the present case.

K   Reliance is placed on a line of English authorities which, the Companies
    submitted, establish that *The Angelic Grace* principles apply where a person

L   (albeit not a contractual party to the arbitration clause) seeks to enforce a

M   right conferred by a contract that contains the arbitration clause.

N   36.      In *Schiffahrtsgesellschaft Detlef Von Appen Gmbh v Wiener*

O   *Allianz Versicherungs AG and Voest Alpine Intertrading GmbH (The Jay*
    *Bola)* [1997] CLC 993, a vessel was chartered by the owners to

P   time-charterers, who in turn chartered her to another party for a part cargo

Q   from Sao Sebastiao to Bangkok on the Gencon form, governed by English
    law and containing a London arbitration clause.  The vessel suffered a fire

R   and the cargo was seriously damaged.  An insurer made payments to the

S   voyage-charterer and cargo owners.  The shipowners admitted liability for
    the casualty.  A decree of limitation was pronounced by the Admiralty

T   Court in London, limiting as well the liability of the time-charterers.  The

U

V

- 17 -

insurer commenced an action in Brazil since judgment there would not be subject to the limitation.  The time-charterers applied to the English court for an anti-suit injunction to restrain the insurer from proceeding in Brazil, relying on the arbitration clause in the voyage charterparty.  The English court held that the insurer's Brazilian action was based on the enforcement of rights derived from the voyage charterer against the time-charterers.  On that basis, Hobhouse LJ held (at pp 1000-1001):

> " … the rights which the insurance company has acquired are rights which are subject to the arbitration clause.  The insurance company … is not entitled to assert its claim inconsistently with the terms of the contract.  One of the terms of the contract is that, in the event of dispute, the claim must be referred to arbitration.  The insurance company is not entitled to enforce its right without also recognising the obligation to arbitrate.
>
> … The insurance company is failing to recognise the equitable rights of the time charterers.  The equitable remedy for such an infringement is the grant of an injunction."

Similarly, Scott VC held (at pp 1007-1008):

> " WAV is bound by the arbitration agreement not because there is any privity of contract between WAV and DVA but because Voest's contractual rights under the sub-charter-party, to the benefit of which WAV has become entitled by subrogation, are subject to the arbitration agreement which, too, is part of the sub-charter-party.  WAV cannot enforce those contractual rights without accepting the contractual burden, in the form of the arbitration agreement to which those rights are subject (cf. *Halsall v Brizell* [1957] Ch 169 and *Tito v Waddell (No 2)* [1977] Ch 106 at p 309).  WAV is, through subrogation, an assignee from Voest of Voest's contractual rights against DVA.  DVA is contractually entitled, whether as against Voest or any assignee from Voest, to require the enforcement of those rights to be pursued by arbitration.  WAV's attempt to enforce those rights otherwise than by arbitration is a breach of DVA's contractual entitlement.  I agree with Lord Justice Hobhouse that DVA's remedy is, *prima facie*, the grant of an injunction to restrain the attempt."

37.　　　In *West Tankers Inc v RAS Riunione Adriatica di Sicurta SpA (The Front Comor)* [2005] 2 Lloyd's Rep 257, a vessel chartered to the owners of an oil refinery severely damaged the oil jetty at the refinery.  The charterparty contained a London arbitration clause.   The charterers commenced arbitration proceedings against the shipowners in London, claiming for their uninsured losses.  In respect of the insured losses, the insurers paid the charterers and commenced court proceedings in Sicily against the shipowners.  Colman J of the English High Court held that an anti-suit injunction should be granted, stating (at §33):

> " Accordingly, by reference to *The Jay Bola*, *supra*, it is to be concluded that the defendant insurers have, under Italian Law, by subrogation become entitled to enforce, the insured charterer's right of action in delict against the Owners, but that, by reference to English Law, their duty to refer their claim to arbitration is an inseparable component of the subject matter transferred to the insurers."[6]

38.　　　In *Shipowners' Mutual Protection and Indemnity Association (Luxembourg) v Containerships Denizcilik Nakliyat ve Ticaret AS (The Yusuf Cepnioglu)* [2016] 1 CLC 687, a vessel was operating on a liner service between Turkey and North Africa when it grounded and became a total loss.  The charterers commenced arbitration proceedings in London against the owners pursuant to the terms of the time charter.  The owners were insured with a P&I club on terms which provided the club would only be liable if the owners had paid the claims against them and, further, that an arbitration award was a condition precedent to the club's liability.  The charterers brought proceedings in Turkey in which they sought to attach the club's assets in Turkey as security for a claim pursuant to a Turkish statute

---

[6]　　　The case was appealed directly to the House of Lords which made a reference to the European Court of Justice on a question concerning the grant of an injunction to restrain proceedings in another Member State of the European Union in the light of EC Regulation 44/2001: see [2007] UKHL 4.  There was no appeal on the point relevant for present purposes.

- 19 -

A

B  which gave them a right of direct action against the club.  The club sought

C  an anti-suit injunction in the English court to restrain the charterers from

   pursuing the Turkish proceedings.  The English court held that despite a

D  Turkish statute was involved, the essential content of the right sought to be

E  enforced was a contractual right arising from the charterparty.  In essence

   the charterers became entitled under the Turkish statute to enforce for their

F  own benefit the contract between the owners and the club.  Longmore LJ

G  said at §21:

H      " Once it is decided that the charterers are exercising an essentially
         contractual right, it must follow that the charterers are bound to
         accept that their claim is governed by English law and must be
I        arbitrated in London.   The charterers' proposed substantive
         Turkish proceedings would be a contravention of that obligation.
         The question therefore arises whether, as a matter of English law,
J        the Club is entitled to an injunction to restrain the charterers from
         instituting or continuing with such proceedings."

K

L  39.      Longmore LJ then applied the principle in *The Jay Bola*,

   preferring it to *Through Transport Mutual Insurance Association (Eurasia)*

M  *Ltd v New India Assurance Association Co Ltd (The Hari Bhum)* [2005] 1

N  All ER (Comm) 715, another Court of Appeal's decision, and held that:

O      " the Club's application for an injunction is made:-

P          ' to protect a contractual right … that the dispute be
             referred to arbitration, a contractual right which equity
             requires the [third party/victim] to recognise.'

Q          It is only by way of an injunction to restrain Turkish proceedings
           that the charterers in the present case can be required to recognise
           the Club's right to have the dispute referred to arbitration."

R

S  On this basis Longmore LJ said (at §34) that the right approach is to apply

   *The Angelic Grace* and ask whether there are good reasons why an

T  injunction should not be granted, without any need for the Club to show

U

V

- 20 -

vexatious or oppressive conduct on ordinary *forum non conveniens* considerations.

40.        Moore-Bick LJ gave a concurring judgment, holding:

> " It is now well-established that a person who becomes entitled to enforce a contractual obligation can do so only in accordance with its terms. …  The Club's rules also provide for arbitration in London and it is now well established that a person who becomes entitled to enforce an obligation which is subject to an arbitration clause must do so by arbitration in accordance with the clause [citing *The Jay Bola*]."

41.        By suing in his own name in the Mainland, it is said that there is no breach of contract because Fan is not a party to the arbitration clause. As such, Fan argues that no anti-suit injunction should issue.  This argument in my view takes too narrow a view of the principle in *The Angelic Grace*. The basis for the court's intervention is the same in the case of a claimant who has become entitled to enforce an obligation but is not a party to a contract of any kind with the defendant, as in the case of a claimant who is an original party to an arbitration agreement.   The court is willing to intervene by granting an anti-suit injunction to restrain such a claimant from enforcing the obligation by proceedings abroad instead of by arbitration,

> " not because the claimant is party to a contract containing an arbitration agreement (which it is not), but because enforcement by arbitration alone is an incident of the obligation which the claimant seeks to enforce and because the defendant is therefore entitled to have any claim against him pursued in arbitration.  It is the right not to be vexed by proceedings otherwise than in arbitration that equity will intervene by injunction to protect."

> " The principle can be seen at work most clearly in cases involving the original parties to an agreement containing an arbitration clause and it is not surprising, therefore, that in *The Angelic Grace* Millett LJ should have expressed the view that in those circumstances an injunction should be granted to restrain a breach of the arbitration agreement unless there was good reason not to

- 21 -

A

B     do so.  However, although he drew a distinction between such a
case and a case where an injunction is sought on the general
C     ground that the foreign proceedings are vexatious or oppressive,
but where no breach of contract is involved, with all due respect
to what was later said by this court in *The Hari Bhum*, I do not
D     think that he can have had in mind a case such as the present.
True it is that this is not a case in which a breach of contract is
E     involved, but nor is it a case in which the Club is seeking to
restrain the proceedings in Turkey on the general ground of
vexation or oppression.  It has very much more the character of
F     the former than the latter, since the right which equity is asked to
protect by injunction is the same in the case of a remote party as
in the case of an original party.  In each case sufficient grounds
G     for intervention are to be found in the commencement of
proceedings contrary to the terms of the arbitration agreement."
H     *The Yusuf Cepnioglu*, §§49-50, *per* Moore-Bick LJ.

I     42.       Mr Anson Wong SC who appeared for Fan submitted that *The Jay Bola* was explicable on the basis that the insurer had by subrogation

J

K stepped into the shoes of the voyage charterers.  It was said that, as an

assignee the insurer was understandably held to be bound by all the equities

L to which the assigned right was subject.  He submitted that neither the

charterers in *The Yusuf Cepnioglu* nor Fan in the present case was a

M subrogated party or an assignee or transferee of the right under the contract.

N In his submission, the court in *The Yusuf Cepnioglu* wrongly applied *The Jay Bola* which was a subrogation case, and should not be followed in Hong

O Kong.

P

43.       With respect, the answer again lies in the judgment of

Q Moore-Bick LJ in *The Yusuf Cepnioglu* where his Lordship said at §55:

R     " … *The Jay Bola* proceeds on the basis that the right to have the
claim against it determined by arbitration is an incident of the
S     obligation which the claimant is seeking to enforce and does not
depend on the existence of a contract between the claimant and
the defendant.  If that is right, there is no distinction of principle
T     between the position of a claimant who is an original party to a
contract containing an arbitration clause and one who is a remote

U

V

A

B party in the sense described earlier.  The grounds upon which
C equity will intervene, as explained in *The Jay Bola*, are the same
 in each case, namely, to protect the defendant's right to have the
D claim determined in arbitration.  The commencement of
 proceedings contrary to the arbitration clause is, I would suggest,
E sufficiently vexatious and oppressive, or at any rate sufficiently
 unconscionable and unjust, to provide sufficient grounds for the
F court's intervention by way of the equitable remedy of an
 injunction.  The position is no doubt at its clearest when the
 proceedings are between original parties to the arbitration
 agreement, but the rationale of the decision in *The Angelic Grace*
 applies equally to both cases."

G

H 44.   For his submissions Mr Wong also relied upon the English
 Court of Appeal's decision in *The Hari Bhum*, but for the reasons explained
I in *The Yusuf Cepnioglu* and in Raphael, *The Anti-suit Injunction*, §10.17,
J I prefer the reasoning in *The Jay Bola* and *The Yusuf Cepnioglu* which
 seems to me, with respect, cogent and just.

K

L 45.   Neither an assignee of contractual rights nor a subrogee to such
 rights becomes a party to the contract in the full sense.  Obligations under
M the contract do not as such pass by assignment or subrogation to them to
N render them liable for breach.  The cases have shown however that their
 conscience is nevertheless bound by the conditions integral to the rights
O they have acquired, which they can therefore be restrained by equity from
 asserting in a manner inconsistent with those conditions.  This approach
P applies, in my view, equally to a claimant such as Fan, who asserts rights
Q under the 3${}^{rd}$ Addendum which are subject to the arbitration clause,
 irrespective of whether he does so through the common law devices referred
R to in §32 above or by reliance on some Mainland law with similar effect to
S the Contracts (Rights of Third Parties) Ordinance.

T

U

V

46.        Even if Fan is not an assignee of the DHE's rights under the contract, it is plain that his rights to the success fee, if any, are derived from the promise made by the Companies to DHE, of which the arbitration clause forms an inseparable part.  The promise of the success fee was subject to the enforcement mechanism chosen by the parties to the contract, namely, arbitration in Hong Kong.  Insofar as he has any direct right, Fan's claim is clearly one "arising out of or relating to" the contract and is justiciable only in accordance with that contractual mechanism.  It is no less unconscionable of Fan to make a claim under the contract in a different forum than it would be for DHE to do so, even though there would be a breach of contract only in the latter case: see *The Jay Bola* at p 1001D-F.  In pursuing court proceedings in the Mainland against the Companies, Fan is seeking to claim a benefit under the contract without recognising the condition to which it is plainly subject.  Such conduct in my view falls within the principles expounded in *The Angelic Grace*, *The Jay Bola* and *The Yusuf Cepnioglu*. The Companies have the right to prevent a claim against them based on their contractual obligations being pursued otherwise than by the contractually agreed mode, *viz* arbitration in Hong Kong.[7]  Unless an injunction is granted such right will be rendered wholly ineffective and valueless.

47.        For the above reasons I consider that in determining whether an anti-suit injunction should be granted against Fan in this case, this court should be guided by *The Angelic Grace* approach.  It should grant an injunction to restrain Fan from acting inconsistently with the inherent

---

[7]        See *per* Scott VC in *The Jay Bola* at p 1009A.

- 24 -

conditions forming part of the promise of success fees, unless there are strong reasons for not doing so.

*F.    Issue estoppel*

48.        Fan contends that an issue estoppel has arisen from the judgment of the Qianhai Court given on 8 October 2018 rejecting the Companies' jurisdictional challenge.

49.        In its decision the Qianhai Court stated:

> " The Court is of the view that although there is an arbitration clause in the Shareholders' Agreement, which was signed by Fan Jiqian, the three parties to the Agreement are [DHE, Moravia and the Company]. Fan Jiqian did sign the Agreement, but nothing in it concerns his personal benefits. He was acting in the capacity of the representative of DHE, and his signing of the Agreement, by nature, is for the purpose of performing the duty for DHE. There is no binding effect on him. What Fan Jiqian has relied on for the present action are two supplemental agreements, one dated 8 December 2011 and the other 16 December 2011, in which no corresponding arbitration clause can be found. Furthermore, the parts concerning Fan Jiqian in those two supplemental agreements, in substance, are related to the rights set out by the parties to the Agreement for the non-parties. Although the contents of the supplemental agreements, to a certain extent, have a connection with the Shareholders' Agreement previously signed, the part on the personal benefits of Fan Jiqian exists independently. Also, in short, Fan Jiqian is not a party who has entered into the Shareholders' Agreement, and is not bound by the its arbitration clause. Nor is there any arbitration clause in the contract relied on by him in this action. The objection to jurisdiction raised by the two Defendants cannot be established. In short, pursuant to Articles 127(1) and 154(1)(ii) of the Civil Procedure Law of the People's Republic of China, it is held that the objection to jurisdiction raised in this case by the two Defendants be dismissed."[8]

---

[8]        The Chinese original reads: 「本院認為：本案所涉的股東協議中雖然約定了仲裁條款，且樊紀乾在該股東協議中簽名，但該協議的三方當事人是迪新公司、MORAVIA C.V. 以及迪維集團，樊紀乾雖然在該協議上簽名，但該協議中並未涉及到樊紀乾的個人獲利，樊紀乾的身份是

50.        Mr Wong submitted on behalf of Fan that the following issues have been determined by the Qianhai Court: (i) Fan is not a party to the Shareholders Agreement; (ii) Fan's entitlement to the success fee has a separate and independent existence from the Shareholders Agreement; and (iii) under this separate arrangement, there is no arbitration clause binding on Fan.

51.        In answer, Ms Lam relied on s 3 of the Foreign Judgments (Restriction on Recognition and Enforcement) Ordinance (Cap 46) ("**FJRREO**") which provides:

> " (1)        Subject to this section, a judgment given by a court of an overseas country in any proceedings shall not be recognized or enforced in Hong Kong if—
>
> > (a)   the bringing of those proceedings in that court was contrary to an agreement under which the dispute in question was to be settled otherwise than by proceedings in the courts of that country; and
> >
> > (b)   the person against whom the judgment was given—
> >
> > > (i)   did not bring or agree to the bringing of those proceedings in that court; and
> > >
> > > (ii)  did not counter-claim in the proceedings or otherwise submit to the jurisdiction of the court.
>
> (2)        Subsection (1) does not apply where the agreement referred to in paragraph (a) of that subsection was illegal, void or unenforceable or was incapable of being performed for reasons not attributable to the fault of the party bringing the proceedings in which the judgment was given.

迪新公司的代表人，其簽名在性質上屬於代迪新公司履行的職務行為，對其個人沒有約束力。而樊紀乾據以在本案起訴的是 2011 年 12 月 8 日、16 日的兩份補充協議。該協議並無相應仲裁條款約定。而且，該補充協議關於樊紀乾的部份本質上是協議的主體為主體之外的第三人設立了相關權利。雖然補充協議與之前的股東協議在內容上有一定的關聯性，但是有關樊紀乾個人獲益的部份是獨立存在的。同時，綜上，樊紀乾不是股東協議的簽訂方、不受該協議中相關仲裁條款的約束。樊紀乾據以起訴的合同依據中也沒有仲裁條款。兩被告的管轄異議不能成立。綜上，根據《中華人民共和國民事訴訟法》第一百二十七條第一款、第一百五十四條第一款第（二）項之規定，裁定如下：駁回兩被告在本案中提出的管轄權異議。……」

A
B
C
D
E
F
G
H
I
J
K
L
M
N
O
P
Q
R
S
T
U
V

(3)     In determining whether a judgment given by a court of an overseas country should be recognized or enforced in Hong Kong, the court in Hong Kong shall not be bound by any decision of the court of the overseas country relating to any of the matters mentioned in subsection (1) or (2).

(4)     ……"

52.     S 4 provides in addition a person shall not be treated as having submitted to the jurisdiction of the overseas court by taking steps for certain purposes, such as to contest the jurisdiction of the court, to ask the court to dismiss or stay the proceedings in favour of arbitration, or to obtain the release of property seized.   These are precisely the steps taken by the Companies in the Qianhai proceedings.

53.     Ms Lam submitted that s 3(1) is applicable here.   The argument ran as follows:

(1)     Since "overseas country" is defined as "any place outside Hong Kong" (see s 2), and "judgment" means "any judgment or order (by what name called) given or made by a court in any civil proceedings", the decision of the Qianhai Court rejecting the Companies' jurisdictional challenge is a judgment given by a court of an overseas country.

(2)     The proceedings in which it was given are the Qianhai proceedings, which have been brought in the Qianhai Court contrary to the arbitration agreement under which the dispute in question — Fan's claim for the success fee — was to be settled by arbitration in Hong Kong, that is to say, otherwise than by proceedings in any Mainland court.

(3)     The Companies, as the persons against whom the judgment was given, did not agree to the bringing of proceedings in the

A

B

C

Qianhai Court; nor did they counterclaim in those proceedings or otherwise submit to the jurisdiction of that court.  In particular, s 4 makes clear that the steps taken by the Companies in the Qianhai proceedings did not amount to submission.

(4)     It follows from s 3(1) that the Qianhai Court's decision "shall not" be recognized or enforced in Hong Kong.

(5)     Further, by virtue of s 3(3), in determining whether s 3(1) applies, this court "shall not be bound" by the Qianhai Court's decision relating to the issues that, according to Fan, have given rise to an issue estoppel: see *Tracomin SA v Sudan Oil Seeds Co Ltd* [1983] 1 WLR 662, 670F (Staughton J); [1983] 1 WLR 1026, 1030H, 1034G-H (CA); *AES Ust-Kamenogorsk Hydropower Plant LLP v Ust-Kamenogorsk Hydropower Plant JSC* [2010] EWHC 772 (Comm) §41; [2011] EWCA Civ 647, §§149-151;[9] see also Johnston, *The Conflict of Laws in Hong Kong* (3rd ed by Paul Harris SC), at §9.073.

54.       For his part, Mr Wong disputed point (2) above.  He submitted that there was no relevant "agreement" here within the meaning of s 3(1)(a) of the FJRREO.  The agreement has to be an agreement between the parties to the litigation in the court of the "overseas country" but in the present case the arbitration agreement is between DHE, Moravia and the Company.

55.       I am unable to accept this construction of s 3(1)(a).  The statute does not require that the plaintiff in the foreign jurisdiction must be a party to the agreement, or that he would be liable for breach of contract by

---

[9]       There was no appeal on that point to the UK Supreme Court; see [2013] UKSC 35, at §§9-10.

bringing the forum proceedings, but simply that the bringing of the relevant proceedings in the overseas court was "contrary to an agreement under which the dispute in question was to be settled otherwise than by proceedings in the court of that country". This in my view essentially raises the same issue as I have dealt with above, namely, whether Fan's claim is subject to the arbitration clause. It follows from my conclusions above that (i) the dispute in question was, under the 3rd Addendum which incorporates the arbitration clause, to be settled by arbitration in Hong Kong rather than by court proceedings in the Mainland; and (ii) the bringing of the Qianhai proceedings by Fan was contrary to that agreement. Accordingly, s 3 applies by reason of which the Companies' contentions in this court are not barred by any relevant issue estoppel.

## G.   Discretionary factors

56.     As stated above, the proper approach to this application requires good reasons to be demonstrated by Fan why an injunction should not be granted to restrain him from proceeding in a way that repudiates the integral condition of the right he seeks to assert under the 3rd Addendum.

57.     Mr Wong submitted that there was delay in the application. I do not think that in taking slightly more than two months after learning of the Qianhai proceedings to issue the application for anti-suit injunction in Hong Kong the Companies were guilty of inexcusable or inordinate delay, particularly having regard to the flurry of steps they needed to take in the Mainland in order to ameliorate the effects of the freezing and execution orders. The present case is a far cry from *Sea Powerful II*, where the injunction-plaintiff was evading service in the Mainland for 8 months, and delayed in applying for injunctive relief in Hong Kong for more than a year

A

B    with the motive that the 12-month limitation period for the injunction-

C    defendant to commence arbitration in Hong Kong would expire and the

D    injunction-defendant would be left without a remedy in any available

E    forum.[10]  No prejudice has been suffered by Fan as a result of the time taken,

     except perhaps as regards the costs incurred in the jurisdictional challenge,

F    which is adequately met by the Companies' offer to compensate him: see

     *The Jay Bola*, at p 1004B-D; *Akai Pty Ltd v People's Insurance Co Ltd*

G    [1998] 1 Lloyd's Rep 90, 108.

H    58.          Nor is the delay serious when viewed against the progress of

I    the Qianhai proceedings.   Those proceedings have not gone on to an

     advanced stage.   The Qianhai Court has only dealt with the interim

J    preservation remedies and the Companies' jurisdictional challenge.   The

K    case has not gone on to any contest on the substantive merits.

L    59.          Mr Wong further submitted that the Companies' conduct was

M    abusive in applying for an injunction here only after having failed in the

     jurisdictional challenge in the Mainland.   The Companies, he said, were

N    "blowing hot and cold"[11] and trying to have "two bites of the cherry".   It

O    would follow from this submission that a failed jurisdictional challenge in

     the overseas court would necessarily be fatal to an application for anti-suit

P    injunction in Hong Kong, but I do not think that is correct.   As Lord Mance

Q    said in *AES Ust-Kamenogorsk Hydropower Plant LLP v Ust-Kamenogorsk*

     *Hydropower Plant JSC* [2013] UKSC 35, §61:

R
                    " In some cases where foreign proceedings are brought in breach
S                      of an arbitration clause or exclusive choice of court agreement,
                       the appropriate course will be to leave it to the foreign court to

T    ---
     [10]        See §§33, 53, 57-60 of Anthony Chan J's judgment; §27 of the Court of Appeal's judgment.

U    [11]        A phrase Mr Wong adopted from Anthony Chan J's judgment in *Sea Powerful II* at §63.

V

- 30 -

A

A

B

> recognise and enforce the parties' agreement on forum. But in
> the present case the foreign court has refused to do so, and done
> this on a basis which the English courts are not bound to
> recognise and on grounds which are unsustainable under English
> law which is accepted to govern the arbitration agreement. In
> these circumstances, there was every reason for the English
> courts to intervene to protect the *prima facie* right of AESUK to
> enforce the negative aspect of its arbitration agreement with JSC."

60.        That a failed jurisdictional challenge in the overseas court is no bar in itself to an application for anti-suit injunction was also recognised by the English Court of Appeal in *Ecobank Transnational Incorporated v Tanoh* [2015] EWCA Civ 1309, in the passages of the judgment of Christopher Clarke LJ (esp §133) quoted at length by the Court of Appeal in *Sea Powerful II* at §21 with apparent approval. In *Ecobank*, the court said that comity is not concerned with "judicial *amour propre*" or "the need to avoid offence to individual judges (who are made of sterner stuff)",[12] but analysed comity in terms of the need to avoid wastage of resources in different jurisdictions. At §133, Christopher Clarke LJ stated:

> " … The fact that at some stage the foreign court has ruled in favour
> of its own jurisdiction is not *per se* a bar to an anti-suit injunction:
> see *AES*. But, as each stage is reached more will have been
> wasted by the abandonment of proceedings which compliance
> with an anti-suit injunction would bring about. That being so, the
> longer an action continues without any attempt to restrain it the
> less likely a court is to grant an injunction and considerations of
> comity have greater force."

61.        In the present case, the Companies had within days of becoming aware of the Qianhai proceedings sought to put a stop to them, albeit by lodging a challenge in that court to its jurisdiction instead of applying in Hong Kong for an anti-suit injunction. It is common ground that nothing the Companies have done so far in the Qianhai proceedings

---

[12]        *Ecobank* at §§132 & 134.

A

B       amounted to submission to the jurisdiction of the Qianhai Court.  I do not

C       think it is entirely accurate to describe their conduct as "blowing hot and

        cold" — their stance in the Qianhai proceedings and in these proceedings

D       are consistent, namely, that the claims should be referred to arbitration in

E       Hong Kong.   Nor can they be criticised for lodging a jurisdictional

        challenge in the Qianhai proceedings.  The evidence shows that, unless the

F       Companies raised a jurisdictional challenge promptly within the time

G       allowed for filing their defence (15 days for the Subsidiary which is located

        in the Mainland, and 30 days for the Company which is located outside),

H       they would be regarded under Mainland law as having accepted the Qianhai

I       Court's jurisdiction.

J       62.      In the circumstances of this case having regard in particular to

K       the further matters below I do not consider it was abusive for the Companies

        to apply for the injunction after having failed in the jurisdictional challenge

L       at first instance and at the same time as an appeal was lodged in Qianhai.

M
        63.      First, as mentioned above, the Qianhai proceedings are not far
N
        advanced and therefore the wastage of resources, if an anti-suit injunction
O
        is granted, will not be unduly substantial.

P       64.      Secondly, as the Court of Appeal said in *Sea Powerful II* at

Q       §18, the importance of comity considerations is "reduced" in the present

        type of case which involves foreign proceedings that are inconsistent with

R       the contractual mode of dispute resolution.  In a case such as this the court

S       is not being asked to grant an anti-suit injunction on *forum non conveniens*

T       considerations involving the comparison of the two jurisdictions to identify

        the more *appropriate* forum, but to issue an injunction so that the dispute

U

V

A

B   can be dealt with by and only by the contractually stipulated mechanism.

C   This court acts to uphold the contract on principles which do not in any way

prefer Hong Kong as the seat of litigation or arbitration.

D

E   65.      Thirdly, the Qianhai Court can, in my respectful opinion,

reasonably be expected to understand that this court is, for the reasons

F   explained above, *bound* by statute (viz. the FJRREO) not to recognize or

G   enforce the Qianhai Court's decision on the jurisdiction challenge.  This

does not flow from any value judgment on the jurisprudence of the Qianhai

H   Court but is simply an incidence of the legal principles as I find to be

I   applicable in this case.

J   66.      Fourthly, to be placed in the balance against comity

K   considerations is the unambiguous policy of the Hong Kong courts in

support of arbitration.   Arbitral agreements and processes require the

L   support and protection of the courts.  As has been observed by Lord

M   Hoffmann in *The Front Comor* [2007] UKHL 4 at §19, the jurisdiction to

grant anti-suit injunction is an "important and valuable weapon in the hands

N   of a court exercising supervisory jurisdiction over the arbitration" against a

O   person who ought to be required to observe the arbitration agreement but

has instead brought proceedings elsewhere.  "It promotes legal certainty and

P   reduces the possibility of conflict between the arbitration award and the

Q   judgment of a national court."

R   67.      Fifthly, whereas there was uncontradicted evidence in *Sea*

*Powerful II* that the Mainland courts there would be likely to regard the

S   application for anti-suit injunction as "an intrusion or obstruction of the

T

U

V

A

B   judicial sovereignty of the Chinese courts"[13], in the present case there is

C   evidence that the relevant court — the Qianhai Court — is a "judicial reform demonstration court", which is a recently-established court

D   receptive to common law principles: a substantial number of its judges had

E   studied common law in universities in Hong Kong and co-adjudicators from Hong Kong are involved from time to time in cases involving this territory.

F   The available evidence from the Qianhai Court itself concerning its policy

G   is that:

H        " by taking advantage of its centralized jurisdiction over
         foreign-related and Hong Kong, Macao, Taiwan-related cases,
I        [the Qianhai Court] learns from and draws on internationally
         applicable judicial philosophies, promotes the reform of the
         foreign-related and Hong Kong, Macao, Taiwan-related judicial
J        mechanism, widens and deepens external exchange and
         cooperation, so as eventually to improve China's judicial
K        credibility, both inter-regional and international."[14]

L   68.        Sixthly, the Qianhai Court has not applied Hong Kong law in reaching its jurisdictional decision.  With its emphasis on cross-border legal

M   disputes and innovative outlook it will readily appreciate that the

N   application of Hong Kong law to the issues may lead to conclusions different from those it has reached apparently without assistance from the

O   parties on Hong Kong law.  There are numerous authorities in the common

P   law in which the court granted an anti-suit injunction in favour of a party who had not submitted to the foreign jurisdiction notwithstanding that the

Q   foreign court had ruled in favour of its own jurisdiction.  The fact that the

R   foreign court did not apply correctly or at all the law of the forum jurisdiction was a significant consideration: *Akai Pty Ltd v People's*

S

---

T   [13]      §23 of the Court of Appeal's judgment.

U   [14]      See *White Paper of the People's Court of Shenzhen Qianhai Cooperation Zone on Serving and Safeguarding Development of Free Trade Zone* (2018).

V

A

B

C

D

E

F

G

H

I

J

K

L

M

N

O

P

Q

R

S

T

U

V

*Insurance Co Ltd* [1998] 1 Lloyd's Rep 90, 105-106; *Donohue v Armco Inc* [2000] 1 Lloyd's Rep 579, §§49-51 & 96[15]; see also *AES Ust-Kamenogorsk Hydropower Plant LLP v Ust-Kamenogorsk Hydropower Plant JSC*, cited at §59 above.  Giving effect to the choice of governing law is an important consideration having a potential bearing on the substantive rights of the parties.

69.        Seventhly, in support of his argument on comity, Mr Wong submitted that this case has strong connections with the Mainland and it is not appropriate for the Hong Kong courts to interfere.  I recognise that Fan is a Mainland resident, the Subsidiary is a Mainland company and the project is situated in the Mainland.  But at the same time it must not be forgotten that the Company — the joint venture vehicle — is a Hong Kong company, the contract is governed by Hong Kong law and stipulates that "[a]ny dispute, controversy or claim arising out of or relating to" the agreements is to be submitted to arbitration in Hong Kong under Hong Kong arbitration rules.  These features are explicable by the fact the foreign and Chinese investors have consciously chosen Hong Kong (a Special Administrative Region albeit part of China) as a mutually acceptable neutral ground, quite possibly for some of the reasons mentioned in *Fiona Trust* referred to in §25 above.  Such choices are an important part of the bargain between commercial men, and should not be easily neglected or thwarted.

70.        It was also submitted on behalf of Fan that it was reasonable for him to bring proceedings in the Mainland because that is where the Companies' assets are located.  In my opinion this factor carries little weight.  There is nothing to suggest that if Fan brings his claim by

---

[15]        The appeal to the House of Lords did not affect the present point: [2002] 1 Lloyd's Rep 425.

A

B

C

arbitration and obtains an award in his favour, it will not be readily enforced by the Mainland courts.

D

E

F

G

H

I

71.       Finally, I should mention, if only to register this court's disapproval of it, that it was submitted on behalf of Fan that any injunction granted would be "wholly toothless".[16]  As a thinly veiled threat of non-compliance, it is in my opinion not a reason at all against granting an injunction.  As has been said long ago in *Re Liddell's Settlement Trust* [1936] Ch 365 at 374: "It is not the habit of this court in considering whether or not it will make an order to contemplate the possibility that it will not be obeyed"; see also *Castanho v Brown & Root (UK) Ltd* [1981] AC 557, 574; *South Buckinghamshire District Council v Porter* [2003] 2 AC 558, §32.

J

K

*H.       Fan's belated summons to set aside service or for stay*

L

M

N

72.       There was in addition a late summons taken out by Fan seeking to set aside service of the originating summons on him, alternatively a stay of these proceedings on the ground of *forum non conveniens*, which was given short shrift at the hearing.

O

P

Q

R

S

73.       After the originating summons was issued, numerous steps were taken by the Companies to have it served on Fan, including through the Hong Kong solicitors who had been acting for DHE in the petition proceedings (which also turn out to be the firm who now act for Fan in these proceedings) and service at the Hong Kong address given by Fan himself in his affirmations filed in the petition proceedings and in the corporate filings for DHE in Hong Kong.  Eventually service was effected on Fan

T

U

V

---

[16]       §55 of Fan's Skeleton Submissions.

- 36 -

A

B   pursuant to leave to serve out granted by Deputy Judge William Wong SC

C   on 7 December 2018, who also directed that the originating summons be

    heard on 31 January 2019 together with the extant summons for strike out

D   and stay in the petition proceedings.  Leave to serve out was based on RHC

E   Order 11 rule 1(1)(d)(iii), namely, that the claim is brought to enforce a

    contract governed by Hong Kong law: see *The Jay Bola*, at p 1002H-1003D.

F

G   74.      Fan did not then say he was not properly served or that the

    originating summons should not be heard.  In fact, he took out a summons

H   in these proceedings on 4 January 2019, not to contest jurisdiction, but to

I   ask for later hearing dates for *substantive argument* of the originating

    summons, and submitted proposed procedural directions for that purpose

J   including directions for the filing of evidence by Fan "in opposition to" the

K   originating summons which clearly meant evidence on the merits of the

    originating summons.  Fan's summons was heard by Au-Yeung J on

L   10 January 2019, when his counsel (not Mr Wong) addressed the court as

M   to why further time was needed by reference to the substantive arguments

    on the originating summons.  Not a word was said that could remotely

N   suggest Fan would contest jurisdiction.

O   75.      It was only on 23 January 2019 that Fan issued his late

P   summons, supported by his affirmation made on 21 January and filed on

    22 January.  Without obtaining directions from the court, Fan procured the

Q   summons to be fixed for hearing on 31 January 2019 at 10am for 3 minutes.

R

S   76.      In these circumstances what was done was in my view an

    abuse and at the hearing I declined to spend any time on this eleventh-hour

T   summons.  It seems to me clear that Fan voluntarily recognised this court

U

V

A

B    has jurisdiction to hear and determine the originating summons.  The stance

C    and steps taken by him or on his behalf up to 23 January (or at least
     21 January) were not explicable except on the basis that he accepted this

D    court should hear the originating summons substantively.  The summons of

E    23 January was a monumental afterthought and came far too late.   In
     addition, the stay sought on *forum non conveniens* grounds seems to me

F    nonsensical.  How the Qianhai Court can possibly be the more appropriate

G    forum for the trial of the claim for an anti-suit injunction escapes me.  If
     instead what is being said is that the underlying claim for the success fee

H    will be more appropriately tried in the Qianhai Court, then this is simply an

I    argument against the anti-suit injunction on the merits, and the application
     for stay is a surplusage that can serve no purpose other than obfuscation of

J    the real issue.

K
     *I.    Conclusion*

L    77.        For the above reasons there will be an injunction in terms of

M    the originating summons upon the condition that the Companies shall

N    reimburse Fan as to his reasonable costs incurred in the jurisdictional
     challenge and appeal in the Qianhai proceedings.  There will further be an

O    order *nisi* that Fan do pay the Companies the costs of these proceedings, to

P    be taxed if not agreed, with certificate for two counsel.

Q

R

                                        (Godfrey Lam)
S                              Judge of the Court of First Instance
                                         High Court
T

U

V

- 38 -

A

B          Ms Rachel Lam, Mr Terrence Tai and Ms Jasmine Cheung, instructed by
               Angela Wang & Co, for the Plaintiffs

C          Mr Anson Wong SC, Mr Alan Kwong and Mr Michael Ng, instructed by
D              William KW Leung & Co, for the Defendant

E

F

G

H

I

J

K

L

M

N

O

P

Q

R

S

T

U

V

# EXHIBIT 10

A

HCMP 2216/2018

[2020]  HKCFI 1793

B

**IN THE HIGH COURT OF THE**

C

**HONG KONG SPECIAL ADMINISTRATIVE REGION**

**COURT OF FIRST INSTANCE**

D

MISCELLANEOUS PROCEEDINGS NO 2216 OF 2018

————————————

E

BETWEEN

F

AIG INSURANCE HONG KONG LIMITED          Plaintiff

G

and

H

LYNN MCCULLOUGH                    1st Defendant

I

WILLIAM MCCULLOUGH               2nd Defendant

————————————

J

K

Before:   Deputy High Court Judge Leung in Chambers

Date of Hearing:   18 October 2019

L

Date of Decision:   30 July 2020

M

————————————

N

D E C I S I O N

————————————

O

1.          The defendants ("the McCulloughs") are US citizens residing

P

in Texas, USA.   The plaintiff ("AIG") has obtained ex parte[1]  from this

court an anti-suit injunction, together with leave for service of proceedings

Q

out of jurisdiction, enjoining the McCulloughs from taking further action

R

in their legal proceedings against AIG in the court of the State of Miami,

Florida, USA without compliance with the relevant insurance policy, in

S

particular the Hong Kong arbitration clause.     AIG applied for

T

————————————

U

[1]  On notice.

V

- 2 -

continuation of the injunction[2], whereas the McCulloughs applied to have it discharged and the leave to serve out set aside or the proceedings herein stayed.   The applications went before DHCJ Blair.   The learned deputy judge handed down his decision on 3 July 2019.   He allowed AIG's application, continued the injunction subject to adjustment in terms, and dismissed the McCulloughs' applications ("the Decision").   He also handed down his decision on costs on 16 August 2019 ("the Costs Decision").

2.        This is the McCulloughs' application for leave to appeal against both the Decision and the Cost Decisions.

A.    *Background*

3.        Briefly, Mrs McCullough sustained serious personal injury during an excursion in the Caribbean, for which the McCulloughs filed a lawsuit in the Miami court for damages against the corporate defendants responsible for operating the excursion.   At one stage, the director of one of the defendants, Mr von der Goltz ("von der Goltz"), was also joined as a defendant.   Von der Goltz sought an indemnity under a director and officer liability insurance policy taken out by his company with AIG, which is subject to coverage limit of US$5 million ("the Policy").   AIG disputed coverage of von der Goltz in respect of the McCulloughs' claim, except for his defence costs.

---

[2]  Continued in the interim by DHCJ William Wong, SC on 28 December 2018 and Hon Au-Yeung J on 4 January 2019.

- 3 -

A

4.        The McCulloughs and those defendants then proceeded to arbitration with a "high-low agreement" behind, which set an agreed range of the award.    The arbitration award was eventually issued, and judgment was entered by the court in terms of the award against those defendants, including von der Goltz, in the sum of US$65.5 million, which is the top end of the agreed range.

5.        It was at that point when the McCulloughs amended their lawsuit in the Miami Court by joining AIG as a defendant for the purpose of what is known as a "bad faith" claim against it ("the Third Amended Complaint").    The "bad faith" claim, under Florida law, is a common law tort claim against AIG for allegedly failing to act in good faith in handling, litigating and settling the US proceedings as the insurer of von der Goltz. That resulted in a judgment in excess of the policy limits against von der Goltz as the insured.    The McCulloughs contended that had AIG honoured the Policy and provided von der Goltz with the US$5 million policy coverage, he would have been able to settle their claim.    AIG's failure has thus exposed von der Goltz to excessive liability under the US$65.5 million judgment.    The McCulloughs now have the right to claim against AIG directly for such sum.

6.        The Policy provides[3] that the governing law is that of Hong Kong, and any dispute in respect of, amongst others, the coverage shall be determined by HKIAC (Hong Kong International Arbitration Centre) arbitration in Hong Kong ("the Dispute Resolution Clause").    Therefore

---

[3] Clauses 8.9 and 8.12.

- 4 -

AIG filed a motion in the Miami Court to compel arbitration in Hong Kong and to dismiss the Third Amended Complaint.

7.      Meanwhile, AIG applied ex parte to this court on 18 December 2018 and obtained the anti-suit injunction with leave to serve out.

8.      In response, the McCulloughs applied in the US to enjoin AIG from taking any further steps in the legal proceedings in Hong Kong (effectively an anti-anti-suit injunction).

9.      The parties' respective inter partes applications in the Hong Kong Court mentioned above came before DHCJ Blair on 23 April 2019. The learned deputy judge reserved his decision after hearing.

10.     In the meantime, Hon Gayles J of the Miami Court handed down in May 2019 the following decision:

(1)     The bad faith claim may be brought by a third party whose claim against the insurance policy was the subject of the alleged bad faith.   The claim is founded upon the obligation of the insurer to pay when all the conditions under the policy would require an insurer, exercising good faith and fair dealing towards its insured, to pay.

(2)     The Florida court limits the bad faith claims against insurers to cases where coverage under the insurance policy *has been determined*.   An injured third party must first obtain a resolution of some kind in favour of the insured on the

- 5 -

coverage issue *before* pursuing the bad faith claim against the insurer.   The McCulloughs' claim against AIG in the absence of the determination of the underlying coverage in favour of the insured was premature.   Instead of dismissing the claim, the learned judge stayed the McCulloughs' lawsuit against AIG.

(3)   As to AIG's motion, according to Florida law, the McCulloughs were not signatories to the Policy and could not be bound by the arbitration agreement contained in the Policy, and therefore could not be compelled to arbitrate in Hong Kong.   AIG's motion was thus refused.

11.      Both the McCulloughs and AIG responded to the above decision of Gayles J.   The McCulloughs applied to lift the stay of proceedings and sought leave to further amend their complaint, this time to seek determination by the Miami Court of the coverage issue in their favour.   AIG lodged an appeal against the court's refusal to compel the McCulloughs to Hong Kong arbitration.

12.      Considering the further written submissions of the parties after the above decision of Gayles J, DHCJ Blair handed down the Decision.   As mentioned, the learned deputy judge dismissed the McCulloughs' applications and continued the anti-suit injunction subject to refinement of its wordings.   Costs were ordered in favour of AIG on a *nisi* basis.   The McCoulloughs applied to vary the *nisi* costs order, which DHCJ Blair refused (except for the costs of the call over hearing on 4 January 2019) ie, the Costs Decision.

- 6 -

13.	The McCulloughs seek to appeal almost every aspects of the Decision and the Costs Decision on the grounds set out in their draft notice of appeal.

B.	*Leave to appeal – the principles*

14.	Leave to appeal shall not be granted unless the appeal has a reasonable prospect of success, or there is some other reason in the interests of justice why the appeal should be heard: section 14AA of the High Court Ordinance, Cap 4.   Reasonable prospect of success involves the notion that the prospect of succeeding must be reasonable and therefore more than fanciful, without having to be probable: see *SMSE v KL* [2009] 4 HKLRD 125 at §17.

15.	Where the appeal is against the exercise of the discretion of the court below, the appellate court will not lightly interfere unless it is demonstrated that the court below has misunderstood the law or the evidence or the exercise of his discretion was plainly wrong such that it was outside the generous ambit within which a reasonable disagreement is possible: see *Mimi Kar Yee Wong Hung v Severn Villa Ltd* [2012] 1 HKLRD 887 at §31; *Hong Kong Civil Procedure 2020* (Vol 1) ("*HKCP*") at §59/2A/4.

C.	*Service out of jurisdiction*[4]

---
[4]  §§1-6 of the draft notice of appeal.

- 7 -

A

B

16.         For this part of the intended appeal, the McCulloughs argue as follows:

(1)    DHCJ Blair failed or erred in finding whether AIG has shown a good arguable case that its claim in this action falls within the scope of O11, r1(1)(d) of the Rules of the High Court, Cap 4A for service out.

(2)    The learned deputy judge failed to consider whether it is proper to grant leave for service out pursuant to O11, r4(2). The learned deputy judge also failed to consider adequately or at all the McCulloughs' application to set aside the leave for service out.

*C1. O11, r1(1)(d) – the contractual gateway to jurisdiction*

17.         It is argued that DHCJ Blair failed to consider whether AIG has shown a good arguable claim that is within the ambit of O11, r1(1)(d). Instead, he simply focused on whether AIG has shown a high degree of probability that the McCulloughs are bound by the Dispute Resolution Clause, which, they say, was also wrong.

18.         AIG commenced these proceedings for declaration and anti-suit injunction on the basis of the Dispute Resolution Clause, and took the contractual gateway to the Hong Kong jurisdiction.    There is the obvious question of whether the McCulloughs, who are claiming in tort in the Miami Court and as non-parties to the Policy, are bound by the clause to arbitrate in Hong Kong.    In answering the question, the first issue, again undisputed by the McCulloughs in the hearing before the learned deputy

judge[5], was the characterization of their claim in the Miami Court from the perspective of the Hong Kong Court exercising the supervisory jurisdiction of the arbitration under the clause.   It was argued that as the McCulloughs' claim against AIG is not contractual in nature and that they are not bound by the clause, the contractual gateway is not open to AIG. As the learned deputy judge summarized[6], this was exactly how the argument was advanced before him on behalf of the McCulloughs[7].

19.        DHCJ Blair disagreed with the argument advanced by the McCulloughs.   Applying the test, which was undisputed[8], DHCJ Blair characterized the substance of the McCulloughs' claim as contractual in nature and there is a high probability that the McCulloughs, albeit non-parties, are bound by the Dispute Resolution Clause.   Such conclusion mirrors a good arguable case in its claim for the declaration and anti-suit injunction in enforcement of the clause in this action.   Hence the availability of the contractual gateway to the Hong Kong jurisdiction.

20.        In the circumstances, the criticism by the McCulloughs in respect of how the learned deputy judge approached the question of whether the contractual jurisdiction gateway was open to AIG is not entirely fair.   As to DHCJ Blair's conclusion on the substance of the characterization of the McCulloughs' claim and the existence of a good arguable claim by AIG, and thus whether the gateway is indeed open to AIG, this is another ground of appeal discussed below.

---

[5] See section C2 of the submissions on behalf of the McCulloughs at the hearing on 23 April 2019.
[6] §§32; 52-53.
[7] See §4 and section C2 of the submissions at the hearing on 23 April 2019.
[8] §§31-32 of the submissions on behalf of the McCulloughs at the hearing on 23 April 2019.

- 9 -

A

B

C

D

E

F

G

H

I

J

K

L

M

N

O

P

Q

R

S

T

U

V

21.      The McCulloughs also take issue as to the scope of O11, r1(1)(d)(iii), which they say DHCJ Blair has failed to (adequately) consider.   Essentially, it is argued that all that AIG seeks is for the Hong Kong court to determine the policy coverage issue, which is a question of construction instead of a claim for substantive relief under the terms of the Policy.   They distinguish *Youell & Ors v Kara Mara Shipping Ltd & Ors* [2000] 2 Lloyd's Rep on the facts.

22.      In *Youell*, the claim for anti-suit injunction was incidental to the claim for a declaration in respect of the right of the underwriter claimants against the defendants to the effect that the underwriters were not liable to pay under the relevant insurance policies.   The McCulloughs say there is no such contractual claim for substantive relief in the present case.

23.      Literally, the gateway under O11, r1(1)(d)(iii) is open to a claim that is brought (i) to enforce, rescind, dissolve, annul or otherwise affect a contract; or (ii) to recover damages or obtain other relief in respect of the breach of a contract, such as contract being governed by Hong Kong law.   AIG claims declarations that the McCulloughs are bound by the Dispute Resolution Clause, and that any dispute regarding coverage under the Policy should be resolved in accordance with the mechanism agreed under that clause.   It seeks a corresponding order to restrain the McCulloughs from breach of that clause in the context of their Miami proceedings.   In that sense, the claim of AIG may well be categorized as one to enforce the contract, albeit apparently against non-parties.   In particular, it is difficult to see how the Chinese version of the word

A

B   "enforce" ("強制執行") in this paragraph of the sub-rule, which the McCulloughs deploy in their argument, serves to cast light on the meaning

C   of the word that, according to the McCulloughs, its English version is said

D   to fail to clearly convey.

E   24.        By substantive relief, one refers to the remedy claimed on the

F   basis of a party's legal rights: see *Kayden Ltd v SFC* (2010)

G   13 HKCFAR 696 at §27, citing *Mercedes-Benz AG v Leiduck* [1996] 1 AC 284 at 301-302, per Lord Mustill.    AIG is enforcing its contractual

H   right to have any dispute in respect of policy coverage determined by the agreed mechanism.    For a claim of such nature, declaration and injunctive

I   relief are indeed the effective relief: see *Youell* at §§44-45.    It cannot be

J   suggested that they are not substantive relief just because they *per se* do

K   not represent a contended result of the determination of the rights according to the terms of the Policy.    Nor can it be suggested that the

L   learned deputy judge extended the long-arm jurisdiction over what is no

M   more than an issue of construction of contract that does not fall within O11, r1(1)(d).

N

O   25.        For the above reasons, and subject to the discussion below in respect of the merits of AIG's claim, I have reservation about this part of

P   the intended appeal.

Q   *C2. Whether it was proper to grant leave to serve out/whether leave should*

R   *be set aside*

S

T

U

V

A

B

26.        DHCJ Blair summarized the grounds for the McCulloughs'
application that the leave to serve out should be set aside[9].   Apart from
arguing that AIG failed to show a high degree of probability that they are
bound by the Dispute Resolution Clause or a serious issue to be tried, the
McCulloughs also argued that in exercising his discretion DHCJ Blair
failed to consider whether this case is a proper one for service out within
O11, r4(2).   The argument is based on *forum conveniens* considerations,
namely that AIG failed to show that Hong Kong is distinctly and clearly
the most appropriate forum for the resolution of the dispute.

27.        DHCJ Blair ruled that the consideration of *forum conveniens*
does not arise[10].   Essentially, once it is decided that the party initiating
the foreign proceedings is bound by an agreement to arbitrate in the
contractual forum, the applicant for an anti-suit injunction in the
contractual forum need not show further that arbitration in the contractual
forum is more appropriate than the foreign proceedings.   As the learned
deputy judge quoted, "the parties' contractual agreement does that for
him", and this applies where a remote party is in effect seeking to enforce
the terms of the contract without regard to the dispute resolution
provision[11].

28.        The McCulloughs argue that the above reasoning of DHCJ
Blair is wrong in law.   They argue that even if they were bound by the
Dispute Resolution Clause, the present case is unique in that such
arbitration in Hong Kong will concern the coverage of the Policy, which

---

[9]  §32(1)-(3) of the Decision.
[10]  §§90-92 of the Decision.
[11]  §91 of the Decision, citing from *Ever Judger Holdings Co* at §58; *Qingdao Huiquan Shipping Company v Shanghai Dong He Xin Industry Group Co Ltd* [2018] EWHC 3009 at §35.

- 12 -

A

B

is merely one issue of their claim in the Miami Court.   DHCJ Blair, they argue, should have applied the *forum conveniens* considerations and refused to compel them to arbitration in respect of such issue in Hong Kong in these circumstances.   That, they suggest, is the approach set out in *Yantai Wanhua Polyurethanes Co Ltd v Pur Products Ltd* [2013] 1 HKLRD 590 and *HKCP* at §12/8/2.

29.        *Yantai* involved a choice of law instead of a choice of forum agreement, a material difference that Hon Anthony To J in that case cared to highlight, saying that the former was not to be elevated to the latter[12]. It was on this basis that the balancing exercise in the *Spiliada* argument became relevant in that case.

30.        §12/8/2 of *HKCP* relates to O12, r8, which provides that a defendant may dispute jurisdiction or ask the court to decline exercising jurisdiction over a claim initiated by the plaintiff in Hong Kong.   The grounds that the defendant may advance in support of such an application include that the plaintiff is bound by an exclusive jurisdiction agreement and that there are pending proceedings between the parties in respect of the same cause of action in another jurisdiction.   In such context, §12/8/2 refers to what the court said in *Lammas Global Corporation v Barclays Bank (Suisse) SA*, HCA 2411/2009 (13 April 2011)[13].

31.        In *Lammas Global Corporation*, the plaintiff commenced action in the Hong Kong Court, which was found to be in breach of the

---

[12] At §26.

[13] Where Hon Saunders J applied *The Eleftheria* [1969] 1 Lloyd's Rep 237, *The Pioneer Container* [1994] 2 AC 324 and *Noble Power Investment Ltd v Nissei Stomach Tokyo Co* [2008] 5 HKLRD 631.

- 13 -

exclusive jurisdiction clause (for the Swiss forum) in the contracts between the parties.   Hon Saunder J in that case made clear that he would not approach a jurisdiction challenge based on an exclusive jurisdiction clause by embarking upon a *Spiliada* balancing exercise because the view taken by the English and Hong Kong court is that a party should not be released from a contractual agreement as to jurisdiction on the basis of matters of convenience which were foreseeable at the time of their making of the agreement.   To successfully resist the defendant's application for stay, the plaintiff would need to cross the high hurdle of demonstrating that full effect should not be given to the exclusive jurisdiction clause for reasons not foreseeable at the time of contract.   Relying on that, the McCulloughs argue that they were not even parties to the Policy, let alone any contemplation at the time when the Policy was issued that they may become bound by the Dispute Resolution Clause.

32.      I doubt what the court said in *Lammas Global Corporation* assists the McCulloughs in the present context.   First, once it is established that there is a high probability that the McCulloughs, notwithstanding the fact that they are non-parties to the Policy, are bound by the Dispute Resolution Clause for the purpose of determination of the coverage issue, the fact that they are non-parties to the Policy, and therefore could not foresee that they would be so bound, cannot at the same time be a strong reason for not giving effect to the clause.   Second, the proceedings herein were commenced by AIG to enforce the agreed dispute determination mechanism in Hong Kong by way of declaratory and anti-suit injunctive relief.   It was for the claim for such relief that leave to serve out had to be considered.   As DHCJ Blair found, what Hon Godfrey Lam J said in *Dickson Valora Group (Holdings) Company Limited & Anor*

- 14 -

A

B

*v Fan Ji Qian* [2019] 2 HKLRD 173 applies in such context so that the Hong Kong Court should hardly decline jurisdiction on the ground that the foreign jurisdiction is somehow the more proper forum for determining the claim for such relief.

C

D

E

33.        In these circumstances, the McCulloughs could not be right in criticizing DHCJ Blair for failing to consider whether it was proper to grant the leave out pursuant to O11, r4(2).   There is equally no basis for the criticism that the learned deputy judge has failed to adequately consider the grounds of their application to set aside the leave to serve out.

F

G

H

I

34.        Similarly, when it came to whether the anti-suit injunction in the present context should be granted (the merits of which are challenged under the ground of appeal discussed below), DHCJ Blair never denied that the court retains a discretion.   Only that the court's approach is that unless there are strong reasons to the contrary, an anti-suit injunction will ordinary be granted to restrain a party from suing in a non-contractual forum[14].   In applying whether there are such strong reasons, the approach likewise does not fall within the *forum conveniens* principles that would have been applicable in the absence of such agreement[15].

J

K

L

M

N

O

P

Q

R

S

T

---

[14]  See §51 of the Decision.
[15]  See §92 of the Decision.

U

V

- 15 -

A
B
C
D
E
F
G
H
I
J
K
L
M
N
O
P
Q
R
S
T
U
V

*D.     Merits of the anti-suit injunction – characterisation of the McCullough's claim[16]*

35.        The key to the prospect of success of the intended appeal is the substance of DHCJ Blair's characterization of the McCulloughs' claim against AIG and whether the McCulloughs, albeit non-parties, should be bound by the Dispute Resolution Clause to arbitrate the issue of the policy coverage in Hong Kong.

36.        On behalf of the McCulloughs, it is argued that DHCJ Blair erred by failing to appreciate that their claim in the Miami Court as a whole is to assert an independent common law right of claim in tort[17].   In their reply submissions, they stress that their claim is wider in scope and entirely separate from any contractual claim under the Policy.    In the oral submissions on their behalf, it was emphasized that determination of the coverage is but one of the issues of their claim in the Miami Court.

37.        The Decision literally shows that DHCJ Blair did appreciate the nature of McCulloughs' bad faith claim.    After setting out the respective arguments of the parties[18], the learned deputy judge actually took a course which was both constructive to the McCulloughs' case and in line with the relevant case law of Florida, namely to approach the matter on the basis that the claim in the Miami Court is a common law tort claim, allowing a third party an independent right to sue an insurer where the insurer has failed to act in good faith in handling a claim brought by the

---

[16]  §§7-8 of the draft notice of appeal.
[17]  §28 of the written submissions on behalf of the McCulloughs.
[18]  §§63-64 of the Decision.

- 16 -

third party against an insured[19].   Only that such formulation of the claim according to the Florida law *per se* is not the answer to the characterization of such claim for the purpose before the Hong Kong Court.

38.        DHCJ Blair also recorded the parties' agreement that this is a matter of the *lex fori*, i.e., the law of Hong Kong[20].   The relevant case law[21] set down the principle that a party to an arbitration agreement will be held to the agreement.   This applies to a remote party to the agreement such as an insurer seeking to exercise the rights of the insured by way of subrogation and a third party seeking to exercise the rights of the insured against the insurer by virtue of statute.   It is this that gives rise to the need to distinguish between the case where the assertion of such third party's right, be it by way of subrogation or statute, is to enforce the obligation created by the contract and the case where it is to enforce a liability entirely independent of the contract.   DHCJ Blair noted that it is necessary to look beyond the formulation of the claim and to identify the question at issue[22]. He derived support from, amongst others, *The Prestige* [2015] 2 Lloyd's Rep 33.

39.        The learned deputy judge proceeded to apply the principle to the circumstances of the present case.   He found that the determination of the coverage is a requisite content of the obligation of AIG which is effectively the condition precedent to the right of direct claim by the McCulloughs against AIG in the Miami Court.   He concluded that this is contractual in nature under Hong Kong law.   Applying the principle in

---

[19]  §§65-66 of the Decision.
[20]  §55 of the Decision.
[21]  §§56-62 of the Decision.
[22]  §§60; 69 of the Decision.

*Dickson Valora Group (Holdings) Co Ltd* (above) and *Qingdao Huiquan Shipping Company v Shanghai Dong He Xin Industry Group Co Ltd* [2018] EWHC 2009 (Comm), the learned deputy judge concluded that AIG is entitled to prevent such determination from being pursued otherwise than by the contractually agreed mode, ie, arbitration in Hong Kong.

40.      The McCulloughs argues that DHCJ Blair has misread or misunderstood *The Prestige*, and that the application of the relevant law to the context of the present case was erroneous.   They also propose an analogy to be drawn with the situation where a contracting party sues a third party in tort for inducing breach of contract, in which there is an arbitration clause.

41.      The Decision in this respect is a reasoned one.   That said, as the learned deputy judge fairly acknowledged[23], difficult questions may arise as to how a particular claim brought by a remote party is to be characterized, and the characterization question in the present case is novel to the extent that it has not arisen in a similar factual context before. Considering the argument advanced on behalf of the McCulloughs in this respect, I am prepared not to rule out its prospect on appeal.   There is good reason for placing the characterization question in the context of the present case before the appellate court for consideration.

42.      In these circumstances, I am prepared to give leave in respect of this ground of appeal.   The outcome of the appeal on the characterization question will have bearing on whether AIG has a good

---

[23]  §§60; 67 of the Decision.

- 18 -

arguable case for engaging the contractual jurisdiction gateway for service out (see §16(1) above) and whether the leave to serve out should be set aside (see part of §16(2) above).   To that extent, I should give leave to the McCulloughs to appeal against the Decision in respect of that as well.

## E.     Exercise of discretion

### E.1 Abuse of process[24]

43.        The alleged abuse of process relates to delay and urgency. As to delay, the McCulloughs complained about the application for the anti-suit injunction being taken out on 18 December 2018 whilst AIG became aware of the claim against it at the end of October 2018.   As to urgency, the McCulloughs complained about AIG's decision to proceed by way of an ex parte application with notice which was illusory.

44.        DHCJ Blair rejected the complaint about delay, in view of the procedural history and the extent of the alleged delay[25].   The learned deputy judge sympathized with the complaint about the brevity of the notice of the ex parte application.   However, he found that overall, time was genuinely pressing and afforded AIG with sufficient reason to proceed the way it did in order to ensure that its position would be protected.   On these grounds, even if he were to discharge the ex parte injunction, the learned deputy judge would have been prepared to re-grant the injunction inter partes[26].

---

[24] §9 of the draft notice of appeal.
[25] §§87-89 of the Decision.
[26] §§83-84 of the Decision.

- 19 -

A

45.      I accept the submission on behalf of AIG that these are considerations that the learned deputy judge was entitled to take into account and the conclusion that he was in the circumstances entitled to reach.   As a matter of exercise of discretion, I am not satisfied that a reasonable prospect that the appellate court would interfere in this respect is shown.

*E2. Change of case*[27]

46.      This is framed in the draft notice of appeal under the ground of material non-disclosure.   The complaint of the McCulloughs before DHCJ Blair was that AIG proceeded ex parte and obtained an order to enjoin them from proceeding with their claim in the Miami Cout, whereas it made clear at the inter partes stage that it only sought to enjoin them from litigating the coverage issue.   They argued that the court, actually this court, was then misled into granting the injunction ex parte, and the injunction should have been discharged for material non-disclosure. DHCJ Blair did not agree that AIG has changed its case, and considered that its position was made sufficiently clear to this court at the ex parte hearing.   The learned deputy judge proposed that the terms of the injunction would need adjustment in order to put this beyond doubt[28].

47.      By way of submission, the McCulloughs argue that AIG's change of case *per se* suffices as a ground for discharging the injunction (and setting aside the leave to serve out).   Reliance is placed on *Kayden Ltd* (above).   *Kayden Ltd* is an authority for the strict approach of the

---

[27] §10 of the draft notice of appeal.
[28] §97.

court in exercising its discretion under O11.   The extraordinary nature of the long-arm jurisdiction asserted under O11 calls for special care on the plaintiff's part to ensure full disclosure to the court of the basis on which such jurisdiction is invoked, and to enable the defendant to be apprised of the nature of the claim which he has to meet, if and when he seeks to discharge the order for service out.

48.	Be that on the facts of *Kayden Ltd* or *Parker v Schuller* (1901) 17 TLR 299[29], the objectionable feature was invariably the attempt to assert at the inter partes stage another legal basis of claim or a distinct cause of action, which was not before the judge at the ex parte hearing. That would by nature be true change of case.

49.	Insofar as whether AIG has in fact changed its case on the scope of the claim for anti-injunction between the ex parte and the inter partes stages, what this court is called upon to do concerns purely whether DHCJ Blair erred in making his finding with reference to the materials before him.   Whilst I happen to be the coram at the ex parte stage, I would guard against introducing my understanding of the matter then. Otherwise it would constitute evidence from this bench that was not available at the hearing before DHCJ Blair.

50.	The fact is that the McCulloughs could not found its claim in the Miami Court without the coverage issue already determined in their favour.   That was always what drove AIG to insist on its right to have that issue resolved by the agreed mechanism under the Dispute Resolution

---

[29]  See §§35-41 of *Kayden Ltd*.

A B C D E F G H I J K L M N O P Q R S T U V

Clause.   That was the basis of its claim for the declaratory and anti-suit injunctive relief.   The affidavit evidence and submission before this court at the ex parte hearing as well as the attention of this court to the actual terms of the anti-injunction, as recorded by the transcript of the hearing, should speak for themselves.   I am of the view that DHCJ Blair was entitled, in view of these materials, to find that AIG has made its position sufficiently clear at the ex parte hearing, and there was no material change of case on the part of AIG at the inter partes stage.   In view of DHCJ Blair's finding that there was no change of case as such on the part of AIG, the circumstances here materially differ from the true case of change of position that brought about the conclusions in cases like *Parker* and *Kayden Ltd*.   The factual basis for this ground is thus lacking.

### E3. Inconsistent judgments between the Miami Court and the Hong Kong Court[30]

51.        The McCulloughs complain about AIG's steps taken in the Miami Court and then the present proceedings.

52.        AIG has entered appearance in the Miami Court to set aside the default judgment and to compel the McCulloughs to arbitration in Hong Kong.   With its appeal against the Miami Court's decision to refuse to accede to AIG's latter application, the application in Hong Kong for an anti-suit injunction, the McCulloughs argue, is for the same effect.

---

[30]  §13 of the draft notice of appeal.

A

B

C

53.       DHCJ Blair observed that the steps taken by AIG in the Miami Court were to resist instead of submitting to the jurisdiction.   Such observation must be correct.   The learned deputy judge considered the necessity for an anti-suit injunction in Hong Kong, in view of the fact that the McCulloughs filed a further amended complaint to seek to restore the Miami proceedings for the exact purpose of determining the coverage issue after Gayles J's decision in May 2019.   He also considered the proportionality of how AIG has acted in attempting first in the Miami Court and then in the Hong Kong Court to prevent the McCulloughs from pursuing in the Miami Court without complying with the agreed mechanism for resolving the coverage issue in Hong Kong.   This was what the learned deputy judge was entitled in the circumstances to conclude, and I do not agree he was wrong in principle.

54.       The McCulloughs also argue that the effect of continuing the anti-suit injunction amounts to inconsistent decisions in respect of the same subject between the two jurisdictions.   This is premised on their understanding of the decision of Gayles J as having the effect that the Miami Court is the appropriate and preferred forum to the Hong Kong Court for the resolution of the coverage issue.

55.       In the exercise of his discretion, DHCJ Blair did not lose sight of the principle of judicial comity, and that inconsistent decisions between jurisdictions in respect of the same matter should be avoided if possible[31]. However, the learned deputy judge did not accept that the anti-suit injunction granted by the Hong Kong Court would be inconsistent with the

---

[31]  §101 of the Decision.

Case 1:23-cv-22083-RAR   Document 34-2   Entered on FLSD Docket 07/21/2023   Page 183 of 186
- 23 -

decision of Gayles J.   First, the McCulloughs' understanding of the decision of Gayles is incorrect.   What Gayles J merely decided was that the McCulloughs, being non-parties to the Dispute Resolution Clause, could not be compelled under Florida law to arbitrate in Hong Kong. Second, and in any event, the enforceability of the Dispute Resolution Clause against the McCulloughs, be they parties to the Policy or not, is really a matter to be decided from the perspective of the Hong Kong Court exercising the supervisory jurisdiction of the arbitration by applying the Hong Kong law.   *Dickson Valora Group (Holdings) Company Limited* (above) refers.

56.        Subject to the ground in respect of which leave is granted as mentioned above, I am not satisfied that this ground has reasonable prospect of success on appeal.

## F.    Application for stay[32]

57.        The McCulloughs complain that whilst DHCJ Blair captured the grounds of their application for stay of proceedings in favour of the Miami Court, the learned deputy judge failed to consider the application adequately or at all.   In particular, the McCulloughs argue that the learned deputy judge considered *forum non conveniens* for the purpose of the anti-suit injunction but failed to do so in the context of the stay application.

58.        It appears to me that the distinction that the McCulloughs seek to make above is more theoretical than real.   Noting the case law that in the absence of strong contrary reason, an anti-suit injunction will

---

[32] §12 of the draft notice of appeal.

- 24 -

ordinarily be granted to restrain a claimant from pursuing proceedings in a non-contractual forum, and concluding that there is a high probability that the McCulloughs, albeit non-parties, are so bound by the Dispute Resolution Clause in the circumstances of the present case, the learned deputy judge indeed considered that *forum non conveniens* did not arise to defeat the enforcement of the clause.    As AIG points out, the application for stay on *forum non conveniens* principle became otiose.    In line with *Dickson Valora Group (Holdings) Company Limited* (above), it would also be odd to stay the proceedings here and prefer the Miami Court as the forum for the purpose of determining whether AIG should be entitled to the anti-suit relief and declaration sought in these proceedings.

## G.    The Costs Decision

59.    The ground of appeal against the Costs Decision is that even on the basis of the conclusion of the learned deputy judge, AIG should nevertheless be liable for the McCulloughs' costs of opposing the continuation of the injunction.   The major ground is the alleged change of case of AIG.

60.    As mentioned, the learned deputy judge did not accept that there was change of case, and hence no material non-disclosure either. Further, along with their opposition to the continuation of the injunction, the McCulloughs also took out their application for orders to set aside the leave to serve out and to stay the present action in favour of the proceedings in the Miami Court.   The learned deputy judge decided in favour of AIG and against the McCulloughs.

- 25 -

61.      In terms of the event of the various applications before him, the learned deputy judge was quite entitled to make the costs order that he did.   It cannot be said that his exercise of discretion as to costs, which he explained in the Costs Decision, was erroneous in principle.   I therefore do not see reasonable prospect that the appellate court would intervene in this respect.

## H.   Conclusion

62.      I give leave to appeal to the extent as summarized in §42 above.   Leave to appeal on the other grounds is refused.   For the avoidance of doubt, the Costs Decision, in respect of which leave to appeal on the grounds proposed is refused, will now be subject to the result of the appeal in respect of which the above leave is granted.

63.      In view of the above event of this application, half of the costs of this application should be to AIG to be taxed, if not agreed, with certificate for two counsel; and half of the costs of this application should be in the cause of the appeal.   I make a *nisi* costs order to that effect, which shall become absolute without further order of the court, if there is no application in 14 days for variation.

(Simon Leung)
Deputy High Court Judge

A               A

Mr Charles Manzoni SC, Mr Toby Brown instructed by Kennedys for the Plaintiff

B               B

Mr Benjamin Yu SC, Ms Elizabeth Cheung, Ms Jennifer Fan instructed by Luk & Partners in association with Morgan, Lewis & Bockius for the Defendants

C               C

D               D

E               E

F               F

G               G

H               H

I               I

J               J

K               K

L               L

M               M

N               N

O               O

P               P

Q               Q

R               R

S               S

T               T

U               U

V               V